**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------- X

PATRICIA OLIVIERI,                                    :
                                                      :        Civil Action No.:
                        Plaintiff,                    :
                                                      :
            v.                                        :        **COMPLAINT**
                                                      :
STIFEL, NICOLAUS & COMPANY,                           :
INCORPORATED,                                         :        **Jury Trial Demanded**
                                                      :
                        Defendant.                    :
--------------------------------------------------------------- X

Plaintiff Patricia Olivieri alleges against Defendant Stifel, Nicolaus & Company,

Incorporated ("Stifel" or the "Company") as follows:

### PRELIMINARY STATEMENT

1.      Ms. Olivieri has been a Registered Client Services Associate at Stifel's office in

Garden City, New York for approximately two years, and, during that time, she has been

subjected to egregious sexual assault and harassment by one of its leading Senior Investment

Managers, Neil Isler.  This harassment has included but not been limited to:

- ***Assaulting Ms. Olivieri by placing the palm of his hand on her buttocks without her consent;***

- ***Repeatedly speaking to Ms. Olivieri about rape, including telling Ms. Olivieri that his friend had drugged and raped a woman he knew;***

- ***Discussing with Ms. Olivieri that he regularly cheated on his wife;***

- ***Discussing with Ms. Olivieri sex he had with his mistress in his car and that his young children found a used condom;***

- ***Telling Ms. Olivieri that his wife likes to "get fucked really hard;"***

- ***Discussing with Ms. Olivieri that he and his wife had a threesome with another woman whom, from the way Mr. Isler described her, seemed to be a prostitute; and***

- ***Viewing pornography in his office and ensuring Ms. Olivieri saw it as well.***

2. Ms. Olivieri complained about this conduct to Stifel's management, and Stifel refused to take the matter seriously, failed to conduct a legitimate investigation and took measures only to protect Mr. Isler – a revenue producer – and shield the Company from potential exposure in litigation. Stifel's responsive measures included:

- Stifel allowed Mr. Isler to continue to work from Stifel's offices (i.e. not being placed on administrative leave or even asked to work from home) during the investigation process, despite being accused of egregious sexual harassment.

- During the investigation process, Zach Anderson (a Human Resources ("HR") employee at Stifel) admitted to Ms. Olivieri that certain of Ms. Olivieri's allegations were substantiated, but Mr. Isler was never disciplined in any way as he continued to work from the office and still does to this day.

- Stifel made it clear that it pre-determined the overall outcome of the investigation in favor of Mr. Isler. In communications between Ms. Olivieri and Mr. Anderson concerning Ms. Olivieri returning to work from administrative leave, Mr. Anderson dismissed Ms. Olivieri's safety concerns working in proximity to Mr. Isler, stating definitively that it did not create any safety issue, despite the fact that he said the investigation was ongoing and had not yet been concluded;

- Mr. Anderson has refused to convey to Ms. Olivieri the results of the investigation in a manner where she feels comfortable. Mr. Anderson said he would only convey the response in-person verbally, even though Ms. Olivieri said that created extreme anxiety for her and asked that the results be emailed to her.

3. Clearly, Stifel is more interested in protecting its bottom line than victims of discrimination, sexual assault, sexual harassment and retaliation. Stifel's willingness to stand by Mr. Isler after he sexually assaulted and harassed Ms. Olivieri is reprehensible and has forced Ms. Olivieri to continue to work in an environment where she feels unsafe and fears that Mr. Isler may assault her again.

4. Ms. Olivieri brings this action seeking injunctive, declaratory and monetary relief against Defendant for violations of the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL").

## ADMINISTRATIVE PROCEDURES

5.      Following the commencement of this action, Plaintiff will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").  Upon issuance of a Notice of Right to Sue from the EEOC, Plaintiff shall seek leave to amend this Complaint to include claims under Title VII.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) based on the diversity of residence between the named parties.

7.      Pursuant to 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

8.      Plaintiff Patricia Olivieri is a Registered Client Service Associate at Defendant Stifel, Nicolaus & Company, Incorporated who resides in Greenlawn, New York.  At all relevant times, Ms. Olivieri met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

9.      Defendant Stifel, Nicolaus & Company, Incorporated is a Missouri-registered foreign corporation with a principal place of business located at 501 North Broadway, St. Louis, Missouri 63102.  At all relevant times, Stifel met the definition of "employer" and/or "covered employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I. Background

10.     Ms. Olivieri is licensed as a General Securities Representative and Uniform Securities Agent in New York with several years of finance experience prior to joining Stifel.

11.     In late 2017 and early 2018, Stifel recruited Ms. Olivieri based on her experience in the finance industry, and, in February 2018, Ms. Olivieri agreed to join Stifel as a Registered Client Sales Associate and quickly established herself as an asset to the Company.

12.     By way of example only, Ms. Olivieri assisted Neil Isler (a Senior Investment Manager and her direct supervisor) in managing more than 1,500 clients and over $300 million in assets; procured over $11 million in assets that clients invested with Stifel; assisted with an audit of Stifel's Garden City branch that resulted in no adverse finding and actions; helped establish the Neil Isler Wealth Management Group at Stifel; and structured customized wealth management plans for clients.

13.     Throughout her employment at Stifel, Ms. Olivieri routinely received positive performance feedback, including from Mr. Isler and Robert Codignotto (Complex Branch Manager at Stifel's Garden City location and Mr. Isler's supervisor).  Ms. Olivieri believed she was working at a place where she could thrive and grow.

### II. Ms. Olivieri is Subjected to Egregious Sexual Harassment

14.     When she joined Stifel, Ms. Olivieri was assigned to perform various tasks for manager-level employees – Mr. Isler one among them – with the goal of having her eventually report to a single supervisor.

15.     Soon after Ms. Olivieri started, Mr. Isler began to visit Ms. Olivieri's cubicle on a daily basis and often visited her multiple times per day.

16.     None of Stifel's other supervisors visited Ms. Olivieri nearly as frequently as Mr. Isler.

17.     It quickly became clear to Ms. Olivieri that Mr. Isler was attempting to establish a relationship with her so that she would eventually be assigned to work under him.

18.     Ms. Olivieri initially thought that Mr. Isler was trying to recruit her solely based on the high quality of her work.

19.     However, Ms. Olivieri later learned that Mr. Isler targeted Ms. Olivieri so that he could sexually harass her and use his position of authority to pressure her into engaging in sexual activity with him.

20.     In June 2018, Ms. Olivieri was assigned to report to Mr. Isler directly.

21.     Mr. Isler immediately began to use his position as Ms. Olivieri's supervisor to grant or promise her certain compensation or work perks, only to then make Ms. Olivieri feel as if she "owed" him.

22.     For instance, as part of her assignment to him, Mr. Isler granted Ms. Olivieri a $10,000 guaranteed annual bonus that was paid out on a monthly basis.

23.     Most other employees at Ms. Olivieri's level are only paid bonuses of a few hundred dollars.

24.     Mr. Isler constantly reminded Ms. Olivieri of his generosity towards her.

25.     Mr. Isler also told Ms. Olivieri that he wanted her to be "happy at work," that she had a job with him "for life" and that she would receive guaranteed annual salary raises.

26.     In September 2018, Mr. Isler increased Ms. Olivieri's guaranteed bonus from $10,000 to $15,000 even though she had only been working under him for a few months.

27.     When Mr. Isler informed Ms. Olivieri of the increase to her bonus, he made it a point to tell Ms. Olivieri that he paid her substantially more than her coworker Gail Baron (a Senior Registered Client Service Associate) who also reports into Mr. Isler.

28.     However, the increased compensation that Mr. Isler provided to Ms. Olivieri and so-called job security came with strings attached.

29.     Shortly after starting to report directly to him, Mr. Isler began routinely calling Ms. Olivieri into his office throughout the workday and would have her remain in his office for extended periods of time.

30.     Mr. Isler made sure that only he and Ms. Olivieri were in his office and would instruct Ms. Olivieri to close the door after she entered.

31.     During these closed-door meetings, Mr. Isler engaged in wildly offensive sexual harassment, including on one occasion, placing his hand on Ms. Olivieri's buttocks without her consent and on other occasions subjecting her to conversations about sexual violence.

32.     It is impossible to list all the outrageous discriminatory and sexually harassing conduct to which Mr. Isler subjected Ms. Olivieri.  Below is just a small sampling of the egregious conduct Mr. Isler forced Ms. Olivieri to endure:

- On one occasion, Ms. Olivieri was in Mr. Isler's office and he got up from his chair, walked over to where Ms. Olivieri was standing and pretended to be grabbing something from his briefcase, which was on a chair next to where Ms. Olivieri was standing.  He got uncomfortably close to Ms. Olivieri and she could sense he was up to something.  Mr. Isler then **placed his palm on Ms. Olivieri's buttocks**.  Ms. Olivieri was shocked, frightened and tried not to react, hoping that he would remove his hand and walk away from her.  After a few moments, Mr. Isler removed his hand and walked back to his desk.  Ms. Olivieri quickly left his office in complete disgust and scared that he would touch her again.

- **Mr. Isler constantly brought up the topic of "rape" with Ms. Olivieri.  Mr. Isler actually told Ms. Olivieri that a friend of his had raped a woman he knows, and he talked about the act of rape in detail**.  Apparently, according to Mr. Isler, his friend was with a woman who was "messed up" due to being drugged.  The woman was passed

out and did not consent to any sexual activity, but his friend started having sex with her. The woman woke up while he was on top of her and tried to push him away and told him that she did not want to have sex with him, but his friend did not listen and continued the act to completion. Mr. Isler spoke about this incident as if it were a fantasy and with a big grin on his face. In fact, he brought the story up on several occasions, likely because Ms. Olivieri attempted to demonstrate her level of discomfort with the topic and the manner in which Mr. Isler spoke about it, and Mr. Isler took pleasure in her reaction. He even asked Ms. Olivieri whether the conversation made her uncomfortable and she said that it did – but he continued to bring it up. Mr. Isler asked Ms. Olivieri if anyone had ever done anything like that to her.

- Mr. Isler would raise the topic of rape in other contexts. For instance, on one occasion, Mr. Isler brought up that someone had been raped in Atlantic Beach, New York. Mr. Isler viewed this as a great topic of office discussion and raised it with Ms. Olivieri and Ms. Baron, again with a grin on his face making it clear that he was fascinated and titillated with the topic.

- Mr. Isler's fascination with rape, together with him touching her without her consent and other offensive conduct described herein, caused Ms. Olivieri to fear that Mr. Isler would rape her. Mr. Isler would often lurk in the hallway and wait for her to leave the office for the day so he could walk with her to her car. These moments created fear and anxiety for Ms. Olivieri as she was constantly concerned that he might touch or otherwise assault her while they were away from the people in the office.

- **Mr. Isler also talked in graphic detail about his sex life with his wife**. For instance, **Mr. Isler once called Ms. Olivieri into his office and told her to shut the door. Mr. Isler proceeded to tell Ms. Olivieri that his wife liked to "get fucked really hard" and asked Ms. Olivieri "do you like to get fucked hard?"** Ms. Olivieri refused to answer, but Mr. Isler tried to pressure Ms. Olivieri to answer and repeatedly said "well do you?" Ms. Olivieri responded that she would not answer his question and left Mr. Isler's office as soon as she was able.

- **Mr. Isler also told Ms. Olivieri that he and his wife had anal sex and he really liked it**.

- **Mr. Isler asked Ms. Olivieri if she had or liked anal sex.** Ms. Olivieri refused to answer his questions.

- **Mr. Isler also told Ms. Olivieri that he and his wife had sex in his car and that they "made a mess."**

- On another occasion, Mr. Isler told Ms. Olivieri that he was taking a lunch break, and, when he returned, he called Ms. Olivieri into his office and told her to shut the door. Mr. Isler told her that he did not actually go to lunch. Instead, **Mr. Isler said that he met his wife and another woman and that they had a threesome. Mr. Isler then described the threesome in detail to Ms. Olivieri. Specifically, Mr. Isler told Ms. Olivieri that**

**the threesome started with Mr. Isler's wife and the other woman kissing each other. Mr. Isler also said that the other woman in the threesome "went down on him."** From the way Mr. Isler described the threesome, it seemed this other woman may have been a prostitute. Additionally, Mr. Isler described the threesome as "amazing" and said that his wife wanted to have another threesome. Mr. Isler then said that he could not believe that he told Ms. Olivieri about the threesome but that he "really trusted her," which was a clear attempt to pressure Ms. Olivieri to not tell anyone about his wildly inappropriate behavior. **Mr. Isler then asked Ms. Olivieri if she had ever had a threesome, if she would ever have a threesome and several other questions about group sex.** Ms. Olivieri attempted to end the conversation and leave. Mr. Isler then stated, "I guess you're just really loyal to your husband, that's unusual." Mr. Isler also said that his wife would forgive him if she ever caught him cheating.

- **Over the next couple of weeks, Mr. Isler repeatedly told Ms. Olivieri that he "could not stop thinking about the threesome" he described to her and reiterated that he wanted to have another threesome**.

- **Mr. Isler also mentioned to Ms. Olivieri that he told his wife that he discussed the threesome with Ms. Olivieri.** There was nothing at all subtle about Mr. Isler's line of inquiry – he was blatantly attempting to pressure Ms. Olivieri to engage in group sex with him. These exchanges made Ms. Olivieri feel like she was a complete object in Mr. Isler's eyes. In the following weeks, Mr. Isler repeatedly brought up threesomes in his conversations with Ms. Olivieri.

- **Mr. Isler bragged to Ms. Olivieri that he cheated on his wife**. He mentioned that on one occasion he had sex with a mistress in his car. Mr. Isler then said that his children later found the used condom in the car and that he told his kids that the condom was "an old balloon." To Mr. Isler, this was apparently a funny joke. Ms. Olivieri thought it was disgusting.

- Mr. Isler made it very clear to Ms. Olivieri that he would often cheat on his wife – he seemed to want to make clear to Ms. Olivieri that he wanted to have sex with her and he also took pleasure in her discomfort. Mr. Isler proudly proclaimed to Ms. Olivieri that, "Sometimes I don't go right home when I leave work. Sometimes guys just need to get their rocks off." The insinuation was clear that Mr. Isler was engaging prostitutes.

- On November 19, 2019, Mr. Isler sent Ms. Olivieri a text message with the following link to an article titled "**Why do many young women prefer older men**":



Why do many young women prefer older men?

xuzzle.com

Clearly, by sending Ms. Olivieri the above link, Mr. Isler was trying to convince her that she should prefer an older man like himself. This was yet another attempt by Mr. Isler to persuade Ms. Olivieri to have sex with him.

- In early 2020, Mr. Isler instructed Ms. Olivieri to draft a client prospecting letter and to bring the letter into his office when she was done so that he could sign the letter. After she drafted the letter, Ms. Olivieri entered Mr. Isler's office and saw that he was watching pornography on his phone. **Mr. Isler positioned himself in such a way as to make sure that Ms. Olivieri could see that he was watching pornography when she entered**. Mr. Isler initially pretended that he did not realize Ms. Olivieri had entered his office and quickly put his phone away after he acknowledged her presence. Ms. Olivieri felt humiliated and tried to have Mr. Isler sign the letter so that she could quickly leave his office.

- On September 24, 2020, Mr. Isler commented to Ms. Olivieri and Ms. Baron that Elizabeth McManus (Office Coordinator for Stifel's Garden City location) was overweight. **Mr. Isler then said he was aware Ms. McManus "has a lot of sex" and "you would think she would be thinner with all that 'exercise' she does."** Mr. Isler then made a fist with one hand and pounded it into his other hand which he held flat. While he was pounding his fist into his hand, which he clearly intended to simulate sexual intercourse, Mr. Isler then asked Ms. Baron, **"doesn't having sex burn a lot of calories?"** Ms. Baron was visibly uncomfortable by Mr. Isler's question and tried to avoid eye contact with him. Ms. Baron then simply responded, "how should I know?" and tried to change the topic of conversation.

- Mr. Isler summoned Ms. Olivieri into his office and started discussing their colleague, Amanda Moran (Client Service Associate). Mr. Isler asked Ms. Olivieri if she had seen Ms. Moran's "tramp stamp," referring to a tattoo Ms. Moran has on her lower back. Ms. Olivieri said that she had not. Mr. Isler then stated that **Ms. Moran "looks like the kind of girl who is secretly a slut,"** that Ms. Moran "**must have had sex with a lot of guys**" and that Ms. Moran "**looks like a girl that would get gang banged."**

- **Mr. Isler claimed (almost certainly falsely) that Helen Giordano (Registered Client Service Associate) had a crush on him, would tell him that he is cute and wanted to have sex with him.**

- **Mr. Isler also asserted that Ms. Baron always tries to kiss him on the lips and claimed that she always bends down in front of him so that he can see her underwear and buttocks**.  Mr. Isler also claimed that on the way to a client meeting with Laurie Jacoby in Manhattan, Ms. Baron held his hand.

- Mr. Isler would often visit Ms. Olivieri's cubicle claiming that he "needed to show her something" on her computer.  Mr. Isler would stand over Ms. Olivieri and place his hand on top of Ms. Olivieri's hand and move her computer mouse.  **Mr. Isler intentionally leaned into Ms. Olivieri so that his crotch was close to touching her.  Mr. Isler would then say, "Oh sorry, am I too close?"**  Ms. Olivieri repeatedly told Mr. Isler not to stand over her or touch her hand.  However, Mr. Isler ignored Ms. Olivieri and continued to stand over her and place his hand on top of her hand.

- Bruce Gould (Financial Advisor at Stifel) has season tickets to the New York Rangers and sometimes gives tickets to Stifel employees.  One time, Mr. Isler overheard Mr. Gould offering tickets to Ms. Olivieri and walked into Mr. Gould's office and tried to invite himself to the game.  Mr. Gould told Mr. Isler that the tickets were not being offered to him and stated that Ms. Olivieri would go to the game with her husband.  Mr. Isler then left Mr. Gould's office, and, after Mr. Isler left, Mr. Gould said to Ms. Olivieri: "You do not want to go to the game with him, do you?"  Ms. Olivieri responded that she did not.

- **Mr. Isler once asked Ms. Olivieri if she only dated "big" guys, referring to men with large penises.**

- **Mr. Isler also has asked Ms. Olivieri on many occasions how many men she had slept with**.  Ms. Olivieri refused to answer each time she was asked, but Mr. Isler persisted and attempted to guess.  Specifically, in response to Ms. Olivieri refusing to answer, Mr. Isler said "Oh, come on.  I'll tell you," referring to the number of sexual partners he has had.  Mr. Isler also pressured Ms. Olivieri by asking "is it more than ten?"  Again, Ms. Olivieri refused to answer.  Mr. Isler then stated that because Ms. Olivieri would not answer, "it must be more than ten."

- As he would leave the office for the day, Mr. Isler would hug Ms. Baron and Ms. Olivieri and kiss them on their cheeks.  Mr. Isler's inappropriate and unprofessional behavior made Ms. Olivieri extremely uncomfortable, and, when she knew Mr. Isler would be leaving for the day, Ms. Olivieri often pretended to be on a phone call or got up from her desk to walk away before he could get to her desk, hoping that Mr. Isler would not try to hug or kiss her.  However, even when she pretended to be on the phone or got up from her desk, Mr. Isler would often still hug and kiss her.

- In October 2018, Ms. Olivieri was in a car accident that resulted in her sustaining injuries to her back. As a result of her injuries, Ms. Olivieri had to attend physical therapy appointments during which she received massage treatment. Ms. Olivieri would inform Mr. Isler when she had to attend an appointment, and, soon after she started the massage therapy, Mr. Isler asked Ms. Olivieri inappropriate questions such as, **"Do you keep your underwear on when you get massages, or do you get naked?"**

33. Ms. Olivieri was forced to endure Mr. Isler's conduct – which ranged from sexual harassment to sexual assault – on a daily basis.

34. Ms. Olivieri has suffered extreme distress and anxiety from this treatment, and she feared going to work, being around Mr. Isler or even speaking to him over the phone.

35. Ms. Olivieri felt that she wanted to vomit when thinking about being around Mr. Isler and going into work with him often gave her panic attacks.

### III. Ms. Olivieri Complains About Mr. Isler's Discriminatory and Harassing Conduct

36. As the Coronavirus pandemic began to spread throughout the country in March 2020, Stifel closed its physical offices and employees began to work remotely.

37. The silver lining, for Ms. Olivieri, was that she did not have to go into the office and work with Mr. Isler and worry about whether he might further touch or assault her.

38. In August 2020, Stifel reopened its offices and Stifel employees started working in the office part-time.

39. Upon her return to the office, Mr. Isler picked up where he left off with his heinous treatment of Ms. Olivieri.

40. Ms. Olivieri tried to avoid Mr. Isler as best she could, but Mr. Isler continued to call Ms. Olivieri into his office but she refused.

41. When Ms. Olivieri refused to go into Mr. Isler's office, Mr. Isler visited Ms. Olivieri's cubicle and attempted to step around a barrier placed at the entrance of Ms. Olivieri's cubicle as a measure to prevent the spread of the Coronavirus.

42.     However, each time Mr. Isler tried to sidestep the barrier, Ms. Olivieri told him not to come inside her cubicle.

43.     Mr. Isler picked up on the fact that Ms. Olivieri was trying to avoid him and, on September 21, 2020, visited Ms. Olivieri's workstation and asked if he could speak with her in his office.  Ms. Olivieri said that she did not feel comfortable meeting in Mr. Isler's office, and Mr. Isler said that he would call her from his office.

44.     On the call, Mr. Isler confronted Ms. Olivieri and asked her, "Do you like me? Because I like you."

45.     Mr. Isler's question made Ms. Olivieri very uncomfortable, and, after a few moments of silence, Mr. Isler asked if she felt pressured to answer "yes" to his question, and Ms. Olivieri said that she did.

46.     Mr. Isler next said that he wanted Ms. Olivieri to be happy and told her that he liked her and that he wanted to work with her "forever."

47.     During the call, Ms. Olivieri complained about Mr. Isler taking issue with her taking intermittent leave to care for her mother who was diagnosed with cancer in 2019 and to attend her own doctor's appointments.  Mr. Isler claimed that he had no issue with Ms. Olivieri taking leave, but it was clear from Mr. Isler's tone that he was not happy that Ms. Olivieri needed to take intermittent leave.

48.     In August 2020, Ms. Olivieri and Mr. Codignotto discussed Ms. Olivieri taking either the Financial Industry Regulatory Authority ("FINRA") Series 24 exam or the Series 9 and 10 exams.

49.     Beginning in September 2020, Stifel employees returned to working in the office full-time.

50.     Around the same time, Ms. Olivieri decided she wanted to take the FINRA Series 9 and 10 exams so that she could obtain a license to be a General Securities Sales Supervisor.

51.     Ms. Olivieri approached Mr. Codignotto about her desire to obtain the license and her desire to increase her compensation beyond its current base and bonus level.

52.     Mr. Codignotto told Ms. Olivieri that Stifel would be happy to sponsor her for these exams.

53.     Mr. Codignotto also admitted that Ms. Olivieri was undervalued at Stifel, and he wanted her to obtain the license as soon as possible because he needed someone to take on a General Securities Sales Supervisor role "right away."

54.     Additionally, Mr. Codignotto told Ms. Olivieri that her salary could double after she got the license.

55.     Towards the end of their meeting, Ms. Olivieri asked Mr. Codignotto if she could be transferred from reporting to Mr. Isler because she felt that he was disrespectful towards her.

56.     Mr. Codignotto inquired whether there was something specific Ms. Olivieri wanted to discuss, as Ms. Olivieri was clearly unnerved.

57.     Ms. Olivieri, sensing that Mr. Codignotto could already tell that something was wrong, left it at that at that point.

58.     On September 10, 2020, Ms. Olivieri called Mr. Codignotto to inform him that she was going to take a paid time-off ("PTO") day because heavy rain made it unsafe for her to drive to work.  Mr. Codignotto approved Ms. Olivieri's request.

59.     On September 14, 2020, Mr. Codignotto called Ms. Olivieri into his office and told her that Mr. Isler complained that she made her PTO request to Mr. Codignotto and not to him.

60. Mr. Codignotto also mentioned that Mr. Isler complained about Ms. Olivieri taking intermittent leave to care for her mother who had been diagnosed with cancer early in 2020.

61. Mr. Codignotto stated that Mr. Isler had a "power issue" and assured her that she did not need to worry about his complaint and that she did nothing wrong.

62. Mr. Codignotto then told Ms. Olivieri that she should take her Series 9 and 10 exams as soon as possible and that he may transfer her to another manager even before she obtained her license.

63. Ms. Olivieri expressed her concern that she would have to forgo her bonus payments if she were transferred from under Mr. Isler.

64. However, Mr. Codignotto assured Ms. Olivieri that her compensation would not be affected by any transfer.

65. On September 25, 2020, Mr. Isler emailed Ms. Olivieri and gave her an unnecessarily hard time about a project he had given her with very loose parameters and no definitive time frame.

66. After receiving Mr. Isler's email, Ms. Olivieri called Mr. Codignotto to complain that Mr. Isler was retaliating against her for avoiding him and refusing to engage with him in nonwork-related discussions.

67. In response, Mr. Codignotto told Ms. Olivieri not to worry and said that there was nothing Mr. Isler could do to her. He also stated that Ms. Olivieri may be able to work out of the Melville location but did not even suggest that Mr. Isler would have change offices or face any repercussions.

68.     Ms. Olivieri said that she was afraid to share the details of Mr. Isler's harassing conduct because she was worried about losing her job, Stifel pulling its support for her taking the Series 9 and 10 exams and jeopardizing her career.

69.     Mr. Codignotto told her that she should discuss her problems with Mr. Isler with an HR employee.

70.     Ms. Olivieri was still hesitant – given Mr. Isler's conduct and apparent "power issue" – to complain to HR out of fear of being retaliated against.

71.     Mr. Codignotto then suggested that they speak again at the Garden City location on Monday so she could take the weekend to decide how she wanted to address the situation. However, Mr. Codignotto did not legitimately prioritize the matter.

72.     On September 28, 2020, Ms. Olivieri called Mr. Codignotto's office number to further discuss the situation with Mr. Isler.

73.     However, Mr. Codignotto's secretary answered the phone and told Ms. Olivieri that she should text Mr. Codignotto's cell phone.

74.     After Ms. Olivieri sent Mr. Codignotto a text message asking to speak with him, Mr. Codignotto told Ms. Olivieri to call his cell phone.

75.     Ms. Olivieri then called Mr. Codignotto's cell phone, and he told her that he could not speak with her that day but that they could speak the following day.

76.     In effect, Ms. Olivieri was forced to chase Mr. Codignotto down to address Mr. Isler's harassing conduct.

77.     On September 29, 2020, when Ms. Olivieri arrived at work at the Garden City location, Mr. Isler immediately confronted Ms. Olivieri and told her that he wanted to discuss her projects and assignments.

78.     Ms. Olivieri then immediately went to Mr. Codignotto's office and complained that she was uncomfortable working in the same office as Mr. Isler and that Mr. Isler had just confronted her.

79.     Mr. Codignotto claimed that he needed more time to figure out how to address the situation, in part because he had been looking into her compensation and claimed he was not previously aware that Mr. Isler paid Ms. Olivieri a $15,000 guaranteed bonus.

80.     Mr. Codignotto did not explain how Ms. Olivieri's compensation had anything to do with her complaints of discomfort with Mr. Isler.

81.     Mr. Codignotto then told Ms. Olivieri that she should take the following day off while he figured out the situation.

82.     Almost immediately after Ms. Olivieri returned to her desk, Mr. Isler went to Mr. Codignotto's office, accused Ms. Olivieri of being "trouble" and claimed that Ms. Olivieri once told him that Mr. Codignotto told Ms. Olivieri that she "looked nice in her jeans" and that she said Mr. Codignotto's comment was inappropriate.

83.     Ms. Olivieri does not even wear jeans to work.

84.     Mr. Codignotto then called Ms. Olivieri back to his office and he told her what Mr. Isler said and asked, "Do we have a problem?"

85.     Ms. Olivieri replied that she did not have a problem with Mr. Codignotto and said that Mr. Isler was making false accusations against her because she complained about his behavior.

86.     The next day, on September 30, 2020, Mr. Codignotto told Ms. Olivieri to take the next day off while he worked to "figure out the situation."

87.     Mr. Codignotto subsequently sent Ms. Olivieri a text message stating that instead of taking off the following day she should report to the Melville location.

88.     On October 1, 2020, Ms. Olivieri worked out of the Melville location.

89.     Ms. Olivieri spoke with Mr. Codignotto on a phone call on October 1, 2020, but Mr. Codignotto again claimed that he needed more time to address her complaints.

90.     On October 2, 2020, Ms. Olivieri took a previously scheduled PTO day and attempted to contact Mr. Codignotto a couple of times to discuss the situation with Mr. Isler. However, Mr. Codignotto never responded to Ms. Olivieri's communications.

91.     Mr. Codignotto's repeated and continued failure to address Ms. Olivieri's complaints in a timely fashion shows that he did not take Ms. Olivieri's complaints seriously or make Ms. Olivieri a priority.

## IV.     Ms. Olivieri Engages in Further Protected Activity and is Placed on Administrative Leave

92.     On October 4, 2020, Ms. Olivieri called Mr. Codignotto and explained that she was anxious about complaining about Mr. Isler's behavior and how her complaints would affect her pay, job security and Stifel's support for her pursuing her General Securities Sales Supervisor license.

93.     Mr. Codignotto reiterated that Ms. Olivieri would not face retaliation but did not provide her with any guarantee that her pay would remain the same if she were transferred from under Mr. Isler.

94.     Mr. Codignotto then said that Ms. Olivieri would not be placed in a new position even after she obtained her General Securities Sales Supervisor license, walking back his earlier claim that he needed someone to take on a General Securities Sales Supervisor role "right away."

95.     Mr. Codignotto then said that Ms. Olivieri's complaints needed to be escalated to HR and that she should report to the Melville location the following day.

96.     That evening, Ms. Olivieri sent Mr. Codignotto a text message requesting a PTO day because she was suffering from anxiety.  Mr. Codignotto approved the request.

97.     On Monday, October 5, 2020, Zack Anderson (HR employee at Stifel) called Ms. Olivieri and said he would be looking into her complaints about Mr. Isler.

98.     Over the course of an approximate hour-long call with Mr. Anderson, Ms. Olivieri detailed Mr. Isler's sexually harassing behavior.  Ms. Olivieri complained about Mr. Isler's inappropriate conduct and comments, including the egregious behavior outlined above. See _supra_ at pp. 6-11.  At the end of the call, Mr. Anderson told Ms. Olivieri to take the following day off as well.

99.     On October 6, 2020, Mr. Anderson called Ms. Olivieri and said he would be speaking with Mr. Isler the next day and that he did not share the details of her complaints with Mr. Codignotto.

100.    Additionally, Mr. Anderson stated that Mr. Codignotto acknowledged that Ms. Olivieri was a strong performer and that she had shown initiative in seeking to obtain her General Securities Sales Supervisor license.

101.    Mr. Anderson also claimed that there would be a full investigation into Ms. Olivieri's claims but asserted his already determined conclusion that it was a "he said, she said" situation.

102.    On October 7, 2020, Mr. Anderson called Ms. Olivieri and said that Mr. Isler had been directed not to speak with her and that the investigation should be completed by the end of the week.

103.     On October 8, 2020, Mr. Anderson called Ms. Olivieri and conferenced in Marissa Ruser (another HR employee) so that she could be a "witness" to the call.

104.     Mr. Anderson then instructed Ms. Olivieri to keep her complaints confidential and to not disclose them with her colleagues or Mr. Codignotto.  This directive was in violation of the National Labor Relations Act.

105.     Mr. Anderson then asked Ms. Olivieri several follow-up questions.  Specifically, Mr. Anderson asked Ms. Olivieri if she had made any inappropriate comments during her conversations with Mr. Isler.  Mr. Anderson also asked Ms. Olivieri when she became aware that Mr. Isler had issues with her performance.

106.     Ms. Olivieri responded that she never engaged in any inappropriate comments or conduct at work and stated that she had already discussed Mr. Isler's false allegations regarding her performance with Mr. Codignotto.

107.     At the end of the call, Mr. Anderson told Ms. Olivieri that she would be placed on administrative leave and she should "stay home until further notice" and that he would contact her soon.

108.     On October 9, 2020, Mr. Anderson called Ms. Olivieri and *admitted* that Mr. Isler made inappropriate comments and that his behavior would be addressed.  However, Mr. Anderson did not explain how Mr. Isler would be reprimanded.

109.     Mr. Anderson then attempted to accuse Ms. Olivieri of also making inappropriate comments at work, completely disregarding the fact the Ms. Olivieri had told Mr. Anderson that she never made inappropriate comments just the day before, not to mention the fact that Mr. Isler is her boss not the other way around.

110.     In response, Ms. Olivieri again told Mr. Anderson that she had done nothing wrong.

111.     Mr. Anderson then told Ms. Olivieri that she could either return to work at the Garden City location, where Mr. Isler *would still be working*, or she could work permanently out of the Melville location.  Mr. Anderson did not even mention the possibility of Mr. Isler having to relocate offices.

112.     If she returned to the Garden City office, Mr. Anderson said that she could work for Michael Turansky, Michael Cox, Shelly Kramer and Eric Singer, who are all manager-level employees that manage only $1 to $2 million in assets.

113.     At the Melville location, Mr. Anderson said Ms. Olivieri could work for Kurt Uzbay, who also only manages around $2 million in assets.

114.     Mr. Isler manages over $300 million in assets and working for a manager that only manages $2 million would severely limit Ms. Olivieri's opportunities to work with high net-worth clients.

115.     Additionally, Mr. Anderson said that Stifel would increase her base salary from $47,470 to $55,000 and that she would receive a bonus between $3,000 to $5,000 for 2020, which would substantially reduce her compensation from the $63,500 all-in compensation that she had been earning under Mr. Isler.

116.     Mr. Anderson said that Ms. Olivieri could get back to him with her decision on Monday.  In response, Ms. Olivieri again complained that Mr. Isler had sexually assaulted and harassed her and that Stifel's response and the options provide to her were unacceptable.

## V.    **Stifel Conducts a Sham Investigation and Retaliates Against Ms. Olivieri**

117.     On October 12, 2020, Ms. Olivieri informed Stifel that she retained legal representation to protect herself and pursue claims of sexual harassment, gender discrimination and retaliation against the Company. Ms. Olivieri remained on administrative leave during this time and Stifel was supposedly investigating Ms. Olivieri's claims.

118.     On November 2, 2020, Ms. Olivieri, through her counsel, provided Stifel with correspondence containing a detailed written description of the extensive sexual harassment she had been subjected, as well as the retaliation following her complaints. This correspondence stated that Ms. Olivieri intended to pursue litigation of her claims.

119.     Despite Ms. Olivieri's initial internal complaints to Stifel, her October 12 correspondence from counsel and her November 2 correspondence from counsel, Mr. Isler remained working at the office on a daily basis.

120.     Stifel did not take any intermediary measures to ensure the safety and appropriateness of the workplace – such as placing Mr. Isler on administrative leave or directing that he work from home – while Ms. Olivieri's claims were under investigation.

121.     On November 5, 2020, while Stifel's investigation remained ongoing, Ms. Olivieri emailed Mr. Anderson and stated that she wanted to return to work from administrative leave on Monday, November 9, 2020. Ms. Olivieri posed several questions to Mr. Anderson about her return to work given that she had previously been thrust out of the workplace due to sexual harassment. Among the questions she posed were:

- What is the status of the investigation into my complaints?

- Who is involved in the investigation?

- Who is aware that I raised these complaints?

- What has been done to ensure the harassment against me ends?

- What steps have been taken to ensure that I will be physically safe?

- Will Mr. Isler be in the office at the same time as me?

122.    On November 6, 2020, Mr. Anderson responded and said among other things that "The investigation is still ongoing and has not been closed" and "Mr. Isler is still working in the Garden City office" where Ms. Olivieri would be returning to work.

123.    Later that day, Ms. Olivieri replied in part as follows:

> It is absolutely unacceptable that you are permitting Neil to continue working in the office after he has sexually harassed and assaulted me.   It is even more unacceptable that you are expecting me to go back to work in the same office where he will be present.  This demonstrates a complete lack of concern for my safety and for the protection of women who raise sexual harassment complaints.  I expect this to be taken seriously.  I cannot believe I even need to explain this to you.  Please confirm that Neil will not be in the office while I am there at the very least until your investigation is completed.  His presence will make me feel completely uncomfortable and unsafe.

124.    Mr. Anderson responded by dismissing Ms. Olivieri's concerns and stated definitively that Mr. Isler's presence did not create an unsafe environment, despite stating in a previous communication that the investigation was ongoing and had not yet been concluded.

125.    This response, together with the fact that Mr. Isler was *never* place on any sort of administrative leave following Ms. Olivieri's complaints, demonstrated that Stifel had pre-determined that it would find that Mr. Isler posed no threat and did not take Ms. Olivieri's complaints seriously, particularly once Ms. Olivieri retained counsel and the prospect of litigation became likely.

126.     Ms. Olivieri responded:

> Neil has sexually harassed and assaulted me. You say you are investigating that. Even though you have said your investigation is not complete, you seem to have already decided that the workplace is not unsafe. How can you possibly make such a flippant decision that concerns my safety if you are not even done with your investigation? Clearly you are not legitimately investigating my complaint and are not genuinely concerned for me or my safety. It seems you are simply protecting the company given that I have hired a lawyer and raised legal claims. I may not bring in revenue like Neil does, but that should not be factored into the way you investigate and treat employees.

127.     Despite the fact that Stifel refused to handle the matter with any level of seriousness, Ms. Olivieri determined that she would not let Mr. Isler and Stifel dictate her life, and she committed to returning to work even though it made her feel unsafe.

128.     Ms. Olivieri was all set to return to work on Thursday, November 12, 2020.

129.     On November 10, 2020, Mr. Anderson informed Ms. Olivieri that when she arrived at work that Deborah O'Connor (an HR employee) would meet with her, and with Mr. Anderson on the phone, to "discuss the investigation."

130.     Ms. Olivieri responded:

> I am not comfortable speaking to the two of you directly regarding the investigation and related topics-- it gives me a lot of stress and anxiety which is already extremely high due to the harassment and assault I've been subjected to by Neil. It also makes me uncomfortable as I do not feel that you are genuinely there to help me and really are just interested in protecting the company. I'd prefer it if all our communications about these matters go through email. Please confirm. Thank you.

131.     Mr. Anderson responded that he would not accommodate this request. He stated, "[r]egarding our meeting about the investigation and related topics, it is a matter of standard practice at the conclusion of an investigation that we discuss these topics with the person who filed a complaint."

132.     Contrary to Mr. Anderson's representation, Stifel's Associate Handbook states nothing whatsoever about any policy or practice to discuss in investigation verbally with employees.

133.     Upon information and belief, there is no "practice" at Stifel to discuss in investigation verbally with employees.

134.     Upon information and belief, there is no "practice" at Stifel requiring a refusal to provide Ms. Olivieri with a written explanation of the investigation results.

135.     In response, Ms. Olivieri implored Mr. Anderson to accommodate her request:

> As to the proposed meeting with you and Debra, again, I am not comfortable with that.  You have completely disregarded my feelings and mental health yet again by stating that I have to attend in person.  Whether Stifel has "standard practices" or not, you should be able to accommodate my mental health and my request to ensure that I do not feel uncomfortable or otherwise create a more stressful environment for me.  You have provided no reason to deny my request.  If you have questions, those can be asked via email.  If you have a conclusion to report (although clearly you are going to conclude whatever is in the company's best interest whether it is true or not), those can be communicated via email . . . I've also read through the employee handbook you sent me and it says nothing about having to do an in-person meeting, let alone one that makes me feel uncomfortable.  Please confirm that my wishes will be respected, and please do not ignore my email.

136.     Mr. Anderson refused to accommodate Ms. Olivieri's request and said that if she wanted the results it would only be provided in an in-person meeting, which he knew made her feel uncomfortable.

137.     On November 12, 2020, Ms. Olivieri returned to work, supporting a different set of investment professionals.  Mr. Isler remained in the workplace apparently facing absolutely no repercussions for his actions.

138.     To date, Stifel has refused to provide Ms. Olivieri with the results of the investigation unless she agrees for the results to be delivered verbally in-person.

139.     Stifel's response to Mr. Isler's conduct and Ms. Olivieri's complaints shows that the Company has no interest in legitimately investigating Mr. Isler and is not genuinely concerned for Ms. Olivieri's safety.  Rather, Stifel's conduct proves that the Company is only interested protecting its revenue producers and its own interests.

140.     Ms. Olivieri continues to work in a hostile work environment where she feels unsafe due to Mr. Isler's presence and unprotected by a Company that does not provide legitimate avenues for complaints of misconduct and remedial measures.

### FIRST CAUSE OF ACTION
**(Gender Discrimination and Hostile Work Environment in Violation of the NYSHRL)**

141.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

142.     Defendant has discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by, *inter alia*, subjecting her to a hostile work environment and denying her the equal terms and conditions of employment because of her gender.

143.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

144.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

145.     Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so

reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)

146.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

147.     Defendant has retaliated against Plaintiff on the basis of her protected complaints by, *inter alia*, engaging in conduct reasonably likely to dissuade and/or deter Plaintiff and others from engaging in protected acts.

148.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

149.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

150.     Defendant's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against Defendant for the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the State of New York;

B.      An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.      An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D.      An award of punitive damages in an amount to be determined at trial;

E.      Prejudgment interest on all amounts due;

F.      An award of Plaintiff's reasonable attorneys' fees and costs; and

G.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 5, 2021
      New York, New York            Respectfully submitted,

                             **WIGDOR LLP**

By: _____
             David E. Gottlieb
             Taylor J. Crabill

           85 Fifth Avenue
           New York, NY 10003
           Telephone: (212) 257-6800
           Facsimile: (212) 257-6845
           dgottlieb@wigdorlaw.com
           tcrabill@wigdorlaw.com

           *Counsel for Plaintiff*