**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
PATRICIA OLIVIERI,                            :
                                              :     Civil Action No.: 21-cv-00046
                              Plaintiff,      :     (JMA)(ARL)
                                              :
              v.                              :
                                              :
STIFEL, NICOLAUS & COMPANY,                   :
INCORPORATED, NEIL ISLER and ROBERT           :
CODIGNOTTO, in their individual and           :
professional capacities,                      :
                                              :
                              Defendants.      :
                                              :
-----------------------------------------------------------X

**DECLARATION OF ALFREDO J. PELICCI IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT**

I, Alfredo J. Pelicci, declare and state pursuant to 28 U.S.C. § 1746:

1.      I am a Senior Associate at the law firm Wigdor LLP (the "Firm"), counsel for

Plaintiff Patricia Olivieri ("Ms. Olivieri" or "Plaintiff") in the above-captioned matter against

Defendants Stifel, Nicolaus & Company, Incorporated ("Stifel" or the "Company"), Neil Isler,

and Robert Codignotto in their individual and professional capacities, (collectively

"Defendants").

2.      I have full knowledge of the facts set forth herein and submit this declaration with

the exhibits thereto in support of Plaintiff's Motion for Leave to File a Second Amended

Complaint. I have personal knowledge of the facts set forth herein.

3.      Attached hereto as Exhibit 1 is a clean version of Plaintiff's Proposed Second

Amended Complaint.

1

4.      Attached hereto as Exhibit 2 is a redline comparison of the Proposed Second

Amended Complaint and the Amended Complaint.

5.      I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: August 15, 2022

_____
Alfredo J. Pelicci

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X

PATRICIA OLIVIERI,

               Plaintiff,

           v.

STIFEL, NICOLAUS & COMPANY,
INCORPORATED, NEIL ISLER, ROBERT
CODIGNOTTO, CHRISTINA SCELTA and
JULIE GAFFNEY, in their individual and
professional capacities,

               Defendants.

-------------------------------------------------------------- X

Civil Action No.: 21-cv-00046 (JMA) (ARL)

**SECOND AMENDED COMPLAINT**

**Jury Trial Demanded**

Plaintiff Patricia Olivieri ("Plaintiff") alleges in this Second Amended Complaint against

Defendants Stifel, Nicolaus & Company, Incorporated ("Stifel" or the "Company"), Neil Isler,

Robert Codignotto, Christina Scelta and Julie Gaffney (collectively "Defendants") as follows:

**PRELIMINARY STATEMENT**

1.     Ms. Olivieri has been a Registered Client Services Associate at Stifel's office in

Garden City, New York for approximately four and a half years, and, during that time, she has

been subjected to egregious sexual assault and harassment by one of its leading Senior

Investment Managers, Neil Isler.  This harassment has included but not been limited to:

- ***Assaulting Ms. Olivieri by placing the palm of his hand on her buttocks without her consent;***

- ***Repeatedly speaking to Ms. Olivieri about rape, including telling Ms. Olivieri that his friend had drugged and raped a woman he knew;***

- ***Discussing with Ms. Olivieri that he regularly cheated on his wife;***

- ***Discussing with Ms. Olivieri sex he had with his mistress in his car and that his young children found a used condom;***

- ***Telling Ms. Olivieri that his wife likes to "get fucked really hard;"***

- ***Discussing with Ms. Olivieri that he and his wife had a threesome with another woman whom, from the way Mr. Isler described her, seemed to be a prostitute; and***

- ***Viewing pornography in his office and ensuring Ms. Olivieri saw it as well.***

2.      Ms. Olivieri complained about this conduct to Stifel's management, and Stifel refused to take the matter seriously, failed to conduct a legitimate investigation and took measures only to protect Mr. Isler – a revenue producer – and shield the Company from potential exposure in litigation.  Stifel's responsive measures included:

- Stifel allowed Mr. Isler to continue to work from Stifel's offices (i.e., not being placed on administrative leave or even asked to work from home) during the investigation process, despite being accused of egregious sexual harassment.

- During the investigation process, Zach Anderson (a Human Resources ("HR") employee at Stifel) admitted to Ms. Olivieri that several of Ms. Olivieri's allegations were substantiated, but Mr. Isler was never disciplined in any way as he continued to work from the office and still does to this day.

- Stifel made it clear that it pre-determined the overall outcome of the investigation in favor of Mr. Isler.  In communications between Ms. Olivieri and Mr. Anderson concerning Ms. Olivieri returning to work from administrative leave, Mr. Anderson dismissed Ms. Olivieri's safety concerns working in proximity to Mr. Isler, stating definitively that it did not create any safety issue, despite the fact that he said the investigation was ongoing and had not yet been concluded.

- Mr. Anderson has refused to convey to Ms. Olivieri the results of the investigation in a manner where she feels comfortable.  Mr. Anderson said he would only convey the response in-person verbally, even though Ms. Olivieri said that created extreme anxiety for her and asked that the results be emailed to her.

3.      Clearly, Stifel is more interested in protecting its bottom line than victims of discrimination, sexual assault, sexual harassment and retaliation. Stifel's willingness to stand by Mr. Isler after he sexually assaulted and harassed Ms. Olivieri is reprehensible and has forced Ms. Olivieri to continue to work in an environment where she feels unsafe and fears that Mr. Isler may assault her again.  Moreover, Stifel has engaged in a pattern of targeted retaliation and

harassment that coincides with Ms. Olivieri engaging in further protected activity, including the filing of an Amended Complaint and Supplemental Complaint in this matter.

4.       In particular, within less than 10 days of Ms. Olivieri filing her Amended Complaint on May 20, 2021 (Dkt. No. 19), Defendants: (i) followed through on previous threats of retaliation by assigning Ms. Olivieri to a different office that Ms. Olivieri previously objected to being assigned to; (ii) altered Ms. Olivieri's reporting structure; (iii) denied Ms. Olivieri a promotion that Mr. Codignotto previously indicated Ms. Olivieri would receive and gave the position to someone with lesser qualifications; (iv) threatened to increase Ms. Olivieri's workload while misrepresenting that she had previously requested that Defendants strip her of her job responsibilities; and (v) subjected Ms. Olivieri to an increasingly hostile work environment.

5.       As a result of Defendants subjecting Ms. Olivieri to a continuing campaign of retaliation and an ongoing hostile work environment, Ms. Olivieri filed a Supplemental Complaint in this matter on June 16, 2021.  (Dkt. No. 23).

6.       Since the filing of Ms. Olivieri's Supplemental Complaint, Defendants continue to retaliate against Ms. Olivieri and subject her to a hostile work environment.  In particular, Defendants: (i) continued requiring Ms. Olivieri to perform a purely administrative role that was inferior to her role as a Client Services Associate; (ii) withheld compensation from Ms. Olivieri in an unjustified manner that is inconsistent with Company practices; (iii) removed Ms. Olivieri from her Client Services Associate role and placed her in a diminished and unrelated role, thereby negatively impacting her career trajectory at Stifel; (iv) unnecessarily included one of Ms. Olivieri's harassers, Mr. Codignotto, in numerous communications with Ms. Olivieri despite Ms. Olivieri indicating that it caused her emotional distress; (v) isolated Ms. Olivieri and/or

failed to include Ms. Olivieri in important Company meetings; (vi) rejected Ms. Olivieri's requests for safety measures to prevent further harassment and retaliation by Mr. Codignotto and Mr. Isler; (vii) directed hostile treatment towards Ms. Olivieri in response to Ms. Olivieri engaging in additional protected activity by raising her concerns of ongoing harassment and retaliation with Stifel's HR, including but not limited to, insulting her, completely refusing to answer her legitimate questions, refusing to provide her with support, and belittling her accommodation requests to communicate in a way (in writing) that did not trigger her anxiety; and, (viii) and ordered Ms. Olivieri to utilize Paid Time Off ("PTO") in a manner that her colleagues are not required to.

7.      Defendants' conduct constitutes continued and ongoing unlawful discrimination and retaliation in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq.* ("NYSHRL").

8.      Ms. Olivieri brings this action seeking injunctive, declaratory and monetary relief against Defendants for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII") and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL").

## ADMINISTRATIVE PROCEDURES

9.      On January 5, 2021 Ms. Olivieri filed her initial Complaint in this matter.  (Dkt. No. 1).

10.      On January 11, 2021, Ms. Olivieri filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging unlawful discrimination and retaliation in violation of Title VII.

11.     On February 4, 2021, the EEOC issued Plaintiff a Notice of Right to Sue.

12.     Shortly thereafter, the Parties entered into a stipulation to toll the period of time that Ms. Olivieri would have to amend her Complaint to include claims under Title VII.  (Dkt. No. 18).

13.     On May 20, 2021, Ms. Olivieri filed an Amended Complaint that named Mr. Isler individually as a Defendant and raised additional claims of retaliation and hostile work environment.  (Dkt. No. 19).

14.     As a result of Defendants subjecting Ms. Olivieri to a continuing campaign of retaliation and an ongoing hostile work environment, Ms. Olivieri filed a Supplemental Complaint in this matter on June 16, 2021.  (Dkt. No. 23).

15.     On August 12, 2021, Plaintiff filed a supplemental Charge of Discrimination and Retaliation with the EEOC, alleging continuing and ongoing violations of Title VII.

16.     On September 15, 2021, the EEOC issued Plaintiff a Notice of Right to Sue as to the Supplemental Charge.

17.     The Parties entered into a joint stipulation whereby Defendants agreed not to argue that there is any deficiency in the Title VII claim asserted in Plaintiff's Supplemental Complaint on grounds that Plaintiff included the Title VII claim before receipt of the Notice of Right to Sue or failed to amend the Supplemental Complaint following receipt of the Notice of Right to Sue.  (Dkt. No. 31).

18.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action involves

federal questions regarding the deprivation of Plaintiff's rights under Title VII.

20.     This Court has supplemental jurisdiction over Plaintiff's related claims arising

under New York State law pursuant to 28 U.S.C. § 1367(a).

21.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a

substantial part of the events or omissions giving rise to this action, including the unlawful

employment practices alleged herein, occurred in this district.

## PARTIES

22.     Plaintiff Patricia Olivieri is a Registered Client Service Associate at Defendant

Stifel, Nicolaus & Company, Incorporated who resides in Greenlawn, New York.  At all relevant

times, Ms. Olivieri met the definition of an "employee" and/or "eligible employee" under all

applicable statutes.

23.     Defendant Stifel, Nicolaus & Company, Incorporated is a Missouri-registered

foreign corporation with a principal place of business located at 501 North Broadway, St. Louis,

Missouri 63102.  At all relevant times, Stifel met the definition of "employer" and/or "covered

employer" under all relevant statutes.

24.     Defendant Neil Isler is a Senior Vice President/Investments at Stifel, Nicolaus &

Company, Incorporated.  Upon information and belief, Defendant Isler is a resident of the State

of New York.  At relevant times, Defendant Isler supervised Plaintiff's employment and met the

definition of Plaintiff's "employer" under all relevant statutes.

25.     Defendant Robert Codignotto is a Senior Vice President/Investments and Branch

Manager of Garden City Complex at Stifel, Nicolaus & Company, Incorporated.  Upon

information and belief, Defendant Codignotto is a resident of the State of New York.  At relevant

times, Defendant Codignotto supervised Plaintiff's employment and met the definition of Plaintiff's "employer" under all relevant statutes.

26.     Defendant Christina Scelta is an Operations Manager at Stifel, Nicolaus & Company, Incorporated.  Upon information and belief, Defendant Scelta is a resident of the state of New York.  At relevant times, Defendant Scelta supervised Plaintiff's employment and met the definition of Plaintiff's "employer" under all relevant statutes.

27.     Defendant Julie Gaffney is a Senior HR Business Partner at Stifel, Nicolaus & Company, Incorporated.  Upon information and belief, Defendant Gaffney is a resident of the state of Missouri.

## FACTUAL ALLEGATIONS

### I.     Background

28.     Ms. Olivieri is licensed as a General Securities Representative and Uniform Securities Agent in New York with several years of finance experience prior to joining Stifel.

29.     In late 2017 and early 2018, Stifel recruited Ms. Olivieri based on her experience in the finance industry, and, in February 2018, Ms. Olivieri joined Stifel as a Registered Client Sales Associate and quickly established herself as an asset to the Company.

30.     By way of example only, Ms. Olivieri assisted Neil Isler (Senior Vice President/Investments and her direct supervisor) in managing more than 1,500 clients and over $300 million in assets; procured over $11 million in assets that clients invested with Stifel; assisted with an audit of Stifel's Garden City branch that resulted in no adverse finding and actions; helped establish the Neil Isler Wealth Management Group at Stifel; and structured customized wealth management plans for clients.

31.     Throughout her employment at Stifel, Ms. Olivieri routinely received positive performance feedback, including from Mr. Isler and Robert Codignotto (Complex Branch Manager at Stifel's Garden City location and Mr. Isler's supervisor).  Ms. Olivieri believed she was working at a place where she could thrive and grow.

**II.    Ms. Olivieri is Subjected to Egregious Sexual Harassment**

32.     When she joined Stifel, Ms. Olivieri was assigned to perform various tasks for manager-level employees – Mr. Isler one among them – with the goal of having her eventually report to a single supervisor.

33.     Soon after Ms. Olivieri started, Mr. Isler began to visit Ms. Olivieri's cubicle on a daily basis and often visited her multiple times per day.

34.     None of Stifel's other supervisors visited Ms. Olivieri nearly as frequently as Mr. Isler.

35.     It quickly became clear to Ms. Olivieri that Mr. Isler was attempting to establish a relationship with her so that she would eventually be assigned to work under him.

36.     Ms. Olivieri initially thought that Mr. Isler was trying to recruit her solely based on the high quality of her work.

37.     However, Ms. Olivieri later learned that Mr. Isler targeted Ms. Olivieri so that he could sexually harass her and use his position of authority to pressure her into engaging in sexual activity with him.

38.     In June 2018, Ms. Olivieri was assigned to report to Mr. Isler directly.

39.     Mr. Isler immediately began to use his position as Ms. Olivieri's supervisor to grant or promise her certain compensation or work perks, only to then make Ms. Olivieri feel as if she "owed" him.

40.     For instance, as part of her assignment to him, Mr. Isler granted Ms. Olivieri a $10,000 guaranteed annual bonus that was paid out on a monthly basis.

41.     Most other employees at Ms. Olivieri's level are only paid bonuses of a few hundred dollars.

42.     Mr. Isler constantly reminded Ms. Olivieri of his generosity towards her.

43.     Mr. Isler also told Ms. Olivieri that he wanted her to be "happy at work," that she had a job with him "for life" and that she would receive guaranteed annual salary raises.

44.     In September 2018, Mr. Isler increased Ms. Olivieri's guaranteed bonus from $10,000 to $15,000 even though she had only been working under him for a few months.

45.     When Mr. Isler informed Ms. Olivieri of the increase to her bonus, he made it a point to tell Ms. Olivieri that he paid her substantially more than her coworker Gail Baron (a Senior Registered Client Service Associate) who also reports into Mr. Isler.

46.     However, the increased compensation that Mr. Isler provided to Ms. Olivieri and so-called job security came with strings attached.

47.     Shortly after starting to report directly to him, Mr. Isler began routinely calling Ms. Olivieri into his office throughout the workday and would have her remain in his office for extended periods of time.

48.     Mr. Isler made sure that only he and Ms. Olivieri were in his office and would instruct Ms. Olivieri to close the door after she entered.

49.     During these closed-door meetings, Mr. Isler engaged in wildly offensive sexual harassment, including on one occasion, placing his hand on Ms. Olivieri's buttocks without her consent and, on other occasions, subjecting her to conversations about sexual violence.

50.     It is impossible to list all the outrageous discriminatory and sexually harassing conduct to which Mr. Isler subjected Ms. Olivieri.  Below is just a small sampling of the egregious conduct Mr. Isler forced Ms. Olivieri to endure:

- On one occasion, Ms. Olivieri was in Mr. Isler's office and he got up from his chair, walked over to where Ms. Olivieri was standing and pretended to be grabbing something from his briefcase, which was on a chair next to where Ms. Olivieri was standing.  He got uncomfortably close to Ms. Olivieri and she could sense he was up to something.  Mr. Isler then **placed his palm on Ms. Olivieri's buttocks**.  Ms. Olivieri was shocked, frightened and tried not to react, hoping that he would remove his hand and walk away from her.  After a few moments, Mr. Isler removed his hand and walked back to his desk.  Ms. Olivieri quickly left his office in complete disgust and scared that he would touch her again.

- **Mr. Isler constantly brought up the topic of "rape" with Ms. Olivieri.  Mr. Isler actually told Ms. Olivieri that a friend of his had raped a woman he knows, and he talked about the act of rape in detail**.  Apparently, according to Mr. Isler, his friend was with a woman who was "messed up" due to being drugged.  The woman was passed out and did not consent to any sexual activity, but his friend started having sex with her.  The woman woke up while he was on top of her and tried to push him away and told him that she did not want to have sex with him, but his friend did not listen and continued the act to completion.  Mr. Isler spoke about this incident as if it were a fantasy and with a big grin on his face.  In fact, he brought the story up on several occasions, likely because Ms. Olivieri attempted to demonstrate her level of discomfort with the topic and the manner in which Mr. Isler spoke about it, and Mr. Isler took pleasure in her reaction.  He even asked Ms. Olivieri whether the conversation made her uncomfortable and she said that it did – but he continued to bring it up.  Mr. Isler asked Ms. Olivieri if anyone had ever done anything like that to her.

- Mr. Isler would raise the topic of rape in other contexts.  For instance, on one occasion, Mr. Isler brought up that someone had been raped in Atlantic Beach, New York.  Mr. Isler viewed this as a great topic of office discussion and raised it with Ms. Olivieri and Ms. Baron, again with a grin on his face making it clear that he was fascinated and titillated with the topic.

- Mr. Isler's fascination with rape, together with him touching her without her consent and other offensive conduct described herein, caused Ms. Olivieri to fear that Mr. Isler would rape her.  Mr. Isler would often lurk in the hallway and wait for her to leave the office for the day so he could walk with her to her car.  These moments created fear and anxiety for Ms. Olivieri as she was constantly concerned that he might touch or otherwise assault her while they were away from the people in the office.

- **Mr. Isler also talked in graphic detail about his sex life with his wife**.  For instance, **Mr. Isler once called Ms. Olivieri into his office and told her to shut the door.  Mr.**

10

Isler proceeded to tell Ms. Olivieri that his wife liked to "get fucked really hard" and asked Ms. Olivieri "do you like to get fucked hard?" Ms. Olivieri refused to answer, but Mr. Isler tried to pressure Ms. Olivieri to answer and repeatedly said "well do you?" Ms. Olivieri responded that she would not answer his question and left Mr. Isler's office as soon as she was able.

- **Mr. Isler also told Ms. Olivieri that he and his wife had anal sex and he really liked it**.

- **Mr. Isler asked Ms. Olivieri if she had or liked anal sex.** Ms. Olivieri refused to answer his questions.

- **Mr. Isler also told Ms. Olivieri that he and his wife had sex in his car and that they "made a mess."**

- On another occasion, Mr. Isler told Ms. Olivieri that he was taking a lunch break, and, when he returned, he called Ms. Olivieri into his office and told her to shut the door. Mr. Isler told her that he did not actually go to lunch. Instead, **Mr. Isler said that he met his wife and another woman and that they had a threesome. Mr. Isler then described the threesome in detail to Ms. Olivieri. Specifically, Mr. Isler told Ms. Olivieri that the threesome started with Mr. Isler's wife and the other woman kissing each other. Mr. Isler also said that the other woman in the threesome "went down on him."** From the way Mr. Isler described the threesome, it seemed this other woman may have been a prostitute. Additionally, Mr. Isler described the threesome as "amazing" and said that he wanted to have another threesome. Mr. Isler then said that he could not believe that he told Ms. Olivieri about the threesome but that he "really trusted her," which was a clear attempt to pressure Ms. Olivieri to not tell anyone about his wildly inappropriate behavior. **Mr. Isler then asked Ms. Olivieri if she had ever had a threesome, if she would ever have a threesome and several other questions about group sex**. Ms. Olivieri attempted to end the conversation and leave. Mr. Isler then stated, "I guess you're just really loyal to your husband, that's unusual." Mr. Isler also said that his wife would forgive him if she ever caught him cheating.

- **Over the next couple of weeks, Mr. Isler repeatedly told Ms. Olivieri that he "could not stop thinking about the threesome" he described to her and reiterated that he wanted to have another threesome**.

- **Mr. Isler also mentioned to Ms. Olivieri that he told his wife that he discussed the threesome with Ms. Olivieri**. There was nothing at all subtle about Mr. Isler's line of inquiry – he was blatantly attempting to pressure Ms. Olivieri to engage in group sex with him. These exchanges made Ms. Olivieri feel like she was a complete object in Mr. Isler's eyes. In the following weeks, Mr. Isler repeatedly brought up threesomes in his conversations with Ms. Olivieri.

- **Mr. Isler bragged to Ms. Olivieri that he cheated on his wife**. He mentioned that on one occasion he had sex with a mistress in his car. Mr. Isler then said that his children

later found the used condom in the car and that he told his kids that the condom was "an old balloon."  To Mr. Isler, this was apparently a funny joke.  Ms. Olivieri thought it was disgusting.

- Mr. Isler made it very clear to Ms. Olivieri that he would often cheat on his wife – he seemed to want to make clear to Ms. Olivieri that he wanted to have sex with her, and he also took pleasure in her discomfort.  Mr. Isler proudly proclaimed to Ms. Olivieri that, "Sometimes I don't go right home when I leave work.  Sometimes guys just need to get their rocks off."  The insinuation was clear that Mr. Isler was engaging prostitutes.

- On November 19, 2019, Mr. Isler sent Ms. Olivieri a text message with the following link to an article titled "**Why do many young women prefer older men**":



Clearly, by sending Ms. Olivieri the above link, Mr. Isler was trying to convince her that she should prefer an older man like himself.  This was yet another attempt by Mr. Isler to persuade Ms. Olivieri to have sex with him.

- In early 2020, Mr. Isler instructed Ms. Olivieri to draft a client prospecting letter and to bring the letter into his office when she was done so that he could sign the letter.  After she drafted the letter, Ms. Olivieri entered Mr. Isler's office and saw that he was watching pornography on his phone.  **Mr. Isler positioned himself in such a way as to make sure that Ms. Olivieri could see that he was watching pornography when she entered**.  Mr. Isler initially pretended that he did not realize Ms. Olivieri had entered his office and quickly put his phone away after he acknowledged her presence.  Ms. Olivieri felt humiliated and tried to have Mr. Isler sign the letter so that she could quickly leave his office.

- On September 24, 2020, Mr. Isler commented to Ms. Olivieri and Ms. Baron that Elizabeth McManus (Office Coordinator for Stifel's Garden City location) was overweight.  **Mr. Isler then said he was aware Ms. McManus "has a lot of sex" and "you would think she would be thinner with all that 'exercise' she does."**  Mr. Isler then made a fist with one hand and pounded it into his other hand which he held flat.

12

While he was pounding his fist into his hand, which he clearly intended to simulate sexual intercourse, Mr. Isler then asked Ms. Baron, **"doesn't having sex burn a lot of calories?"**  Ms. Baron was visibly uncomfortable by Mr. Isler's question and tried to avoid eye contact with him.  Ms. Baron then simply responded, "how should I know?" and tried to change the topic of conversation.

- Mr. Isler summoned Ms. Olivieri into his office and started discussing their colleague, Amanda Moran (Client Service Associate).  Mr. Isler asked Ms. Olivieri if she had seen Ms. Moran's "tramp stamp," referring to a tattoo Ms. Moran has on her lower back.  Ms. Olivieri said that she had not.  Mr. Isler then stated that **Ms. Moran "looks like the kind of girl who is secretly a slut,"** that Ms. Moran "**must have had sex with a lot of guys**" and that Ms. Moran "**looks like a girl that would get gang banged."**

- **Mr. Isler claimed (almost certainly falsely) that Helen Giordano (Registered Client Service Associate) had a crush on him, would tell him that he is cute and wanted to have sex with him.**

- **Mr. Isler also asserted that Ms. Baron always tries to kiss him on the lips and claimed that she always bends down in front of him so that he can see her underwear and buttocks**.  Mr. Isler also claimed that on the way to a client meeting with Laurie Jacoby in Manhattan, Ms. Baron held his hand.

- Mr. Isler would often visit Ms. Olivieri's cubicle claiming that he "needed to show her something" on her computer.  Mr. Isler would stand over Ms. Olivieri and place his hand on top of Ms. Olivieri's hand and move her computer mouse.  **Mr. Isler intentionally leaned into Ms. Olivieri so that his crotch was close to touching her.  Mr. Isler would then say, "Oh sorry, am I too close?"**  Ms. Olivieri repeatedly told Mr. Isler not to stand over her or touch her hand.  However, Mr. Isler ignored Ms. Olivieri and continued to stand over her and place his hand on top of her hand.

- Bruce Gould (Financial Advisor at Stifel) has season tickets to the New York Rangers and sometimes gives tickets to Stifel employees.  One time, Mr. Isler overheard Mr. Gould offering tickets to Ms. Olivieri and walked into Mr. Gould's office and tried to invite himself to the game.  Mr. Gould told Mr. Isler that the tickets were not being offered to him and stated that Ms. Olivieri would go to the game with her husband.  Mr. Isler then left Mr. Gould's office, and, after Mr. Isler left, Mr. Gould said to Ms. Olivieri: "You do not want to go to the game with him, do you?"  Ms. Olivieri responded that she did not.

- **Mr. Isler once asked Ms. Olivieri if she only dated "big" guys, referring to men with large penises.**

- **Mr. Isler also has asked Ms. Olivieri on many occasions how many men she had slept with**.  Ms. Olivieri refused to answer each time she was asked, but Mr. Isler persisted and attempted to guess.  Specifically, in response to Ms. Olivieri refusing to answer, Mr. Isler said "Oh, come on.  I'll tell you," referring to the number of sexual

partners he has had.  Mr. Isler also pressured Ms. Olivieri by asking "is it more than ten?"  Again, Ms. Olivieri refused to answer.  Mr. Isler then stated that because Ms. Olivieri would not answer, "it must be more than ten."

- As he would leave the office for the day, Mr. Isler would hug Ms. Baron and Ms. Olivieri and kiss them on their cheeks.  Mr. Isler's inappropriate and unprofessional behavior made Ms. Olivieri extremely uncomfortable, and, when she knew Mr. Isler would be leaving for the day, Ms. Olivieri often pretended to be on a phone call or got up from her desk to walk away before he could get to her desk, hoping that Mr. Isler would not try to hug or kiss her.  However, even when she pretended to be on the phone or got up from her desk, Mr. Isler would often still hug and kiss her.

- In October 2018, Ms. Olivieri was in a car accident that resulted in her sustaining injuries to her back.  As a result of her injuries, Ms. Olivieri had to attend physical therapy appointments during which she received massage treatment.  Ms. Olivieri would inform Mr. Isler when she had to attend an appointment, and, soon after she started the massage therapy, Mr. Isler asked Ms. Olivieri inappropriate questions such as, **"Do you keep your underwear on when you get massages, or do you get naked?"**

51.    Ms. Olivieri was forced to endure Mr. Isler's conduct – which ranged from sexual harassment to sexual assault – on a daily basis.

52.    Ms. Olivieri has suffered extreme distress and anxiety from this treatment, and she feared going to work, being around Mr. Isler or even speaking to him over the phone.

53.    Ms. Olivieri felt that she wanted to vomit when thinking about being around Mr. Isler and going into work with him often gave her panic attacks.

## III.    Ms. Olivieri Complains About Mr. Isler's Discriminatory and Harassing Conduct

54.    As the Coronavirus pandemic began to spread throughout the country in March 2020, Stifel closed its physical offices and employees began to work remotely.

55.    The silver lining, for Ms. Olivieri, was that she did not have to go into the office and work with Mr. Isler and worry about whether he might further touch or assault her.

56.    In August 2020, Stifel reopened its offices and Stifel employees started working in the office part-time.

57.     Upon her return to the office, Mr. Isler picked up where he left off with his heinous treatment of Ms. Olivieri.

58.     Ms. Olivieri tried to avoid Mr. Isler as best she could, but Mr. Isler continued to call Ms. Olivieri into his office but she refused.

59.     When Ms. Olivieri refused to go into Mr. Isler's office, Mr. Isler visited Ms. Olivieri's cubicle and attempted to step around a barrier placed at the entrance of Ms. Olivieri's cubicle as a measure to prevent the spread of the Coronavirus.

60.     However, each time Mr. Isler tried to sidestep the barrier, Ms. Olivieri told him not to come inside her cubicle.

61.     Mr. Isler picked up on the fact that Ms. Olivieri was trying to avoid him and, on September 21, 2020, visited Ms. Olivieri's workstation and asked if he could speak with her in his office.  Ms. Olivieri said that she did not feel comfortable meeting in Mr. Isler's office, and Mr. Isler said that he would call her from his office.

62.     On the call, Mr. Isler confronted Ms. Olivieri and asked her, "Do you like me? Because I like you."

63.     Mr. Isler's question made Ms. Olivieri very uncomfortable, and, after a few moments of silence, Mr. Isler asked if she felt pressured to answer "yes" to his question, and Ms. Olivieri said that she did.

64.     Mr. Isler next said that he wanted Ms. Olivieri to be happy and told her that he liked her and that he wanted to work with her "forever."

65.     During the call, Ms. Olivieri complained about Mr. Isler taking issue with her taking intermittent leave to care for her mother who was diagnosed with cancer in 2019 and to attend her own doctor's appointments.  Mr. Isler claimed that he had no issue with Ms. Olivieri

taking leave, but it was clear from Mr. Isler's tone that he was not happy that Ms. Olivieri needed to take intermittent leave.

66.     In August 2020, Ms. Olivieri and Mr. Codignotto discussed Ms. Olivieri taking either the Financial Industry Regulatory Authority ("FINRA") Series 24 exam or the Series 9 and 10 exams.

67.     Beginning in September 2020, Stifel employees returned to working in the office full-time.

68.     Around the same time, Ms. Olivieri decided she wanted to take the FINRA Series 9 and 10 exams so that she could obtain a license to be a General Securities Sales Supervisor.

69.     Ms. Olivieri approached Mr. Codignotto about her desire to obtain the license and her desire to increase her compensation beyond its current base and bonus level.

70.     Mr. Codignotto told Ms. Olivieri that Stifel would be happy to sponsor her for these exams.

71.     Mr. Codignotto also admitted that Ms. Olivieri was undervalued at Stifel, and he wanted her to obtain the license as soon as possible because he needed someone to take on a General Securities Sales Supervisor role "right away."

72.     Additionally, Mr. Codignotto told Ms. Olivieri that her salary could double after she got the license.

73.     Towards the end of their meeting, Ms. Olivieri asked Mr. Codignotto if she could be transferred from reporting to Mr. Isler because she felt that he was disrespectful towards her.

74.     Mr. Codignotto inquired whether there was something specific Ms. Olivieri wanted to discuss, as Ms. Olivieri was clearly unnerved.

75.     Ms. Olivieri, sensing that Mr. Codignotto could already tell that something was wrong, left it at that at that point.

76.     On September 10, 2020, Ms. Olivieri called Mr. Codignotto to inform him that she was going to take a paid time-off ("PTO") day because heavy rain made it unsafe for her to drive to work.  Mr. Codignotto approved Ms. Olivieri's request.

77.     On September 14, 2020, Mr. Codignotto called Ms. Olivieri into his office and told her that Mr. Isler complained that she made her PTO request to Mr. Codignotto and not to him.

78.     Mr. Codignotto also mentioned that Mr. Isler complained about Ms. Olivieri taking intermittent leave to care for her mother who had been diagnosed with cancer in 2019.

79.     Mr. Codignotto stated that Mr. Isler had a "power issue" and assured her that she did not need to worry about his complaint and that she did nothing wrong.

80.     Mr. Codignotto then told Ms. Olivieri that she should take her Series 9 and 10 exams as soon as possible and that he may transfer her to another manager even before she obtained her license.

81.     Ms. Olivieri expressed her concern that she would have to forgo her bonus payments if she were transferred from under Mr. Isler.

82.     However, Mr. Codignotto assured Ms. Olivieri that her compensation would not be affected by any transfer.

83.     On September 25, 2020, Mr. Isler emailed Ms. Olivieri and gave her an unnecessarily hard time about a project he had given her with very loose parameters and no definitive time frame.

84.     After receiving Mr. Isler's email, Ms. Olivieri called Mr. Codignotto to complain that Mr. Isler was retaliating against her for avoiding him and refusing to engage with him in nonwork-related discussions.

85.     In response, Mr. Codignotto told Ms. Olivieri not to worry and said that there was nothing Mr. Isler could do to her.  He also stated that Ms. Olivieri may be able to work out of the Melville location but did not even suggest that Mr. Isler would have change offices or face any repercussions.

86.     Ms. Olivieri said that she was afraid to share the details of Mr. Isler's harassing conduct because she was worried about losing her job, Stifel pulling its support for her taking the Series 9 and 10 exams and jeopardizing her career.

87.     Mr. Codignotto told her that she should discuss her problems with Mr. Isler with an HR employee.

88.     Ms. Olivieri was still hesitant – given Mr. Isler's conduct and apparent "power issue" – to complain to HR out of fear of being retaliated against.

89.     Mr. Codignotto then suggested that they speak again at the Garden City location on Monday so she could take the weekend to decide how she wanted to address the situation. However, Mr. Codignotto did not legitimately prioritize the matter.

90.     On September 28, 2020, Ms. Olivieri called Mr. Codignotto's office number to further discuss the situation with Mr. Isler.

91.     However, Mr. Codignotto's secretary answered the phone and told Ms. Olivieri that she should text Mr. Codignotto's cell phone.

92.     After Ms. Olivieri sent Mr. Codignotto a text message asking to speak with him, Mr. Codignotto told Ms. Olivieri to call his cell phone.

93.     Ms. Olivieri then called Mr. Codignotto's cell phone, and he told her that he could not speak with her that day but that they could speak the following day.

94.     In effect, Ms. Olivieri was forced to chase Mr. Codignotto down to address Mr. Isler's harassing conduct.

95.     On September 29, 2020, when Ms. Olivieri arrived at work at the Garden City location, Mr. Isler immediately confronted Ms. Olivieri and told her that he wanted to discuss her projects and assignments.

96.     Ms. Olivieri then immediately went to Mr. Codignotto's office and complained that she was uncomfortable working in the same office as Mr. Isler and that Mr. Isler had just confronted her.

97.     Mr. Codignotto claimed that he needed more time to figure out how to address the situation, in part because he had been looking into her compensation and claimed he was not previously aware that Mr. Isler paid Ms. Olivieri a $15,000 guaranteed bonus.

98.     Mr. Codignotto did not explain how Ms. Olivieri's compensation had anything to do with her complaints of discomfort with Mr. Isler.

99.     Mr. Codignotto then told Ms. Olivieri that she should take the following day off while he figured out the situation.

100.    Almost immediately after Ms. Olivieri returned to her desk, Mr. Isler went to Mr. Codignotto's office, accused Ms. Olivieri of being "trouble" and claimed that Ms. Olivieri once told him that Mr. Codignotto told Ms. Olivieri that she "looked nice in her jeans" and that she said Mr. Codignotto's comment was inappropriate.

101.    Ms. Olivieri does not even wear jeans to work.

102.     Mr. Codignotto then called Ms. Olivieri back to his office and he told her what Mr. Isler said and asked, "Do we have a problem?"

103.     Ms. Olivieri replied that she did not have a problem with Mr. Codignotto and said that Mr. Isler was making false accusations against her because she complained about his behavior.

104.     The next day, on September 30, 2020, Mr. Codignotto told Ms. Olivieri to take the next day off while he worked to "figure out the situation."

105.     Mr. Codignotto subsequently sent Ms. Olivieri a text message stating that instead of taking off the following day she should report to the Melville location.

106.     On October 1, 2020, Ms. Olivieri worked out of the Melville location.

107.     Ms. Olivieri spoke with Mr. Codignotto on a phone call on October 1, 2020, but Mr. Codignotto again claimed that he needed more time to address her complaints.

108.     On October 2, 2020, Ms. Olivieri took a previously scheduled PTO day and attempted to contact Mr. Codignotto a couple of times to discuss the situation with Mr. Isler. However, Mr. Codignotto never responded to Ms. Olivieri's communications.

109.     Mr. Codignotto's repeated and continued failure to address Ms. Olivieri's complaints in a timely fashion shows that he did not take Ms. Olivieri's complaints seriously or make Ms. Olivieri a priority.

**IV.    Ms. Olivieri Engages in Further Protected Activity and is Placed on Administrative Leave**

110.     On October 4, 2020, Ms. Olivieri called Mr. Codignotto and explained that she was anxious about complaining about Mr. Isler's behavior and how her complaints would affect

her pay, job security and Stifel's support for her pursuing her General Securities Sales Supervisor license.

111.    Mr. Codignotto reiterated that Ms. Olivieri would not face retaliation but did not provide her with any guarantee that her pay would remain the same if she were transferred from under Mr. Isler.

112.    Mr. Codignotto then said that Ms. Olivieri would not be placed in a new position even after she obtained her General Securities Sales Supervisor license, walking back his earlier claim that he needed someone to take on a General Securities Sales Supervisor role "right away."

113.    Mr. Codignotto then said that Ms. Olivieri's complaints needed to be escalated to HR and that she should report to the Melville location the following day.

114.    That evening, Ms. Olivieri sent Mr. Codignotto a text message requesting a PTO day because she was suffering from anxiety.  Mr. Codignotto approved the request.

115.    On Monday, October 5, 2020, Zack Anderson (HR employee at Stifel) called Ms. Olivieri and said he would be looking into her complaints about Mr. Isler.

116.    Over the course of an approximate hour-long call with Mr. Anderson, Ms. Olivieri detailed Mr. Isler's sexually harassing behavior.  Ms. Olivieri complained about Mr. Isler's inappropriate conduct and comments, including the egregious behavior outlined above. See *supra* at pp. 7-11.  At the end of the call, Mr. Anderson told Ms. Olivieri to take the following day off as well.

117.    On October 6, 2020, Mr. Anderson called Ms. Olivieri and said he would be speaking with Mr. Isler the next day and that he did not share the details of her complaints with Mr. Codignotto.

118.    Additionally, Mr. Anderson stated that Mr. Codignotto acknowledged that Ms. Olivieri was a strong performer and that she had shown initiative in seeking to obtain her General Securities Sales Supervisor license.

119.    Mr. Anderson also claimed that there would be a full investigation into Ms. Olivieri's claims but asserted his already determined conclusion that it was a "he said, she said" situation.

120.    On October 7, 2020, Mr. Anderson called Ms. Olivieri and said that Mr. Isler had been directed not to speak with her and that the investigation should be completed by the end of the week.

121.    On October 8, 2020, Mr. Anderson called Ms. Olivieri and conferenced in Marissa Ruser (another HR employee) so that she could be a "witness" to the call.

122.    Mr. Anderson then instructed Ms. Olivieri to keep her complaints confidential and to not disclose them with her colleagues or Mr. Codignotto.  This directive was in violation of the National Labor Relations Act.

123.    Mr. Anderson then asked Ms. Olivieri several follow-up questions.  Specifically, Mr. Anderson asked Ms. Olivieri if she had made any inappropriate comments during her conversations with Mr. Isler.  Mr. Anderson also asked Ms. Olivieri when she became aware that Mr. Isler had issues with her performance.

124.    Ms. Olivieri responded that she never engaged in any inappropriate comments or conduct at work and stated that she had already discussed Mr. Isler's false allegations regarding her performance with Mr. Codignotto.

125.    At the end of the call, Mr. Anderson told Ms. Olivieri that she would be placed on administrative leave and she should "stay home until further notice" and that he would contact her soon.

126.    On October 9, 2020, Mr. Anderson called Ms. Olivieri and *admitted* that Mr. Isler made inappropriate comments and that his behavior would be addressed.  However, Mr. Anderson did not explain how Mr. Isler would be reprimanded.

127.    Mr. Anderson then attempted to accuse Ms. Olivieri of also making inappropriate comments at work, completely disregarding the fact the Ms. Olivieri had told Mr. Anderson that she never made inappropriate comments just the day before, not to mention the fact that Mr. Isler is her boss not the other way around.

128.    In response, Ms. Olivieri again told Mr. Anderson that she had done nothing wrong.

129.    Mr. Anderson then told Ms. Olivieri that she could either return to work at the Garden City location, where Mr. Isler *would still be working*, or she could work permanently out of the Melville location.  Mr. Anderson did not even mention the possibility of Mr. Isler having to relocate offices.

130.    If she returned to the Garden City office, Mr. Anderson said that she could work for Michael Turansky, Michael Cox, Shelly Kramer and Eric Singer, who are all manager-level employees that manage only $1 to $2 million in assets.

131.    At the Melville location, Mr. Anderson said Ms. Olivieri could work for Kurt Uzbay, who also only manages around $2 million in assets.

132.     Mr. Isler manages over $300 million in assets and working for a manager that only manages $2 million would severely limit Ms. Olivieri's opportunities to work with high net-worth clients.

133.     Additionally, Mr. Anderson said that Stifel would increase her base salary from $47,470 to $55,000 and that she would receive a bonus between $3,000 to $5,000 for 2020, which would substantially reduce her compensation from the $63,500 all-in compensation that she had been earning under Mr. Isler.

134.     Mr. Anderson said that Ms. Olivieri could get back to him with her decision on Monday.  In response, Ms. Olivieri again complained that Mr. Isler had sexually assaulted and harassed her and that Stifel's response and the options provide to her were unacceptable.

**V.     Stifel Conducts a Sham Investigation and Retaliates Against Ms. Olivieri**

135.     On October 12, 2020, Ms. Olivieri informed Stifel that she retained legal representation to protect herself and pursue claims of sexual harassment, gender discrimination and retaliation against the Company.  Ms. Olivieri remained on administrative leave during this time and Stifel was supposedly investigating Ms. Olivieri's claims.

136.     On November 2, 2020, Ms. Olivieri, through her counsel, provided Stifel with correspondence containing a detailed written description of the extensive sexual harassment she had been subjected, as well as the retaliation following her complaints.  This correspondence stated that Ms. Olivieri intended to pursue litigation of her claims.

137.     Despite Ms. Olivieri's initial internal complaints to Stifel, her October 12, 2020 correspondence from counsel and her November 2, 2020 correspondence from counsel, Mr. Isler remained working at the office on a daily basis.

138.    Stifel did not take any intermediary measures to ensure the safety and appropriateness of the workplace – such as placing Mr. Isler on administrative leave or directing that he work from home – while Ms. Olivieri's claims were under investigation.

139.    On November 5, 2020, while Stifel's investigation remained ongoing, Ms. Olivieri emailed Mr. Anderson and stated that she wanted to return to work from administrative leave on Monday, November 9, 2020.  Ms. Olivieri posed several questions to Mr. Anderson about her return to work given that she had previously been thrust out of the workplace due to sexual harassment.  Among the questions she posed were:

- What is the status of the investigation into my complaints?

- Who is involved in the investigation?

- Who is aware that I raised these complaints?

- What has been done to ensure the harassment against me ends?

- What steps have been taken to ensure that I will be physically safe?

- Will Mr. Isler be in the office at the same time as me?

140.    On November 6, 2020, Mr. Anderson responded and said among other things that "The investigation is still ongoing and has not been closed" and "Mr. Isler is still working in the Garden City office" where Ms. Olivieri would be returning to work.

141.    Later that day, Ms. Olivieri replied in part as follows:

> It is absolutely unacceptable that you are permitting Neil to continue working in the office after he has sexually harassed and assaulted me.  It is even more unacceptable that you are expecting me to go back to work in the same office where he will be present.  This demonstrates a complete lack of concern for my safety and for the protection of women who raise sexual harassment complaints.  I expect this to be taken seriously.  I cannot believe I even need to explain this to you.  Please confirm that Neil will not be in the office while I am there at the very least until your investigation is

completed. His presence will make me feel completely uncomfortable and unsafe.

142. Mr. Anderson responded by dismissing Ms. Olivieri's concerns and stated definitively that Mr. Isler's presence did not create an unsafe environment, despite stating in a previous communication that the investigation was ongoing and had not yet been concluded.

143. This response, together with the fact that Mr. Isler was *never* placed on any sort of administrative leave following Ms. Olivieri's complaints, demonstrated that Stifel had pre-determined that it would find that Mr. Isler posed no threat and did not take Ms. Olivieri's complaints seriously, particularly once Ms. Olivieri retained counsel and the prospect of litigation became likely.

144. Ms. Olivieri responded:

> Neil has sexually harassed and assaulted me. You say you are investigating that. Even though you have said your investigation is not complete, you seem to have already decided that the workplace is not unsafe. How can you possibly make such a flippant decision that concerns my safety if you are not even done with your investigation? Clearly you are not legitimately investigating my complaint and are not genuinely concerned for me or my safety. It seems you are simply protecting the company given that I have hired a lawyer and raised legal claims. I may not bring in revenue like Neil does, but that should not be factored into the way you investigate and treat employees.

145. Despite the fact that Stifel refused to handle the matter with any level of seriousness, Ms. Olivieri determined that she would not let Mr. Isler and Stifel dictate her life, and she committed to returning to work even though it made her feel unsafe.

146. Ms. Olivieri was all set to return to work on Thursday, November 12, 2020.

147. On November 10, 2020, Mr. Anderson informed Ms. Olivieri that when she arrived at work that Deborah O'Connor (an HR employee) would meet with her, and with Mr. Anderson on the phone, to "discuss the investigation."

26

148.    Ms. Olivieri responded:

> I am not comfortable speaking to the two of you directly regarding the investigation and related topics-- it gives me a lot of stress and anxiety which is already extremely high due to the harassment and assault I've been subjected to by Neil.  It also makes me uncomfortable as I do not feel that you are genuinely there to help me and really are just interested in protecting the company.  I'd prefer it if all our communications about these matters go through email.  Please confirm.  Thank you.

149.    Mr. Anderson responded that he would not accommodate this request.  He stated, "[r]egarding our meeting about the investigation and related topics, it is a matter of standard practice at the conclusion of an investigation that we discuss these topics with the person who filed a complaint."

150.    Contrary to Mr. Anderson's representation, Stifel's Associate Handbook states nothing whatsoever about any policy or practice to discuss in investigation verbally with employees.

151.    Upon information and belief, there is no "practice" at Stifel to discuss in investigation verbally with employees.

152.    Upon information and belief, there is no "practice" at Stifel requiring a refusal to provide Ms. Olivieri with a written explanation of the investigation results.

153.    In response, Ms. Olivieri implored Mr. Anderson to accommodate her request:

> As to the proposed meeting with you and Debra, again, I am not comfortable with that.  You have completely disregarded my feelings and mental health yet again by stating that I have to attend in person.  Whether Stifel has "standard practices" or not, you should be able to accommodate my mental health and my request to ensure that I do not feel uncomfortable or otherwise create a more stressful environment for me.  You have provided no reason to deny my request.  If you have questions, those can be asked via email.  If you have a conclusion to report (although clearly you are going to conclude whatever is in the company's best interest whether it is true or not), those can be communicated via email . . . I've also read

through the employee handbook you sent me and it says nothing
about having to do an in-person meeting, let alone one that makes
me feel uncomfortable.  Please confirm that my wishes will be
respected, and please do not ignore my email.

154.    Mr. Anderson refused to accommodate Ms. Olivieri's request and said that if she

wanted the results it would only be provided in an in-person meeting, which he knew made her

feel uncomfortable.

155.    On November 12, 2020, Ms. Olivieri returned to work.

156.    Instead of assigning Ms. Olivieri to support different set of investment

professionals, as previously indicated, Mr. Codignotto informed Ms. Olivieri that she will not be

assigned to support anyone and will be spending her days preparing for her Series 9 and 10

certifications. Essentially, all of Ms. Olivieri's job responsibilities were stripped from her.  Mr.

Isler remained in the workplace apparently facing absolutely no repercussions for his actions.

157.    To date, Stifel has refused to provide Ms. Olivieri with the results of the

investigation unless she agrees for the results to be delivered verbally in-person.

158.    Stifel's response to Mr. Isler's conduct and Ms. Olivieri's complaints shows that

the Company has no interest in legitimately investigating Mr. Isler and is not genuinely

concerned for Ms. Olivieri's safety.  Rather, Stifel's conduct proves that the Company will go to

all lengths to protect its revenue producers and its own interests, including subjecting Ms.

Olivieri to blatant retaliation and hostilities for complaining of Mr. Isler's sexual harassment of

her.

159.    On January 5, 2021, Ms. Olivieri filed her Complaint in this instant action.  In her

initial Complaint, Ms. Olivieri alleged that while employed at Stifel, Mr. Isler subjected her to

egregious sexual harassment and retaliation after she raised complaints about his conduct.  As

she then alleged, Ms. Olivieri's numerous complaints resulted in not a single substantive

remedial measure.  Instead, it was Ms. Olivieri who was subjected to changes in the terms and conditions of her employment and, ultimately, punished for raising her complaints.

**VI.  Following Ms. Olivieri Filing Her Amended Complaint, Defendants Followed Through on Their Threats to Assign Ms. Olivieri to a Different Office Location**

160.    On May 20, 2021, Plaintiff filed her Amended Complaint in which she specifically named Mr. Isler individually as a Defendant and also raised additional claims of retaliation.

161.    In the immediate aftermath of Ms. Olivieri filing her Amended Complaint, Defendants – with Mr. Codignotto as the primary individual actor –engaged in completely blatant further retaliation and harassment.

162.    Within less than 10 days of Ms. Olivieri filing her Amended Complaint, Stifel and Mr. Codignotto followed through with their previous threats to transfer Ms. Olivieri to a different office location less desirable to Ms. Olivieri.

163.    On May 28, 2021, Mr. Codignotto called Ms. Olivieri into his office and informed Ms. Olivieri that he was transferring her from the Garden City office location to Melville to work for four different Advisors that would all be supervising her.  In doing so, Mr. Codignotto informed Ms. Olivieri that she "will be reporting to Melville" effective the following workday, June 1, 2021.

164.    Ms. Olivieri immediately requested that Mr. Codignotto put this information into an email and send it to her.  Mr. Codignotto responded that he did not want to because he "just gave her all the details."  Ms. Olivieri once again requested that she receive the details in writing. Mr. Codignotto finished the conversation by stating he had to check with Stifel's legal team to see if he could send her an email.

165.    Shortly thereafter, Ms. Olivieri received an email from Mr. Codignotto indicating that Ms. Olivieri would be assigned to the Melville location and be supporting Jeff Haiken, Gail Sokol, Scott Klein and Jeff Wagner starting June 1, 2021.

166.    Ms. Olivieri was immediately upset given that she had previously – on numerous occasions – protested Stifel's and Mr. Codignotto's attempts to transfer her to a new location, while allowing Mr. Isler to remain at the Garden City location.

167.    That same day, Ms. Olivieri responded to Mr. Codignotto by protesting his decision to move her office location and indicating that she believed Mr. Codignotto's actions were continued retaliation:

> I do not accept or agree with this assignment, which is clearly retaliation for me refusing to discontinue the lawsuit against Stifel and for naming Neil as a defendant.  As you probably remember, after I raised my sexual harassment claims I was placed on administrative leave.  When I returned, Stifel tried to move me to the Melville location.  I refused because it was completely improper to force me to move offices and to allow my harasser to remain in Garden City.  I was then permitted to stay in Garden City, though clearly that is not what you, Neil or the company wanted.  Now, even knowing that it is unacceptable to me, you are again attempting to move me away from the Garden City location.

168.    In response, also on May 28, 2021, Mr. Codignotto said it was not her choice, that relocating Ms. Olivieri was "appropriate under the circumstances" and that he expected Ms. Olivieri to report to Melville on the following business day.

169.    Ms. Olivieri responded by inquiring if she would be fired if she did not agree with Mr. Codignotto's retaliatory transfer of her work location.

170.    Mr. Codignotto confirmed that Ms. Olivieri would be terminated if she did not report to Melville moving forward, stating: "If you choose not to accept this role and report to the Melville office on June 1, we will consider this your resignation."

171.    By threatening to terminate Ms. Olivieri and designate her termination a

"resignation," Defendants were attempting to prevent Ms. Olivieri from even obtaining

unemployment benefits from her potential termination.

172.    On May 31, 2021, Ms. Olivieri responded to Mr. Codignotto stating:

> You are clearly retaliating against me and you have never once held
> Neil accountable for sexually harassing me.  As you have said I will
> be fired if I don't accept your transfer (and would then attempt to
> prevent me from getting unemployment by falsely saying I quit), I
> have no choice but to work from Melville.

173.    On May 31, 2021, Ms. Olivieri also emailed Stifel's Director of HR, Benjamin

Ola Akande, to inform him of Mr. Codignotto's retaliatory transfer of her office location and to

request remote work accommodations as a result of her pregnancy putting her at high risk for

complications associated with COVID-19.  She wrote:

> I am reaching out to you because I understand you recently became
> the Director of Human Resources at Stifel.  You may or may not be
> aware that I was sexually harassed by the financial advisor I support
> named Neil Isler and have filed a lawsuit against the company.  Just
> last week, directly after I named Neil Isler personally as a defendant
> in the lawsuit, my branch manager Rob Codignotto retaliated against
> me by forcing me to transfer locations and saying I would be fired
> if I did not accept the transfer.  I had previously told Rob I wanted
> to continue working in Garden City and the company said it would
> honor that request.  But now the company has taken a new approach
> and I have no say in this matter.  This is so clearly retaliatory but
> there is nothing I can do about it.  I wanted to make sure you are
> aware of this given your position at the company.

174.    On June 1, 2021, as a result of being told that she would be terminated unless she

complied with Defendants' retaliatory transfer of her office location, Ms. Olivieri reported to the

Melville office.

175.    Immediately upon reporting to Melville, Ms. Olivieri was confronted by an

unwelcome setting clearly not intended to make her feel at all welcome.

31

176.    Despite being told that her workstation was to be appropriately sanitized, Ms. Olivieri was provided with a dirty workstation and an office chair that appeared to be unclean and stained and warped from the oils in the hair of the previous employee that used it.

177.    Additionally, at Ms. Olivieri's previous office, after informing Mr. Codignotto of injuries she received from an accident in 2018, Ms. Olivieri was provided with a chair that provided better support to her neck and back.

178.    At her new office, no efforts were made prior to her arrival to provide Ms. Olivieri with a chair that provided similar level of support.

**VII.    Stifel and Mr. Codignotto Denied Plaintiff a Promotion and Awarded the Position to a Lesser Qualified and Experienced Candidate**

179.    While Ms. Olivieri was waiting for her new workstation to be cleared out of the previous occupant's belongings, Ms. Olivieri learned from Christina Scelta (Operations Manager) that their colleague, Marie Baratta, was being transferred to Garden City because she had been awarded a promotion to Administrative Assistant to the Branch Manager, a position that Mr. Codignotto previously indicated Ms. Olivieri was the "perfect fit" for.

180.    In or around late January/early February 2021, Ms. Olivieri first learned of the opening for the position of Administrative Assistant to the Branch Manager when Mr. Codignotto approached Ms. Olivieri and urged her to apply for the position.

181.    Mr. Codignotto told Ms. Olivieri that she was the "perfect fit" for the position and that he "needed somebody he could trust," like Ms. Olivieri.  Mr. Codignotto then told Ms. Olivieri that she should apply for the position.

182.    Ms. Olivieri looked into the position and became interested.  Ms. Olivieri noticed that under the essential duties and responsibilities of the role both Series 9 and 10 licenses were mentioned with respect to carrying out certain functions when the Branch Manager is absent.

183.     This made Ms. Olivieri confident that she was a good candidate for the position as she obtained her Series 9 license on January 29, 2021 and was in the process of obtaining her Series 10 license.  Additionally, Ms. Olivieri already had previously obtained Series 7 and Series 63 licenses.

184.     On or about March 17, 2021, Ms. Olivieri applied for the Administrative Assistant to the Branch Manager Position.

185.     Despite being urged to apply for the position and being qualified for the position, Ms. Olivieri was never even contacted for an interview.

186.     Instead, as mentioned above, Stifel chose to award the position to Ms. Baratta.

187.     Upon information and belief, Ms. Baratta is less qualified and experienced than Ms. Olivieri and did not have a Series 7, Series 63, Series 9 or Series 10 license at the time of being selected for the position over Ms. Olivieri.

188.     Stifel and Mr. Codignotto declined to interview Ms. Olivieri and awarded the position to a less qualified employee in retaliation for Ms. Olivieri for prosecuting her claims against Stifel and Mr. Isler and in response to Ms. Olivieri filing an Amended Complaint in this matter.

189.     Shortly after learning from Ms. Scelta that Ms. Baratta had been selected for the position on June 1, 2021, Ms. Olivieri received an email from the Talent Acquisition Team rejecting her candidacy for the Administrative Assistant to the Branch Manager and informing her that Stifel had "decided to pursue other candidates."

190.     Upon information and belief, as Branch Manager, Mr. Codignotto had the authority to make hiring decisions for the Administrative Assistant to the Branch Manager

position and played a substantial role in Stifel declining Ms. Olivieri's application for the role

without interviewing Ms. Olivieri.

## VIII.   Mr. Codignotto Attempts to Intimidate Ms. Olivieri and Create Documentation to Support His False Allegations

191.    On June 3, 2021, Mr. Codignotto followed up his retaliatory transfer of Ms.

Olivieri by sending her an intimidating email full of false accusations.

192.    In his email, despite Mr. Codignotto being the person that stripped Ms. Olivieri of

her job responsibilities and told Ms. Olivieri to spend her days studying for the Series 9 and 10

licenses, Mr. Codignotto indicated that Ms. Olivieri would be provided with new assignments

and claimed that she needed to "get back to work" because it "has been well over six months of

us paying you for work you are not performing."

193.    Additionally, in a blatant attempt to cover up his retaliatory actions of stripping

Ms. Olivieri of her job duties upon her return to work in November 2020, Mr. Codignotto

claimed that Ms. Olivieri asked to be stripped of her job responsibilities as an "accommodation,"

which is false:

> You asked us for an accommodation to delay assigning you to a
> team last November to study for an exam and catch up on other
> work.  Since then, you have now claimed that the accommodation
> was retaliation.

194.    Mr. Codignotto also informed Ms. Olivieri that rather than performing the

responsibilities associated with her role as a Client Services Associate, Ms. Olivieri would be

performing tasks that amounted to administrative busy work moving forward.  Finally, in an

apparent attempt to lay the groundwork for claiming that Ms. Olivieri is having performance

issues, Mr. Codignotto included several false allegations regarding Ms. Olivieri's work

performance, including that she was "resistant" to working with her new team and "refused to answer phones after being instructed to do so."

195.    Mr. Codignotto's June 3, 2021 email was sent with the intent of further harassing and intimidating Ms. Olivieri and caused Ms. Olivieri to experience continued distress due to the hostile work environment at Stifel.  Moreover, Mr. Codignotto's alterations to the terms and conditions of Ms. Olivieri's employment are a continuation of the campaign of retaliation and hostilities that is being waged against Ms. Olivieri.

196.    That same day, on June 3, 2021, Ms. Olivieri received a call from Teri Wheeler, who was a Senior HR Business Partner at the time.  Ms. Wheeler informed Ms. Olivieri that another member of Stifel's HR Department, Lisa Garcia, would be reaching out to Ms. Olivieri regarding her accommodation request and to provide additional paperwork for Ms. Olivieri's medical provider to complete.  Ms. Wheeler indicated that Ms. Olivieri would be permitted to work from home during the processing of Ms. Olivieri's accommodation request.

197.    On June 4, 2021 Defendants Stifel and Codignotto proceeded to intentionally diminish Ms. Olivieri's role at Stifel by reducing Ms. Olivieri's role to a purely administrative function whereby she was assigned to perform busy work such as locating missing documentation.  In doing so, Stifel once again stripped Ms. Olivieri of the functions associated with the role of Client Services Associate.

198.    Defendants' reduction of Ms. Olivieri's role to administrative functions was not necessitated by Ms. Olivieri's remote work accommodation, as Ms. Olivieri and other Client Services Associates successfully performed their roles remotely for extended periods during the COVID-19 pandemic.

199.     On June 10, 2021, Ms. Olivieri provided the completed accommodation paperwork to Ms. Wheeler and Ms. Garcia.  In her paperwork, Ms. Olivieri's medical provider stated that the remote work accommodation would not prevent her from performing any essential functions of her role.  Ms. Olivieri was certain that she could perform the essential functions of her role remotely because, as noted above, Ms. Olivieri and other Client Services Associates had done so during the COVID-19 pandemic.

IX.   **Ms. Olivieri Files a Supplemental Complaint and Defendants Continue to Retaliate Against Ms. Olivieri and Subject Ms. Olivieri to a Hostile Work Environment**

200.     As a result of Defendants subjecting Ms. Olivieri to a continuing campaign of retaliation and an ongoing hostile work environment, Ms. Olivieri filed a Supplemental Complaint in this matter on June 16, 2021.  (Dkt. No. 23).

201.     Since the filing of Ms. Olivieri's Supplemental Complaint, Defendants continue to retaliate against Ms. Olivieri and subject her to a hostile work environment to the present day. Defendants' conduct makes it clear Stifel is attempting to make Ms. Olivieri's life at Stifel as difficult as possible to send a message to her that filing litigation against the Company will not be tolerated.  This retaliatory and ongoing hostility comes in the form of certain overt acts of retaliation together with completely disparate treatment relative to Ms. Olivieri's peers.

202.     As described in more detail below, but as a non-exhaustive list, Defendants have:

- Functionally demoted Ms. Olivieri by requiring her to remain in a purely administrative role, thereby negatively impacting her career trajectory at Stifel;

- Refused to provide Ms. Olivieri with a pathway to get her career and trajectory back on track to a Client Services Associate role or another more senior and more highly compensated role previously promised to her;

- Withheld compensation from Ms. Olivieri in an unjustified manner that is inconsistent with Company practices;

- Removed Ms. Olivieri from her Client Services Associate role and required Ms. Olivieri to perform an inferior role that is unrelated to her Client Services Associate role and offers less possibility for advancement both internally at Stifel and externally for her career prospects;

- Unnecessarily included one of Ms. Olivieri's harassers, Mr. Codignotto, in numerous communications with Ms. Olivieri despite Ms. Olivieri indicating that it caused her anxiety and emotional distress to work with him;

- Intentionally isolated Ms. Olivieri, failed to communicate Company announcements that impacted Ms. Olivieri's work schedule and excluded Ms. Olivieri from important Company meetings, thereby making it clear to Ms. Olivieri and others that she had a diminished role and future at Stifel;

- Rejected Ms. Olivieri's requests that Stifel take action to address the ongoing and persistent harassment by developing and implementing safety measures to prevent further harassment and retaliation by Mr. Codignotto and Mr. Isler;

- Directed hostile treatment towards Ms. Olivieri in response to Ms. Olivieri engaging in additional protected activity by raising her concerns of ongoing harassment and retaliation with Stifel's HR, including but not limited to, insulting her, completely refusing to answer her legitimate questions, refusing to provide her with support, and belittling her requests to communicate in a way (in writing) that did not trigger her anxiety; and,

- Ordered Ms. Olivieri to be docked for PTO in a manner that her colleagues are not required to; namely, despite acknowledging that Stifel routinely provided leniency to employees from its written policy that any 15-minute break from work constitute PTO (i.e., coffee breaks, short errands, short doctor's appointments). In doing so, Stifel told Ms. Olivieri that she would be treated differently than others and had to follow the written policy without exception.

203.    The aforementioned list of conduct, which has been part of the ongoing and continuing hostile work environment which started with Mr. Isler's sexual harassment and continued through the retaliatory conduct which followed her initial internal complaints of discrimination, continues to the present day.

204.    As to Ms. Olivieri's effective demotion and the derailment of her career trajectory referenced above, despite being aware that Ms. Olivieri could perform the functions of her Client

Services Associates role remotely, Defendants continued to require Ms. Olivieri to work in a purely administrative role.

205.    Even in this diminished role, Defendants routinely ignored Ms. Olivieri's communications and failed to provide her with the appropriate supplies and materials to perform the administrative tasks she was assigned.

206.    By way of example, Ms. Scelta – who was actively overseeing Ms. Olivieri's work – was completely unresponsive to numerous emails and calls from Ms. Olivieri's to the point that Ms. Olivieri needed to reach out to Ms. McManus for assistance on August 26, 2021.

207.    Ms. Olivieri remained in an administrative role until going on maternity leave on October 29, 2021.  The hostile work environment continued immediately upon her return, which was scheduled for February 24, 2022.

**X.    Ms. Olivieri Returns from Maternity Leave in March 2022 and is Instantly Subjected to Additional Retaliation and Harassment**

208.    Ten days before her return to work, on February 14, 2022, Ms. Olivieri reached out to her HR Representative, Ms. Wheeler, regarding her need for a remote work accommodation.  On February, 22, 2022, more than one week later and only two days before Ms. Olivieri's scheduled return from leave, Stifel provided forms for Ms. Olivieri and her medical provider to complete.

209.    Despite a previous practice of providing employees with an interim accommodation while the paperwork was being processed, Stifel changed course for Ms. Olivieri.  For Ms. Olivieri, Stifel decided that no interim accommodation would be provided and proceeded to withhold Ms. Olivieri's pay during the processing of her accommodation request and paperwork.  This was clear disparate treatment due to Ms. Olivieri's lawsuit.  Stifel's

withholding of pay from Ms. Olivieri while her accommodation paperwork was processing was a retaliatory and hostile deviation from the Company's practices.

210.    Further demonstrating that Stifel's refusal to pay Ms. Olivieri during the processing of her accommodation was merely an attempt to cause harm to Ms. Olivieri and was contrary to typical practice, Stifel had previously permitted Ms. Olivieri to receive compensation and work remotely while her prior accommodation was being processed in June 2021.  Notably, this occurred before Ms. Olivieri's additional complaints of continued retaliation and hostile work environment, as well as Ms. Olivieri's filing of a Supplemental Complaint that added Mr. Codignotto as a defendant.

211.    On March 9, 2022, Ms. Olivieri provided her completed accommodation paperwork to Stifel.  Two days later, on March 11, 2022, Ms. Gaffney acknowledged that the Company had received Ms. Olivieri's documentation, and that Ms. Olivieri's accommodation request had been granted.  Ms. Gaffney informed Ms. Olivieri that, she had "spoken to the Branch and we ask for your patience while we make sure we have the appropriate set up for you to work from home in *your position*."

212.    Despite Ms. Gaffney indicating that Stifel was arranging the "appropriate set up" for Ms. Olivieri to "work from home in [her] position" – Client Services Associate – Stifel *did not restore Ms. Olivieri to her role* upon Ms. Olivieri's return from maternity leave on March 10, 2022.  Rather, Stifel, once again, intentionally diminished Ms. Olivieri's role at the Company – this time by placing her in a completely different and unrelated role, whereby she reported to a new supervisor, Neal Manfredi (Central Supervision Supervisor).  In doing so, Stifel continued their ongoing pattern of interfering with Ms. Olivieri's role at the Company in a manner that has negatively impacted Ms. Olivieri's career trajectory and growth at Stifel.

213.    On March 18, 2022, Ms. Scelta scheduled a meeting with Ms. Olivieri and Mr. Codignotto to discuss Ms. Olivieri's medical accommodation.  Mr. Codignotto is not only an accused harasser and retaliator, but he is also a Defendant in this action and adverse to Ms. Olivieri.

214.    Shocked that Mr. Codignotto was being looped in on conversations and decision making regarding her employment despite already having a record of harassing her (together with an already lengthy record of numerous retaliatory acts by Stifel), Ms. Olivieri responded:

> I don't feel comfortable discussing something as private as my medical accommodation with Robert Codignotto present. As you know, I'm currently suing Mr. Codignotto for discrimination and retaliation. Requiring me to discuss my medical accommodation with him feels like a continuation of Stifel's efforts to harass and intimidate me. I request that any conversation regarding my medical accommodation occur without Mr. Codignotto present.

215.    On March 22, 2022, Ms. Olivieri had her call with Ms. Scelta regarding Ms. Olivieri's role moving forward.  Putting to doubt any remaining belief that that she could succeed at Stifel, Ms. Scelta confirmed that Stifel was assigning Ms. Olivieri to a completely different and diminished role, unrelated to Ms. Olivieri's Client Services Associate role, that offers less possibility for advancement both internally at Stifel and externally for her career prospects.  Ms. Scelta also confirmed that Mr. Manfredi would be supervising Ms. Olivieri in her new role.

216.    That same day, Ms. Scelta followed-up with Ms. Olivieri by email and memorialized that Stifel placed Ms. Olivieri in an unrelated and diminished role.  Ms. Scelta also confirmed that Stifel would be providing Ms. Olivieri the necessary equipment to perform her new role soon – despite Ms. Olivieri already being back from leave for nearly two weeks.

217.     On March 23, 2022, Ms. Olivieri was once again forced to encounter Mr. Codignotto in communications related to her role.  Stifel has allowed unnecessary interactions between Ms. Olivieri and her harasser, Mr. Codignotto, to persist despite being on explicit notice that Ms. Olivieri experiences significant distress and trauma when she encounters him or Mr. Isler.

218.     On March 25, 2022, Ms. Olivieri was included on an email to Stifel's Entitlements and Access Control Team from John Thomas (Stifel Central Supervision) stating that the Company was yet to definitively determine the role that they were going to shuffle Ms. Olivieri into next.  Rather, they were "attempting to find a role" for Ms. Olivieri.  The same day, Megan Gilbert (Director, Entitlements and Access Control) confirmed that the Company had revoked Ms. Olivieri's privileges to access systems that were essential to her role as a Client Services Associate, further demonstrating that Stifel removed Ms. Olivieri from her role.

219.     As Ms. Olivieri and other Stifel employees performed the Client Services Associate role remotely in the past, any suggestions by Stifel that the changes to Ms. Olivieri's role were necessitated by Ms. Olivieri's accommodation are pretextual.  Rather, Stifel was clearly continuing its pattern of diminishing Ms. Olivieri's role at the company and interfering with her ability to progress into the previously promised career advancements.  Stifel's pattern of interfering with Ms. Olivieri's role and trajectory began at the point of her complaints concerning Mr. Isler's sexual assault and harassment of her and has persisted to this point.

220.     On or around March 31, 2022, at the recommendation of her new supervisor, Mr. Manfredi, Ms. Olivieri reached out to Stifel's Technical Support Department to request an additional monitor so she could more efficiently perform her work at home.  Shortly after making her request, Ms. Scelta scolded Ms. Olivieri for not obtaining approval from Mr.

Codignotto before requesting the equipment from Technical Support.  Ms. Scelta was explicitly aware that requiring Ms. Olivieri to request approval directly from Mr. Codignotto would cause Ms. Olivieri to experience unnecessary distress.  Moreover, it was unreasonable for Ms. Scelta to reprimand Ms. Olivieri for requesting equipment at the recommendation of current supervisor, Mr. Manfredi.

221.    On April 5, 2022, Stifel – via Ms. Scelta – proceeded to dock Ms. Olivieri's PTO in 15-minute increments for a brief period that she was away from her computer for a short doctor's appointment.  This was a complete and blatant deviation from Stifel's longstanding practices.  Previously, Ms. Olivieri would not be required to use PTO in such a situation.  In fact, throughout the four and a half years that Ms. Olivieri has been employed by Stifel, Ms. Olivieri obviously observed her colleagues similarly being permitted to briefly step out of the office without utilizing PTO for short doctor's appointments, coffee breaks, or running quick errands.  But all of a sudden, Ms. Olivieri was being subject to a new and more restrictive set of rules and conditions.  Further demonstrating that this was a change in how Stifel's PTO policies were applied to Ms. Olivieri, had it been the norm for PTO to be utilized in such a manner, there would be no need for Ms. Scelta to inform Ms. Olivieri of this practice.  No mass communication or other communication was sent to other employees that the PTO policy was going to be applied in a different manner than before.

222.    Upon information and belief, Stifel has not made changes to its PTO practices with respect to any other employees besides Ms. Olivieri.

223.    Upon information and belief, Ms. Scelta was aware that her docking of Ms. Olivieri's pay was a deviation from Company practice and did so to support and advance Stifel's hostile and retaliatory campaign against Ms. Olivieri.

224.    On April 8, 2022, Ms. Olivieri raised complaints of ongoing retaliation and

hostile work environment with Stifel's HR Department through an email to Ms. Gaffney:

> I have some concerns regarding the impact that my complaints of
> sexual harassment are having on my role and overall career
> trajectory at Stifel. Ever since I complained about Neil Isler's sexual
> harassment of me, I am being subjected to retaliation and a hostile
> work environment. This includes that fact that my role has been and
> continues to be altered. My responsibilities and supervisors have
> shifted now on several occasions and continues to do so. It is as if I
> am in an entirely different role now.
>
> Changes to my role have happened as recently as March 10, 2022
> (upon my return from maternity leave). Once again, I find myself
> reporting to new supervisors and performing tasks that were never
> previously my responsibilities. I would like to know why my role
> has and continues to keep changing? I can't imagine that the
> constant and continuing changing of my role hasn't affected my
> trajectory. On a similar note, I find myself now doing compliance
> work for Stifel. Is my current compensation aligned to the new
> nature of my responsibilities and has my title changed?
>
> Equally concerning, the company has recently (3/18/22) included
> Robert Codignotto in highly private conversations related to my
> request for a medical accommodation. The fact that the company
> included Mr. Codignotto in these personal matters of mine while
> knowing that I am suing Mr. Codignotto for discrimination and
> retaliation shows that the company didn't take adequate measures to
> ensure that I am not exposed to additional mistreatment and distress.
> In response to Mr. Codignotto being included on private
> correspondence related to my medical accommodations, I made it
> clear that it felt like a "continuation of Stifel's efforts to harass and
> intimidate me." Since then, Mr. Codignotto has been looped in on
> other issues related to my role.

225.    Without conducting any investigation into Ms. Olivieri's complaints whatsoever,

which was completely in contravention of Stifel's written policy and best practices, Ms. Gaffney

responded and confirmed that Ms. Olivieri had been placed in a different role.[1]  Ms. Gaffney

falsely claimed that the change to Ms. Olivieri's role was a result of Ms. Olivieri's remote work

---

[1]        To date, approximately 5 months after returning from maternity leave, Ms. Olivieri remains performing a
diminished role, which is unrelated to Ms. Olivieri's role of Client Services Associate.

accommodation.  Ms. Gaffney provided a blatantly pretextual excuse for Stifel engaging in a

retaliatory and hostile pattern of altering Ms. Olivieri's role that has been ongoing ever since Ms.

Olivieri first complained of Mr. Isler's sexual harassment.[2]  In doing so, Ms. Gaffney ignored

Ms. Olivieri's protected complaints about ongoing retaliation and harassment and, instead,

knowingly attempted to cover up the Company's unlawful behavior.

226.    Further confirming that Stifel no longer considered Ms. Olivieri for the career

advancements that she was previously promised, Ms. Gaffney informed Ms. Olivieri that she did

not need to obtain additional licensing as the licenses were not necessary for a "support role" at

the Stifel.  Clearly, ever since Ms. Olivieri engaged in protected complaints and file this lawsuit,

she lost any chance and being anything more an a "support role" at Stifel, which was the

opposite of what she had previously been promised.

227.    On April 12, 2022, Ms. Olivieri responded to Ms. Gaffney detailing Stifel's

pattern of interfering with Ms. Olivieri's role:

> With respect to my concerns about my career trajectory, my role has
> completely changed at least 4 times since I complained about Mr.
> Isler's sexual harassment. I was completely stripped of my job
> duties and told to study. Then after I complained that my role was
> removed from me, I was assigned to doing administrative busy work
> related to finding missing documents for brokers across locations. I
> did that up until going on maternity leave. Upon returning from
> leave on 3/10, I have been assigned a whole new set of
> responsibilities that are not associated with any of the functions of
> the Client Services Associates role. Client Services Associates don't
> report to Mr. Manfredi. It wasn't made clear to me that I was
> assigned a "temporary" role. How long will I be in this role? After
> this role, what are my role and responsibilities going to be and who
> will I report to?

---

[2]      Stifel's pattern of altering Ms. Olivieri's role in the aftermath of her complaints of sexual harassment and
retaliation includes, but is not limited to, the following: placing Ms. Olivieri on a paid leave in October 2020; stripping
Ms. Olivieri of her job responsibilities in November 2020; transferring Ms. Olivieri to a different job location within
10 days of Ms. Olivieri filing her Amended Complaint in May 2021; assigning Ms. Olivieri to perform purely
administrative functions that were not aligned with her role and experience in June 2021; and now, upon Ms. Olivieri's
return from maternity leave on March 10, 2022, removing Ms. Olivieri from her Client Services Associate role and
placing her in an unrelated and diminished role.

> Before I complained about Mr. Isler's sexual harassment, I was being told that I had a promising future. I was told I was on track to become a General Securities Sales Supervisor. Your point that I don't need the additional licensure that I'm seeking to perform the Client Services Associate role or to be "support staff" shows me that Stifel no longer considers me somebody who will progress to the next level. This has been the case ever since I complained. I have been shuffled around across teams and locations and assigned busy work or "temporary" roles. With respect to the point that this has all been done simply to "accommodate" me, I don't understand how that is the case, especially since I could have performed Client Services Associates functions remotely. Stripping me of my job responsibilities and then assigning me busy work also weren't accommodations.

228.    Ms. Olivieri also requested information regarding basic protocols to ensure her safety from further retaliation from Mr. Codignotto:

> With respect to Mr. Codignotto, I feel like nobody is hearing me when I am saying that being required to work closely with somebody who is retaliating against me because he decided to support my harasser continues to be very traumatizing. I've already provided you several examples on how he's being looped into communications with me in an unnecessary way. Stifel has done very little to look out for me in this respect (was a similar situation with Mr. Isler).

229.    Through a series of correspondence, Ms. Gaffney proceeded to ignore Ms. Olivieri's protected complaints and advanced knowingly false justifications for Stifel's continued pattern of diminishing Ms. Olivieri's role and lack of safety protocols to prevent Ms. Olivieri from unnecessarily encountering her harassers.  Still, no investigation of Ms. Olivieri's complaints of ongoing retaliation and harassment was ever conducted – again, in complete contravention of the policies and practices Stifel guarantees to its employees.

230.    On April 27, 2022, nearly a month and a half from Ms. Olivieri returning from maternity leave, Ms. Gaffney admitted that Stifel did not have a role for Ms. Olivieri, stating that Stifel "cannot determine the position to which [Ms. Olivieri] will be assigned."

231.    As a result of Ms. Gaffney clearly avoiding Ms. Olivieri's concerns and engaging in a blatant attempted cover-up of the Company's ongoing retaliation and harassment, Ms. Olivieri requested to be connected with somebody who would address her concerns.

232.    On April 28, 2022, Milissa Roth (Director, Employee Relations ("ER")) reached out to Ms. Olivieri via email.  Instead of addressing Ms. Olivieri's concerns about how Stifel's pattern of shuffling Ms. Olivieri around into new roles, Ms. Roth stated that Ms. Olivieri "may apply" for positions as they become available.  Thus, Stifel thrusted upon Ms. Olivieri the obligation to find an appropriate job – even though Stifel never interviewed Ms. Olivieri for the last role she applied for and awarded it to a less qualified employee.

233.    Clearly attempting to avoid addressing Ms. Olivieri's concerns in writing, Ms. Roth scheduled a call for herself and Ms. Olivieri for the following Monday.

234.    The next day, Ms. Olivieri responded to Ms. Roth and provided a detailed account of Stifel's history of altering Ms. Olivieri's role in the aftermath of her complaints of sexual harassment, retaliation and hostile work environment, in the perhaps naïve hope that doing so in a clear and direct manner might possibly generate some remedial action:

- On October 8, 2020, while a purported investigation into my sexual harassment complaints was occurring, I was placed on administrative leave while Mr. Isler was permitted to remain working at the office.

- Upon return from administrative leave on November 12, 2020, Stifel stripped me of all of my job responsibilities, and I was told to spend days preparing for my Series 9 and 10 certifications.

- I complained about my job duties being stripped from me and Stifel's failure to put adequate measures in place to protect me from being exposed to Mr. Isler. I also filed an Amended Complaint in my active litigation against Stifel and Mr. Isler to include detailed claims with respect to Robert Codignotto's retaliation. In response, Stifel assigned me administrative busy

46

work (rather than giving me my role back) and transferred me
to a different location.

- In October 2021, I went out on maternity leave. When I returned
  from maternity leave on March 10, 2022, I was assigned a
  completely different set of job functions that do not relate to
  my initial role and assigned to a new supervisor.

- When I inquired with Ms. Gaffney about the changes to my
  role at Stifel, I was informed that I was placed in a "temporary
  role" and that the company had no idea what my permanent role
  or who my next supervisor will be.

235.    Ms. Olivieri also reiterated that the Company's continued failure to prevent

unnecessary interaction between Ms. Olivieri and her harassers was causing her to experience

severe distress.

236.    Stifel rejected Ms. Olivieri's pleas for help.  Through a series of emails, Ms. Roth

intentionally avoided addressing Ms. Olivieri's concerns and proceeded to pressure Ms. Olivieri

into having a verbal conversation with her.

237.    Ms. Olivieri made it explicitly clear to Ms. Roth that verbal discussions of the

ongoing harassment and retaliation – which stemmed from Mr. Isler's sexual assault and

harassment of her – would be traumatic for her and cause her to experience further distress and

that she felt a lack of trust due to the onslaught of ongoing retaliation and mistreatment.  As such,

Ms. Olivieri reiterated her request that the Company accommodate her mental and emotional

health needs by communicating about these topics in writing.

238.    As Ms. Olivieri suffers from diagnosed anxiety, she sought the accommodation of

communicating in writing to avoid having her symptoms exacerbated during a verbal

conversation with an employee of Stifel regarding matters that have been severely traumatizing

for her.  Moreover, Ms. Olivieri was particularly concerned about the conversation causing her

anxiety to flare up because of the lack of empathy that Ms. Roth and Ms. Gaffney had expressed during their exchanges about Ms. Olivieri's concerns of continuing retaliation and harassment.

239.    Ms. Roth ignored Ms. Olivieri's plea for her concerns to be addressed in writing and continued her attempt to bully Ms. Olivieri into a verbal conversation.  That is, rather than simply responding in writing as would have been both easy and respectful, Ms. Roth cast blame and derision at Ms. Olivieri for "refusing" to speak to her.  In doing so, Ms. Roth insulted Ms. Olivieri on the basis of her need for an accommodation and baselessly said her request was "unacceptable" and "unproductive" without explaining why she could not simply email with Ms. Olivieri regarding her concerns.

240.    Ms. Roth also further confirmed Ms. Gaffney's representations regarding Stifel's lack of a role for Ms. Olivieri by indicating that she "cannot determine the position to which [Ms. Olivieri] will be assigned and with whom [Ms. Olivieri] will be working with."

241.    Finally, Ms. Roth took it upon herself to revisit Stifel's previous retaliatory transfer of Ms. Olivieri's office location by claiming the Company "accommodated" Ms. Olivieri by forcing her to transfer locations – against Ms. Olivieri's objections – after she engaged in additional protected activity and filed her Supplemental Complaint.  In doing so, Ms. Roth advanced a knowingly false excuse for one of Stifel's previous retaliatory acts.[3]

242.    As it was clear to Ms. Olivieri that Stifel's HR and ER were ignoring Ms. Olivieri's concerns and continuing to merely protect the Company, Ms. Olivieri requested that Stifel utilize outside investigators to look into her recent complaints of ongoing retaliation and hostile work environment.  Quite literally, Ms. Olivieri was being denied the rights Stifel

---

[3]    As a result of Ms. Olivieri's previous representations to both Ms. Roth and Ms. Gaffney, Ms. Roth was aware that Stifel's transfer of Ms. Olivieri's office location was objected to by Ms. Olivieri and was not in any way related to an accommodation request.

guaranteed to her for a fair and impartial investigation of her complaints.  No investigation whatsoever had been or was being conducted, let alone anything done fairly or impartially.

243.    Unsurprisingly, as Stifel's HR has clearly operated with the intent of insulating the Company from liability and making Ms. Olivieri's environment at Stifel as unpleasant as possible after she filed this lawsuit, Ms. Roth rejected Ms. Olivieri's request for an independent and unbiased investigator – despite the fact that hiring an outside investigator is a common practice where obvious conflicts of interest are involved with a company investigating itself at the same time it is being sued by an employee.

244.    Ms. Roth's aggressive attempts to bully Ms. Olivieri into a verbal conversation persisted for nearly a month and through the exchanging of approximately 20 emails.

245.    Stifel's above responses (blatantly ignoring Ms. Olivieri's concerns, insulting Ms. Olivieri and attempting to corner her into a distressing meeting) to Ms. Olivieri's recent complaints of ongoing retaliation and hostile work environment caused Ms. Olivieri to experience a significant amount of additional anxiety and stress that required medical treatment.

246.    Moreover, it rendered Ms. Olivieri without access to legitimate HR channels to express her concerns of ongoing retaliation and harassment and caused Ms. Olivieri to be less likely to raise future concerns with the Company's HR and ER Departments.

247.    Since Ms. Olivieri's return from maternity leave on March 10, 2022, Defendants have continued their pattern of ignoring and/or untimely responding to Ms. Olivieri's correspondence and isolating Ms. Olivieri.

248.    By way of example, on May 23, 2022, Stifel held a mandatory semi-annual compliance meeting and failed to take adequate measures to include Ms. Olivieri.  At the scheduled time of the meeting, Ms. Olivieri joined the telephone number that was provided to

her by Ms. Parrett.  Ms. Olivieri patiently waited for the meeting to begin.  After not hearing the meeting begin, Ms. Olivieri reached out to Ms. Parrett to inquire about the meeting.  Ms. Parrett looped in Ms. Scelta to address her concerns.  Ms. Scelta called Ms. Olivieri informed Ms. Olivieri that the meeting concluded, and that Defendants proceeded to hold the meeting without her.  Adding insult to injury, Ms. Scelta attempted to shift the blame to Ms. Olivieri by suggesting that she did not properly join the call.  As a result of Defendants' failure to include Ms. Olivieri in this meeting, Ms. Olivieri missed important information related to financial compliance.

249.     Similarly, Stifel has failed to communicate announcements to Ms. Olivieri regarding early dismissals that have regularly occurred throughout Ms. Olivieri's employment at Stifel.  As such, Ms. Olivieri's colleagues have been permitted to leave work at an earlier time, while Ms. Olivieri remains working.  Ms. Olivieri raised the Company's failure to communicate these announcements with Stifel's HR and requested that she simply be informed of the announcements moving forward.  Stifel – via Ms. Gaffney – declined Ms. Olivieri's request.  As a result, Ms. Olivieri remains unaware of the early dismissals and is working more hours than her similarly situated colleagues.

250.     By way of another example of the Company's isolation of Ms. Olivieri, it took Ms. Scelta and Ms. McManus until July 2022 to address Ms. Olivieri's request for supplies and shipping labels that was made on March 29, 2022.

251.     As yet another example of retaliation and ongoing hostility, on July 8, 2022, Ms. Scelta reached out to Ms. Olivieri and informed her that Stifel unilaterally deducted Ms. Olivieri's PTO for the time period that Ms. Olivieri's accommodation request was processing.

252.     As noted above, Stifel's denial of pay to Ms. Olivieri was a retaliatory deviation

from their normal practices, including with respect to Ms. Olivieri during a previous request.[4]

Ms. Gaffney admitted that Stifel's deducting of PTO in Ms. Olivieri's circumstances was outside

of the Company's ordinary practices: "Charging the PTO is not our normal practice in this type

of situation."  Ms. Gaffney's support of the Company's efforts to engage in unwarranted

withholding of Ms. Olivieri's pay was committed with the intent of furthering the Company's

retaliation and harassment of Ms. Olivieri.

253.     As a result of Defendants' interference with Ms. Olivieri's PTO and failure to

communicate company-wide announcements to Ms. Olivieri that resulted in her working longer

hours than her colleagues, Ms. Olivieri made additional protected complaints regarding Stifel's

ongoing harassment and retaliation, including complaints on July 21, 2022, August 2, 2022 and

August 9, 2022.

254.     With respect to Ms. Olivieri's complaints that the Company was retaliatorily

treating her differently with respect to PTO requirements, Ms. Gaffney admitted that the

Company had previously not required Ms. Olivieri to utilize her PTO in such a manner,

admitting on one occasion that, "I understand that you and others may have received such

leniency in the past."  Shockingly, Ms. Gaffney stated that Ms. Olivieri should reach out to Mr.

Codignotto if she has "questions about [her] schedule."  It's undeniable that Ms. Gaffney knew

that interactions with Mr. Codignotto would cause severe distress and trauma to Ms. Olivieri

from their previous communications and there was no genuine need to include him.

---

[4]        As noted above, Ms. Scelta also previously interfered with Ms. Olivieri's PTO by requiring her to utilize
PTO in 15-minute increments for brief periods away from her desk while Ms. Olivieri's colleagues were not required
to do so.

255.     Upon information and belief, Stifel has not modified its PTO practices with respect to any other employees besides Ms. Olivieri, including changing the "leniency" with which the PTO policies are applied to employees.

256.     Upon information and belief, Stifel has not informed any other employees that the Company's PTO practices were being modified.  Notably, Ms. Gaffney refused to respond to Ms. Olivieri's numerous inquiries about whether or not the Company had communicated any changes in the PTO practices to any other employees besides Ms. Olivieri and if other employees were being subjected to a similar modification of Stifel's PTO practices.

257.     Over the course of several emails, Ms. Gaffney, once again, avoided addressing Ms. Olivieri's complaints of ongoing harassment and retaliation.  While doing so, Ms. Gaffney *blamed her failure to address Ms. Olivieri's concerns on Ms. Olivieri*, for her medical need to communicate in writing.  Due to previous correspondence, Ms. Gaffney was well aware that Ms. Olivieri had made the accommodation request to communicate in writing due to the severe anxiety and trauma that she would experience during verbal conversations about the harassment, retaliation and sexual assault she experienced at Stifel.

258.     Once again, the response by Stifel's HR Department has placed Ms. Olivieri in a position where she has no meaningful recourse for her complaints to be addressed.  Rather than addressing Ms. Olivieri's concerns in a reasonable manner, Stifel's HR has clearly attempted to stifle her complaints.  As such, unlike her other colleagues, Ms. Olivieri is left without access to any assistance by Stifel's HR Department.

259.     On August 9, 2022, Stifel admitted to Ms. Olivieri that they placed Ms. Olivieri in a Compliance Analyst role rather than her Client Services Associate role upon her return from maternity leave on March 10, 2022.

260.    On August 12, 2022, after bullying Ms. Olivieri in response to her request for an accommodation to communicate in writing for several months, Ms. Gaffney emailed Ms. Olivieri acknowledging Ms. Olivieri's accommodation request and requested that Ms. Olivieri and Ms. Olivieri's medical provider complete accommodation-related paperwork.

261.    Ms. Gaffney's communication demonstrates that Stifel was aware that Ms. Olivieri was making an accommodation request to communicate in writing based on her medical needs, which they intentionally ignored and attempted to subvert.[5]

262.    Despite intentionally ignoring Ms. Olivieri's accommodation request in the past, Ms. Gaffney stated that Ms. Olivieri's failure to provide the requested paperwork by August 27, 2022, would result in the "Stifel assum[ing] that the accommodation is no longer necessary."

263.    Despite HR's ability to easily communicate with Ms. Olivieri in writing, Ms. Gaffney stated that Stifel will not communicate with Ms. Olivieri in writing until Ms. Olivieri's accommodation paperwork is received by Stifel.  Moreover, Defendants have not provided any legitimate basis for rejecting Ms. Olivieri's accommodation request in the past.

264.    Upon information and belief, Stifel's HR does not require other employees to submit an accommodation request before agreeing to communicate in writing.

265.    Upon information and belief, Stifel's HR regularly and frequently communicates with other employees in writing.

266.    Ms. Gaffney assisted Stifel's efforts to circumvent Ms. Olivieri's accommodation request to communicate in writing and, as a result, caused Ms. Olivieri to experience further distress and trauma.

---

[5]    As noted above, Stifel's HR – through communications from Ms. Olivieri to Mr. Anderson – was informed of Ms. Olivieri's medical need to communicate in writing as far back as November 2020.

267.    To date, Ms. Olivieri remains employed at Stifel where Defendants continue to subject her to a campaign of retaliation and harassment.  Defendants' actions have caused and continue to cause Ms. Olivieri to experience severe emotional distress.

**FIRST CAUSE OF ACTION**
**(Gender Discrimination and Hostile Work Environment in Violation of Title VII)**
***Against Defendant Stifel***

268.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

269.    Defendant Stifel has discriminated against Plaintiff on the basis of her gender in violation of Title VII by, *inter alia*, subjecting her to a hostile work environment, retaliatory hostile work environment, and denying her the equal terms and conditions of employment because of her gender.

270.    As a direct and proximate result of Defendant Stifel's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

271.     As a direct and proximate result of Defendant Stifel's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress for which she is entitled to an award of compensatory damages and other relief.

272.    Defendant Stifel's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII)
### *Against Defendant Stifel*

273.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

274.    By the actions described above, Defendant Stifel retaliated against Plaintiff based on her protected activities in violation of Title VII.

275.    As a direct and proximate result of Defendant Stifel's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

276.    As a direct and proximate result of Defendant Stifel's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress for which she is entitled to an award of compensatory damages and other relief.

277.    Defendant Stifel's unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### (Gender Discrimination and Hostile Work Environment in Violation of the NYSHRL)
### *Against All Defendants*

278.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

279.     Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by, *inter alia*, subjecting her to a hostile work environment, retaliatory hostile work environment, and denying her the equal terms and conditions of employment because of her gender.

280.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

281.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress for which she is entitled to an award of damages.

282.     Defendants' unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
#### *Against All Defendants*

283.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

284.     Defendants have retaliated against Plaintiff on the basis of her protected complaints by, *inter alia*, engaging in conduct reasonably likely to dissuade and/or deter Plaintiff and others from engaging in protected acts.

285.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

286.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress for which she is entitled to an award of damages.

287.     Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting Discrimination and Retaliation in Violation of the NYSHRL)
#### *Against Individual Defendants*

288.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

289.     Individual Defendants knowingly or recklessly aided and abetted the unlawful employment practices, including discrimination and retaliation, against Plaintiff in violation of the NYSHRL.

290.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

291.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress for which she is entitled to an award of damages.

292.    Individual Defendants' unlawful discriminatory and retaliatory actions constitute malicious, willful and wanton violations of NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against Defendants for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B.    An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.    An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D.    An award of punitive damages in an amount to be determined at trial;

E.    Prejudgment interest on all amounts due;

F.    An award of Plaintiff's reasonable attorneys' fees and costs; and

G.    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  August 15, 2022
         New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
         David E. Gottlieb
         Alfredo J. Pelicci

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dgottlieb@wigdorlaw.com
apelicci@wigdorlaw.com

*Counsel for Plaintiff*

# Exhibit 2



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
PATRICIA OLIVIERI,                                      :
                                                        :      Civil Action No.: 21-cv-00046 (JMA) (ARL)
                           Plaintiff,                   :
                                                        :
            v.                                          :      **SECOND** AMENDED COMPLAINT
                                                        :
STIFEL, NICOLAUS & COMPANY,                             :
INCORPORATED and, NEIL ISLER, ROBERT                    :      **Jury Trial Demanded**
CODIGNOTTO, CHRISTINA SCELTA and                        :
JULIE GAFFNEY, in histheir individual and               :
professional capacities,                                :
                                                        :
                           Defendants.                  :
-------------------------------------------------------------- X

Plaintiff Patricia Olivieri ("Plaintiff") alleges in this Second Amended Complaint against

DefendantDefendants Stifel, Nicolaus & Company, Incorporated ("Stifel" or the "Company") and"),

and"), Neil Isler, in his individual and professional capacities,Robert Codignotto, Christina

Scelta and Julie Gaffney (collectively "Defendants") as follows:

### PRELIMINARY STATEMENT

1.      Ms. Olivieri has been a Registered Client Services Associate at Stifel's office in

Garden City, New York for approximately threefour and a half years, and, during that time, she

has been subjected to egregious sexual assault and harassment by one of its leading Senior

Investment Managers, Neil Isler.  This harassment has included but not been limited to:

- *Assaulting Ms. Olivieri by placing the palm of his hand on her buttocks without her consent;*

- *Repeatedly speaking to Ms. Olivieri about rape, including telling Ms. Olivieri that his friend had drugged and raped a woman he knew;*

- *Discussing with Ms. Olivieri that he regularly cheated on his wife;*

- *Discussing with Ms. Olivieri sex he had with his mistress in his car and that his young children found a used condom;*

- ***Telling Ms. Olivieri that his wife likes to "get fucked really hard;"***

- ***Discussing with Ms. Olivieri that he and his wife had a threesome with another woman whom, from the way Mr. Isler described her, seemed to be a prostitute; and***

- ***Viewing pornography in his office and ensuring Ms. Olivieri saw it as well.***

2.      Ms. Olivieri complained about this conduct to Stifel's management, and Stifel refused to take the matter seriously, failed to conduct a legitimate investigation and took measures only to protect Mr. Isler – a revenue producer – and shield the Company from potential exposure in litigation.  Stifel's responsive measures included:

- Stifel allowed Mr. Isler to continue to work from Stifel's offices (i.e., not being placed on administrative leave or even asked to work from home) during the investigation process, despite being accused of egregious sexual harassment.

- During the investigation process, Zach Anderson (a Human Resources ("HR") employee at Stifel) admitted to Ms. Olivieri that several of Ms. Olivieri's allegations were substantiated, but Mr. Isler was never disciplined in any way as he continued to work from the office and still does to this day.

- Stifel made it clear that it pre-determined the overall outcome of the investigation in favor of Mr. Isler.  In communications between Ms. Olivieri and Mr. Anderson concerning Ms. Olivieri returning to work from administrative leave, Mr. Anderson dismissed Ms. Olivieri's safety concerns working in proximity to Mr. Isler, stating definitively that it did not create any safety issue, despite the fact that he said the investigation was ongoing and had not yet been concluded.

- Mr. Anderson has refused to convey to Ms. Olivieri the results of the investigation in a manner where she feels comfortable.  Mr. Anderson said he would only convey the response in-person verbally, even though Ms. Olivieri said that created extreme anxiety for her and asked that the results be emailed to her.

3.      Clearly, Stifel is more interested in protecting its bottom line than victims of discrimination, sexual assault, sexual harassment and retaliation.  Stifel's willingness to stand by Mr. Isler after he sexually assaulted and harassed Ms. Olivieri is reprehensible and has forced Ms. Olivieri to continue to work in an environment where she feels unsafe and fears that Mr. Isler may assault her again.  Moreover, Stifel has engaged in a pattern of targeted retaliation

2

and harassment that coincides with Ms. Olivieri engaging in further protected activity, including the filing of an Amended Complaint and Supplemental Complaint in this matter.

4.      In particular, within less than 10 days of Ms. Olivieri filing her Amended Complaint on May 20, 2021 (Dkt. No. 19), Defendants: (i) followed through on previous threats of retaliation by assigning Ms. Olivieri to a different office that Ms. Olivieri previously objected to being assigned to; (ii) altered Ms. Olivieri's reporting structure; (iii) denied Ms. Olivieri a promotion that Mr. Codignotto previously indicated Ms. Olivieri would receive and gave the position to someone with lesser qualifications; (iv) threatened to increase Ms. Olivieri's workload while misrepresenting that she had previously requested that Defendants strip her of her job responsibilities; and (v) subjected Ms. Olivieri to an increasingly hostile work environment.

5.      As a result of Defendants subjecting Ms. Olivieri to a continuing campaign of retaliation and an ongoing hostile work environment, Ms. Olivieri filed a Supplemental Complaint in this matter on June 16, 2021.  (Dkt. No. 23).

6.      Since the filing of Ms. Olivieri's Supplemental Complaint, Defendants continue to retaliate against Ms. Olivieri and subject her to a hostile work environment.  In particular, Defendants: (i) continued requiring Ms. Olivieri to perform a purely administrative role that was inferior to her role as a Client Services Associate; (ii) withheld compensation from Ms. Olivieri in an unjustified manner that is inconsistent with Company practices; (iii) removed Ms. Olivieri from her Client Services Associate role and placed her in a diminished and unrelated role, thereby negatively impacting her career trajectory at Stifel; (iv) unnecessarily included one of Ms. Olivieri's harassers, Mr. Codignotto, in numerous communications with Ms. Olivieri despite Ms. Olivieri indicating that it caused her emotional distress; (v) isolated Ms. Olivieri and/or

failed to include Ms. Olivieri in important Company meetings; (vi) rejected Ms. Olivieri's requests for safety measures to prevent further harassment and retaliation by Mr. Codignotto and Mr. Isler; (vii) directed hostile treatment towards Ms. Olivieri in response to Ms. Olivieri engaging in additional protected activity by raising her concerns of ongoing harassment and retaliation with Stifel's HR, including but not limited to, insulting her, completely refusing to answer her legitimate questions, refusing to provide her with support, and belittling her accommodation requests to communicate in a way (in writing) that did not trigger her anxiety; and, (viii) and ordered Ms. Olivieri to utilize Paid Time Off ("PTO") in a manner that her colleagues are not required to.

7.     Defendants' conduct constitutes continued and ongoing unlawful discrimination and retaliation in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq.* ("NYSHRL").

4.8.     Ms. Olivieri brings this action seeking injunctive, declaratory and monetary relief against Defendants for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII") and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL").

## ADMINISTRATIVE PROCEDURES

9.     On January 5, 2021 Ms. Olivieri filed her initial Complaint in this matter.  (Dkt. No. 1).

5.10.   On January 11, 2021, Ms. Olivieri filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging unlawful discrimination and retaliation in violation of Title VII.

4

6.11.   On February 4, 2021, the EEOC issued Plaintiff a Notice of Right to Sue.

12.   Plaintiff's filingShortly thereafter, the Parties entered into a stipulation to toll the period of time that Ms. Olivieri would have to amend her Complaint to include claims under Title VII.  (Dkt. No. 18).

13.   On May 20, 2021, Ms. Olivieri filed an Amended Complaint that named Mr. Isler individually as a Defendant and raised additional claims of retaliation and hostile work environment.  (Dkt. No. 19).

14.   As a result of Defendants subjecting Ms. Olivieri to a continuing campaign of retaliation and an ongoing hostile work environment, Ms. Olivieri filed a Supplemental Complaint in this matter on June 16, 2021.  (Dkt. No. 23).

15.   On August 12, 2021, Plaintiff filed a supplemental Charge of Discrimination and Retaliation with the EEOC, alleging continuing and ongoing violations of Title VII.

16.   On September 15, 2021, the EEOC issued Plaintiff a Notice of Right to Sue as to the Supplemental Charge.

7.17.   The Parties entered into a joint stipulation whereby Defendants agreed not to argue that there is timely any deficiency in the Title VII claim asserted in Plaintiff's Supplemental Complaint on grounds that Plaintiff included the Title VII claim before receipt of the Notice of Right to Sue or failed to amend the Supplemental Complaint following receipt of the Notice of Right to Sue.  (Dkt. No. 31).

8.18.   Any and all other prerequisites to the filing of this suit have been met.

5

**JURISDICTION AND VENUE**

9.19.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII.

10.20.  This Court has supplemental jurisdiction over Plaintiff's related claims arising under New York State law pursuant to 28 U.S.C. § 1367(a).

11.21.  Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**PARTIES**

12.22.  Plaintiff Patricia Olivieri is a Registered Client Service Associate at Defendant Stifel, Nicolaus & Company, Incorporated who resides in Greenlawn, New York.  At all relevant times, Ms. Olivieri met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

13.23.  Defendant Stifel, Nicolaus & Company, Incorporated is a Missouri-registered foreign corporation with a principal place of business located at 501 North Broadway, St. Louis, Missouri 63102.  At all relevant times, Stifel met the definition of "employer" and/or "covered employer" under all relevant statutes.

14.24.  Defendant Neil Isler is a Senior Vice President/Investments at Stifel, Nicolaus & Company, Incorporated.  Upon information and belief, Defendant Isler is a resident of the State of New York.  At relevant times, Defendant Isler supervised Plaintiff's employment and met the definition of Plaintiff's "employer" under all relevant statutes.

25.     Defendant Robert Codignotto is a Senior Vice President/Investments and Branch Manager of Garden City Complex at Stifel, Nicolaus & Company, Incorporated.  Upon information and belief, Defendant Codignotto is a resident of the State of New York.  At relevant

6

times, Defendant Codignotto supervised Plaintiff's employment and met the definition of Plaintiff's "employer" under all relevant statutes.

26.     Defendant Christina Scelta is an Operations Manager at Stifel, Nicolaus & Company, Incorporated.  Upon information and belief, Defendant Scelta is a resident of the state of New York.  At relevant times, Defendant Scelta supervised Plaintiff's employment and met the definition of Plaintiff's "employer" under all relevant statutes.

27.     Defendant Julie Gaffney is a Senior HR Business Partner at Stifel, Nicolaus & Company, Incorporated.  Upon information and belief, Defendant Gaffney is a resident of the state of Missouri.

**FACTUAL ALLEGATIONS**

**I.     Background**

~~15.~~28.   Ms. Olivieri is licensed as a General Securities Representative and Uniform Securities Agent in New York with several years of finance experience prior to joining Stifel.

~~16.~~29.   In late 2017 and early 2018, Stifel recruited Ms. Olivieri based on her experience in the finance industry, and, in February 2018, Ms. Olivieri joined Stifel as a Registered Client Sales Associate and quickly established herself as an asset to the Company.

~~17.~~30.   By way of example only, Ms. Olivieri assisted Neil Isler (Senior Vice President/Investments and her direct supervisor) in managing more than 1,500 clients and over $300 million in assets; procured over $11 million in assets that clients invested with Stifel; assisted with an audit of Stifel's Garden City branch that resulted in no adverse finding and actions; helped establish the Neil Isler Wealth Management Group at Stifel; and structured customized wealth management plans for clients.

7

18.31.  Throughout her employment at Stifel, Ms. Olivieri routinely received positive performance feedback, including from Mr. Isler and Robert Codignotto (Complex Branch Manager at Stifel's Garden City location and Mr. Isler's supervisor).  Ms. Olivieri believed she was working at a place where she could thrive and grow.

**II.**      **Ms. Olivieri is Subjected to Egregious Sexual Harassment**                   ← Formatted: Keep with next

19.32.  When she joined Stifel, Ms. Olivieri was assigned to perform various tasks for manager-level employees – Mr. Isler one among them – with the goal of having her eventually report to a single supervisor.

20.33.  Soon after Ms. Olivieri started, Mr. Isler began to visit Ms. Olivieri's cubicle on a daily basis and often visited her multiple times per day.

21.34.  None of Stifel's other supervisors visited Ms. Olivieri nearly as frequently as Mr. Isler.

22.35.  It quickly became clear to Ms. Olivieri that Mr. Isler was attempting to establish a relationship with her so that she would eventually be assigned to work under him.

23.36.  Ms. Olivieri initially thought that Mr. Isler was trying to recruit her solely based on the high quality of her work.

24.37.  However, Ms. Olivieri later learned that Mr. Isler targeted Ms. Olivieri so that he could sexually harass her and use his position of authority to pressure her into engaging in sexual activity with him.

25.38.  In June 2018, Ms. Olivieri was assigned to report to Mr. Isler directly.

26.39.  Mr. Isler immediately began to use his position as Ms. Olivieri's supervisor to grant or promise her certain compensation or work perks, only to then make Ms. Olivieri feel as if she "owed" him.

8

27.40.  For instance, as part of her assignment to him, Mr. Isler granted Ms. Olivieri a $10,000 guaranteed annual bonus that was paid out on a monthly basis.

28.41.  Most other employees at Ms. Olivieri's level are only paid bonuses of a few hundred dollars.

29.42.  Mr. Isler constantly reminded Ms. Olivieri of his generosity towards her.

30.43.  Mr. Isler also told Ms. Olivieri that he wanted her to be "happy at work," that she had a job with him "for life" and that she would receive guaranteed annual salary raises.

31.44.  In September 2018, Mr. Isler increased Ms. Olivieri's guaranteed bonus from $10,000 to $15,000 even though she had only been working under him for a few months.

32.45.  When Mr. Isler informed Ms. Olivieri of the increase to her bonus, he made it a point to tell Ms. Olivieri that he paid her substantially more than her coworker Gail Baron (a Senior Registered Client Service Associate) who also reports into Mr. Isler.

33.46.  However, the increased compensation that Mr. Isler provided to Ms. Olivieri and so-called job security came with strings attached.

34.47.  Shortly after starting to report directly to him, Mr. Isler began routinely calling Ms. Olivieri into his office throughout the workday and would have her remain in his office for extended periods of time.

35.48.  Mr. Isler made sure that only he and Ms. Olivieri were in his office and would instruct Ms. Olivieri to close the door after she entered.

36.49.  During these closed-door meetings, Mr. Isler engaged in wildly offensive sexual harassment, including on one occasion, placing his hand on Ms. Olivieri's buttocks without her consent and, on other occasions, subjecting her to conversations about sexual violence.

9

37.50.  It is impossible to list all the outrageous discriminatory and sexually harassing conduct to which Mr. Isler subjected Ms. Olivieri.  Below is just a small sampling of the egregious conduct Mr. Isler forced Ms. Olivieri to endure:

- On one occasion, Ms. Olivieri was in Mr. Isler's office and he got up from his chair, walked over to where Ms. Olivieri was standing and pretended to be grabbing something from his briefcase, which was on a chair next to where Ms. Olivieri was standing.  He got uncomfortably close to Ms. Olivieri and she could sense he was up to something.  Mr. Isler then **placed his palm on Ms. Olivieri's buttocks**.  Ms. Olivieri was shocked, frightened and tried not to react, hoping that he would remove his hand and walk away from her.  After a few moments, Mr. Isler removed his hand and walked back to his desk.  Ms. Olivieri quickly left his office in complete disgust and scared that he would touch her again.

- **Mr. Isler constantly brought up the topic of "rape"** with Ms. Olivieri.  **Mr. Isler actually told Ms. Olivieri that a friend of his had raped a woman he knows, and he talked about the act of rape in detail**.  Apparently, according to Mr. Isler, his friend was with a woman who was "messed up" due to being drugged.  The woman was passed out and did not consent to any sexual activity, but his friend started having sex with her.  The woman woke up while he was on top of her and tried to push him away and told him that she did not want to have sex with him, but his friend did not listen and continued the act to completion.  Mr. Isler spoke about this incident as if it were a fantasy and with a big grin on his face.  In fact, he brought the story up on several occasions, likely because Ms. Olivieri attempted to demonstrate her level of discomfort with the topic and the manner in which Mr. Isler spoke about it, and Mr. Isler took pleasure in her reaction.  He even asked Ms. Olivieri whether the conversation made her uncomfortable and she said that it did – but he continued to bring it up.  Mr. Isler asked Ms. Olivieri if anyone had ever done anything like that to her.

- Mr. Isler would raise the topic of rape in other contexts.  For instance, on one occasion, Mr. Isler brought up that someone had been raped in Atlantic Beach, New York.  Mr. Isler viewed this as a great topic of office discussion and raised it with Ms. Olivieri and Ms. Baron, again with a grin on his face making it clear that he was fascinated and titillated with the topic.

- Mr. Isler's fascination with rape, together with him touching her without her consent and other offensive conduct described herein, caused Ms. Olivieri to fear that Mr. Isler would rape her.  Mr. Isler would often lurk in the hallway and wait for her to leave the office for the day so he could walk with her to her car.  These moments created fear and anxiety for Ms. Olivieri as she was constantly concerned that he might touch or otherwise assault her while they were away from the people in the office.

- **Mr. Isler also talked in graphic detail about his sex life with his wife**.  For instance, **Mr. Isler once called Ms. Olivieri into his office and told her to shut the door.  Mr.**

10

**Isler proceeded to tell Ms. Olivieri that his wife liked to "get fucked really hard" and asked Ms. Olivieri "do you like to get fucked hard?"** Ms. Olivieri refused to answer, but Mr. Isler tried to pressure Ms. Olivieri to answer and repeatedly said "well do you?" Ms. Olivieri responded that she would not answer his question and left Mr. Isler's office as soon as she was able.

- **Mr. Isler also told Ms. Olivieri that he and his wife had anal sex and he really liked it**.

- **Mr. Isler asked Ms. Olivieri if she had or liked anal sex.** Ms. Olivieri refused to answer his questions.

- **Mr. Isler also told Ms. Olivieri that he and his wife had sex in his car and that they "made a mess."**

- On another occasion, Mr. Isler told Ms. Olivieri that he was taking a lunch break, and, when he returned, he called Ms. Olivieri into his office and told her to shut the door. Mr. Isler told her that he did not actually go to lunch. Instead, **Mr. Isler said that he met his wife and another woman and that they had a threesome. Mr. Isler then described the threesome in detail to Ms. Olivieri. Specifically, Mr. Isler told Ms. Olivieri that the threesome started with Mr. Isler's wife and the other woman kissing each other. Mr. Isler also said that the other woman in the threesome "went down on him."** From the way Mr. Isler described the threesome, it seemed this other woman may have been a prostitute. Additionally, Mr. Isler described the threesome as "amazing" and said that he wanted to have another threesome. Mr. Isler then said that he could not believe that he told Ms. Olivieri about the threesome but that he "really trusted her," which was a clear attempt to pressure Ms. Olivieri to not tell anyone about his wildly inappropriate behavior. **Mr. Isler then asked Ms. Olivieri if she had ever had a threesome, if she would ever have a threesome and several other questions about group sex.** Ms. Olivieri attempted to end the conversation and leave. Mr. Isler then stated, "I guess you're just really loyal to your husband, that's unusual." Mr. Isler also said that his wife would forgive him if she ever caught him cheating.

- **Over the next couple of weeks, Mr. Isler repeatedly told Ms. Olivieri that he "could not stop thinking about the threesome" he described to her and reiterated that he wanted to have another threesome**.

- **Mr. Isler also mentioned to Ms. Olivieri that he told his wife that he discussed the threesome with Ms. Olivieri**. There was nothing at all subtle about Mr. Isler's line of inquiry – he was blatantly attempting to pressure Ms. Olivieri to engage in group sex with him. These exchanges made Ms. Olivieri feel like she was a complete object in Mr. Isler's eyes. In the following weeks, Mr. Isler repeatedly brought up threesomes in his conversations with Ms. Olivieri.

- **Mr. Isler bragged to Ms. Olivieri that he cheated on his wife**. He mentioned that on one occasion he had sex with a mistress in his car. Mr. Isler then said that his children

11

later found the used condom in the car and that he told his kids that the condom was "an old balloon." To Mr. Isler, this was apparently a funny joke. Ms. Olivieri thought it was disgusting.

- Mr. Isler made it very clear to Ms. Olivieri that he would often cheat on his wife – he seemed to want to make clear to Ms. Olivieri that he wanted to have sex with her, and he also took pleasure in her discomfort. Mr. Isler proudly proclaimed to Ms. Olivieri that, "Sometimes I don't go right home when I leave work. Sometimes guys just need to get their rocks off." The insinuation was clear that Mr. Isler was engaging prostitutes.

- On November 19, 2019, Mr. Isler sent Ms. Olivieri a text message with the following link to an article titled "**Why do many young women prefer older men**":



Clearly, by sending Ms. Olivieri the above link, Mr. Isler was trying to convince her that she should prefer an older man like himself. This was yet another attempt by Mr. Isler to persuade Ms. Olivieri to have sex with him.

- In early 2020, Mr. Isler instructed Ms. Olivieri to draft a client prospecting letter and to bring the letter into his office when she was done so that he could sign the letter. After she drafted the letter, Ms. Olivieri entered Mr. Isler's office and saw that he was watching pornography on his phone. **Mr. Isler positioned himself in such a way as to make sure that Ms. Olivieri could see that he was watching pornography when she entered.** Mr. Isler initially pretended that he did not realize Ms. Olivieri had entered his office and quickly put his phone away after he acknowledged her presence. Ms. Olivieri felt humiliated and tried to have Mr. Isler sign the letter so that she could quickly leave his office.

- On September 24, 2020, Mr. Isler commented to Ms. Olivieri and Ms. Baron that Elizabeth McManus (Office Coordinator for Stifel's Garden City location) was overweight. **Mr. Isler then said he was aware Ms. McManus "has a lot of sex" and "you would think she would be thinner with all that 'exercise' she does."** Mr. Isler then made a fist with one hand and pounded it into his other hand which he held flat.

12

While he was pounding his fist into his hand, which he clearly intended to simulate sexual intercourse, Mr. Isler then asked Ms. Baron, **"doesn't having sex burn a lot of calories?"**  Ms. Baron was visibly uncomfortable by Mr. Isler's question and tried to avoid eye contact with him.  Ms. Baron then simply responded, "how should I know?" and tried to change the topic of conversation.

- Mr. Isler summoned Ms. Olivieri into his office and started discussing their colleague, Amanda Moran (Client Service Associate).  Mr. Isler asked Ms. Olivieri if she had seen Ms. Moran's "tramp stamp," referring to a tattoo Ms. Moran has on her lower back.  Ms. Olivieri said that she had not.  Mr. Isler then stated that **Ms. Moran "looks like the kind of girl who is secretly a slut,"** that Ms. Moran **"must have had sex with a lot of guys"** and that Ms. Moran **"looks like a girl that would get gang banged."**

- **Mr. Isler claimed (almost certainly falsely) that Helen Giordano (Registered Client Service Associate) had a crush on him, would tell him that he is cute and wanted to have sex with him.**

- **Mr. Isler also asserted that Ms. Baron always tries to kiss him on the lips and claimed that she always bends down in front of him so that he can see her underwear and buttocks**.  Mr. Isler also claimed that on the way to a client meeting with Laurie Jacoby in Manhattan, Ms. Baron held his hand.

- Mr. Isler would often visit Ms. Olivieri's cubicle claiming that he "needed to show her something" on her computer.  Mr. Isler would stand over Ms. Olivieri and place his hand on top of Ms. Olivieri's hand and move her computer mouse.  **Mr. Isler intentionally leaned into Ms. Olivieri so that his crotch was close to touching her.  Mr. Isler would then say, "Oh sorry, am I too close?"**  Ms. Olivieri repeatedly told Mr. Isler not to stand over her or touch her hand.  However, Mr. Isler ignored Ms. Olivieri and continued to stand over her and place his hand on top of her hand.

- Bruce Gould (Financial Advisor at Stifel) has season tickets to the New York Rangers and sometimes gives tickets to Stifel employees.  One time, Mr. Isler overheard Mr. Gould offering tickets to Ms. Olivieri and walked into Mr. Gould's office and tried to invite himself to the game.  Mr. Gould told Mr. Isler that the tickets were not being offered to him and stated that Ms. Olivieri would go to the game with her husband.  Mr. Isler then left Mr. Gould's office, and, after Mr. Isler left, Mr. Gould said to Ms. Olivieri: "You do not want to go to the game with him, do you?"  Ms. Olivieri responded that she did not.

- **Mr. Isler once asked Ms. Olivieri if she only dated "big" guys, referring to men with large penises.**

- **Mr. Isler also has asked Ms. Olivieri on many occasions how many men she had slept with**.  Ms. Olivieri refused to answer each time she was asked, but Mr. Isler persisted and attempted to guess.  Specifically, in response to Ms. Olivieri refusing to answer, Mr. Isler said "Oh, come on.  I'll tell you," referring to the number of sexual

13

partners he has had.  Mr. Isler also pressured Ms. Olivieri by asking "is it more than ten?"  Again, Ms. Olivieri refused to answer.  Mr. Isler then stated that because Ms. Olivieri would not answer, "it must be more than ten."

- As he would leave the office for the day, Mr. Isler would hug Ms. Baron and Ms. Olivieri and kiss them on their cheeks.  Mr. Isler's inappropriate and unprofessional behavior made Ms. Olivieri extremely uncomfortable, and, when she knew Mr. Isler would be leaving for the day, Ms. Olivieri often pretended to be on a phone call or got up from her desk to walk away before he could get to her desk, hoping that Mr. Isler would not try to hug or kiss her.  However, even when she pretended to be on the phone or got up from her desk, Mr. Isler would often still hug and kiss her.

- In October 2018, Ms. Olivieri was in a car accident that resulted in her sustaining injuries to her back.  As a result of her injuries, Ms. Olivieri had to attend physical therapy appointments during which she received massage treatment.  Ms. Olivieri would inform Mr. Isler when she had to attend an appointment, and, soon after she started the massage therapy, Mr. Isler asked Ms. Olivieri inappropriate questions such as, **"Do you keep your underwear on when you get massages, or do you get naked?"**

38.51.  Ms. Olivieri was forced to endure Mr. Isler's conduct – which ranged from sexual harassment to sexual assault – on a daily basis.

39.52.  Ms. Olivieri has suffered extreme distress and anxiety from this treatment, and she feared going to work, being around Mr. Isler or even speaking to him over the phone.

40.53.  Ms. Olivieri felt that she wanted to vomit when thinking about being around Mr. Isler and going into work with him often gave her panic attacks.

### III.   **Ms. Olivieri Complains About Mr. Isler's Discriminatory and Harassing Conduct**

41.54.  As the Coronavirus pandemic began to spread throughout the country in March 2020, Stifel closed its physical offices and employees began to work remotely.

42.55.  The silver lining, for Ms. Olivieri, was that she did not have to go into the office and work with Mr. Isler and worry about whether he might further touch or assault her.

43.56.  In August 2020, Stifel reopened its offices and Stifel employees started working in the office part-time.

14

44.57.  Upon her return to the office, Mr. Isler picked up where he left off with his heinous treatment of Ms. Olivieri.

45.58.  Ms. Olivieri tried to avoid Mr. Isler as best she could, but Mr. Isler continued to call Ms. Olivieri into his office but she refused.

46.59.  When Ms. Olivieri refused to go into Mr. Isler's office, Mr. Isler visited Ms. Olivieri's cubicle and attempted to step around a barrier placed at the entrance of Ms. Olivieri's cubicle as a measure to prevent the spread of the Coronavirus.

47.60.  However, each time Mr. Isler tried to sidestep the barrier, Ms. Olivieri told him not to come inside her cubicle.

48.61.  Mr. Isler picked up on the fact that Ms. Olivieri was trying to avoid him and, on September 21, 2020, visited Ms. Olivieri's workstation and asked if he could speak with her in his office.  Ms. Olivieri said that she did not feel comfortable meeting in Mr. Isler's office, and Mr. Isler said that he would call her from his office.

49.62.  On the call, Mr. Isler confronted Ms. Olivieri and asked her, "Do you like me? Because I like you."

50.63.  Mr. Isler's question made Ms. Olivieri very uncomfortable, and, after a few moments of silence, Mr. Isler asked if she felt pressured to answer "yes" to his question, and Ms. Olivieri said that she did.

51.64.  Mr. Isler next said that he wanted Ms. Olivieri to be happy and told her that he liked her and that he wanted to work with her "forever."

52.65.  During the call, Ms. Olivieri complained about Mr. Isler taking issue with her taking intermittent leave to care for her mother who was diagnosed with cancer in 2019 and to attend her own doctor's appointments.  Mr. Isler claimed that he had no issue with Ms. Olivieri

15

taking leave, but it was clear from Mr. Isler's tone that he was not happy that Ms. Olivieri needed to take intermittent leave.

53.66.  In August 2020, Ms. Olivieri and Mr. Codignotto discussed Ms. Olivieri taking either the Financial Industry Regulatory Authority ("FINRA") Series 24 exam or the Series 9 and 10 exams.

54.67.  Beginning in September 2020, Stifel employees returned to working in the office full-time.

55.68.  Around the same time, Ms. Olivieri decided she wanted to take the FINRA Series 9 and 10 exams so that she could obtain a license to be a General Securities Sales Supervisor.

56.69.  Ms. Olivieri approached Mr. Codignotto about her desire to obtain the license and her desire to increase her compensation beyond its current base and bonus level.

57.70.  Mr. Codignotto told Ms. Olivieri that Stifel would be happy to sponsor her for these exams.

58.71.  Mr. Codignotto also admitted that Ms. Olivieri was undervalued at Stifel, and he wanted her to obtain the license as soon as possible because he needed someone to take on a General Securities Sales Supervisor role "right away."

59.72.  Additionally, Mr. Codignotto told Ms. Olivieri that her salary could double after she got the license.

60.73.  Towards the end of their meeting, Ms. Olivieri asked Mr. Codignotto if she could be transferred from reporting to Mr. Isler because she felt that he was disrespectful towards her.

61.74.  Mr. Codignotto inquired whether there was something specific Ms. Olivieri wanted to discuss, as Ms. Olivieri was clearly unnerved.

16

62.75.  Ms. Olivieri, sensing that Mr. Codignotto could already tell that something was wrong, left it at that at that point.

63.76.  On September 10, 2020, Ms. Olivieri called Mr. Codignotto to inform him that she was going to take a paid time-off ("PTO") day because heavy rain made it unsafe for her to drive to work.  Mr. Codignotto approved Ms. Olivieri's request.

64.77.  On September 14, 2020, Mr. Codignotto called Ms. Olivieri into his office and told her that Mr. Isler complained that she made her PTO request to Mr. Codignotto and not to him.

65.78.  Mr. Codignotto also mentioned that Mr. Isler complained about Ms. Olivieri taking intermittent leave to care for her mother who had been diagnosed with cancer in 2019.

66.79.  Mr. Codignotto stated that Mr. Isler had a "power issue" and assured her that she did not need to worry about his complaint and that she did nothing wrong.

67.80.  Mr. Codignotto then told Ms. Olivieri that she should take her Series 9 and 10 exams as soon as possible and that he may transfer her to another manager even before she obtained her license.

68.81.  Ms. Olivieri expressed her concern that she would have to forgo her bonus payments if she were transferred from under Mr. Isler.

69.82.  However, Mr. Codignotto assured Ms. Olivieri that her compensation would not be affected by any transfer.

70.83.  On September 25, 2020, Mr. Isler emailed Ms. Olivieri and gave her an unnecessarily hard time about a project he had given her with very loose parameters and no definitive time frame.

17

71.84.  After receiving Mr. Isler's email, Ms. Olivieri called Mr. Codignotto to complain that Mr. Isler was retaliating against her for avoiding him and refusing to engage with him in nonwork-related discussions.

72.85.  In response, Mr. Codignotto told Ms. Olivieri not to worry and said that there was nothing Mr. Isler could do to her.  He also stated that Ms. Olivieri may be able to work out of the Melville location but did not even suggest that Mr. Isler would have change offices or face any repercussions.

73.86.  Ms. Olivieri said that she was afraid to share the details of Mr. Isler's harassing conduct because she was worried about losing her job, Stifel pulling its support for her taking the Series 9 and 10 exams and jeopardizing her career.

74.87.  Mr. Codignotto told her that she should discuss her problems with Mr. Isler with an HR employee.

75.88.  Ms. Olivieri was still hesitant – given Mr. Isler's conduct and apparent "power issue" – to complain to HR out of fear of being retaliated against.

76.89.  Mr. Codignotto then suggested that they speak again at the Garden City location on Monday so she could take the weekend to decide how she wanted to address the situation. However, Mr. Codignotto did not legitimately prioritize the matter.

77.90.  On September 28, 2020, Ms. Olivieri called Mr. Codignotto's office number to further discuss the situation with Mr. Isler.

78.91.  However, Mr. Codignotto's secretary answered the phone and told Ms. Olivieri that she should text Mr. Codignotto's cell phone.

79.92.  After Ms. Olivieri sent Mr. Codignotto a text message asking to speak with him, Mr. Codignotto told Ms. Olivieri to call his cell phone.

18

80.93.  Ms. Olivieri then called Mr. Codignotto's cell phone, and he told her that he could not speak with her that day but that they could speak the following day.

81.94.  In effect, Ms. Olivieri was forced to chase Mr. Codignotto down to address Mr. Isler's harassing conduct.

82.95.  On September 29, 2020, when Ms. Olivieri arrived at work at the Garden City location, Mr. Isler immediately confronted Ms. Olivieri and told her that he wanted to discuss her projects and assignments.

83.96.  Ms. Olivieri then immediately went to Mr. Codignotto's office and complained that she was uncomfortable working in the same office as Mr. Isler and that Mr. Isler had just confronted her.

84.97.  Mr. Codignotto claimed that he needed more time to figure out how to address the situation, in part because he had been looking into her compensation and claimed he was not previously aware that Mr. Isler paid Ms. Olivieri a $15,000 guaranteed bonus.

85.98.  Mr. Codignotto did not explain how Ms. Olivieri's compensation had anything to do with her complaints of discomfort with Mr. Isler.

86.99.  Mr. Codignotto then told Ms. Olivieri that she should take the following day off while he figured out the situation.

87.100.       Almost immediately after Ms. Olivieri returned to her desk, Mr. Isler went to Mr. Codignotto's office, accused Ms. Olivieri of being "trouble" and claimed that Ms. Olivieri once told him that Mr. Codignotto told Ms. Olivieri that she "looked nice in her jeans" and that she said Mr. Codignotto's comment was inappropriate.

88.101.       Ms. Olivieri does not even wear jeans to work.

19

89.102.	Mr. Codignotto then called Ms. Olivieri back to his office and he told her what Mr. Isler said and asked, "Do we have a problem?"

90.103.	Ms. Olivieri replied that she did not have a problem with Mr. Codignotto and said that Mr. Isler was making false accusations against her because she complained about his behavior.

91.104.	The next day, on September 30, 2020, Mr. Codignotto told Ms. Olivieri to take the next day off while he worked to "figure out the situation."

92.105.	Mr. Codignotto subsequently sent Ms. Olivieri a text message stating that instead of taking off the following day she should report to the Melville location.

93.106.	On October 1, 2020, Ms. Olivieri worked out of the Melville location.

94.107.	Ms. Olivieri spoke with Mr. Codignotto on a phone call on October 1, 2020, but Mr. Codignotto again claimed that he needed more time to address her complaints.

95.108.	On October 2, 2020, Ms. Olivieri took a previously scheduled PTO day and attempted to contact Mr. Codignotto a couple of times to discuss the situation with Mr. Isler. However, Mr. Codignotto never responded to Ms. Olivieri's communications.

96.109.	Mr. Codignotto's repeated and continued failure to address Ms. Olivieri's complaints in a timely fashion shows that he did not take Ms. Olivieri's complaints seriously or make Ms. Olivieri a priority.

20

**IV.** **Ms. Olivieri Engages in Further Protected Activity and is Placed on Administrative** **Leave**

Formatted: Keep with next

97. 110.      On October 4, 2020, Ms. Olivieri called Mr. Codignotto and explained that she was anxious about complaining about Mr. Isler's behavior and how her complaints would affect her pay, job security and Stifel's support for her pursuing her General Securities Sales Supervisor license.

98. 111.      Mr. Codignotto reiterated that Ms. Olivieri would not face retaliation but did not provide her with any guarantee that her pay would remain the same if she were transferred from under Mr. Isler.

99. 112.      Mr. Codignotto then said that Ms. Olivieri would not be placed in a new position even after she obtained her General Securities Sales Supervisor license, walking back his earlier claim that he needed someone to take on a General Securities Sales Supervisor role "right away."

100. 113.      Mr. Codignotto then said that Ms. Olivieri's complaints needed to be escalated to HR and that she should report to the Melville location the following day.

101. 114.      That evening, Ms. Olivieri sent Mr. Codignotto a text message requesting a PTO day because she was suffering from anxiety.  Mr. Codignotto approved the request.

102. 115.      On Monday, October 5, 2020, Zack Anderson (HR employee at Stifel) called Ms. Olivieri and said he would be looking into her complaints about Mr. Isler.

103. 116.      Over the course of an approximate hour-long call with Mr. Anderson, Ms. Olivieri detailed Mr. Isler's sexually harassing behavior.  Ms. Olivieri complained about Mr. Isler's inappropriate conduct and comments, including the egregious behavior outlined above. _See supra_ at pp. 7-11.  At the end of the call, Mr. Anderson told Ms. Olivieri to take the following day off as well.

21

104.117.     On October 6, 2020, Mr. Anderson called Ms. Olivieri and said he would be speaking with Mr. Isler the next day and that he did not share the details of her complaints with Mr. Codignotto.

105.118.     Additionally, Mr. Anderson stated that Mr. Codignotto acknowledged that Ms. Olivieri was a strong performer and that she had shown initiative in seeking to obtain her General Securities Sales Supervisor license.

106.119.     Mr. Anderson also claimed that there would be a full investigation into Ms. Olivieri's claims but asserted his already determined conclusion that it was a "he said, she said" situation.

107.120.     On October 7, 2020, Mr. Anderson called Ms. Olivieri and said that Mr. Isler had been directed not to speak with her and that the investigation should be completed by the end of the week.

108.121.     On October 8, 2020, Mr. Anderson called Ms. Olivieri and conferenced in Marissa Ruser (another HR employee) so that she could be a "witness" to the call.

109.122.     Mr. Anderson then instructed Ms. Olivieri to keep her complaints confidential and to not disclose them with her colleagues or Mr. Codignotto.  This directive was in violation of the National Labor Relations Act.

110.123.     Mr. Anderson then asked Ms. Olivieri several follow-up questions. Specifically, Mr. Anderson asked Ms. Olivieri if she had made any inappropriate comments during her conversations with Mr. Isler.  Mr. Anderson also asked Ms. Olivieri when she became aware that Mr. Isler had issues with her performance.

111.124.      Ms. Olivieri responded that she never engaged in any inappropriate

comments or conduct at work and stated that she had already discussed Mr. Isler's false

allegations regarding her performance with Mr. Codignotto.

112.125.      At the end of the call, Mr. Anderson told Ms. Olivieri that she would be

placed on administrative leave and she should "stay home until further notice" and that he would

contact her soon.

113.126.      On October 9, 2020, Mr. Anderson called Ms. Olivieri and *admitted* that

Mr. Isler made inappropriate comments and that his behavior would be addressed.  However, Mr.

Anderson did not explain how Mr. Isler would be reprimanded.

114.127.      Mr. Anderson then attempted to accuse Ms. Olivieri of also making

inappropriate comments at work, completely disregarding the fact the Ms. Olivieri had told Mr.

Anderson that she never made inappropriate comments just the day before, not to mention the

fact that Mr. Isler is her boss not the other way around.

115.128.      In response, Ms. Olivieri again told Mr. Anderson that she had done

nothing wrong.

116.129.      Mr. Anderson then told Ms. Olivieri that she could either return to work at

the Garden City location, where Mr. Isler *would still be working*, or she could work permanently

out of the Melville location.  Mr. Anderson did not even mention the possibility of Mr. Isler

having to relocate offices.

117.130.      If she returned to the Garden City office, Mr. Anderson said that she could

work for Michael Turansky, Michael Cox, Shelly Kramer and Eric Singer, who are all manager-

level employees that manage only $1 to $2 million in assets.

23

118.131.    At the Melville location, Mr. Anderson said Ms. Olivieri could work for Kurt Uzbay, who also only manages around $2 million in assets.

119.132.    Mr. Isler manages over $300 million in assets and working for a manager that only manages $2 million would severely limit Ms. Olivieri's opportunities to work with high net-worth clients.

120.133.    Additionally, Mr. Anderson said that Stifel would increase her base salary from $47,470 to $55,000 and that she would receive a bonus between $3,000 to $5,000 for 2020, which would substantially reduce her compensation from the $63,500 all-in compensation that she had been earning under Mr. Isler.

121.134.    Mr. Anderson said that Ms. Olivieri could get back to him with her decision on Monday.  In response, Ms. Olivieri again complained that Mr. Isler had sexually assaulted and harassed her and that Stifel's response and the options provide to her were unacceptable.

**V.    Stifel Conducts a Sham Investigation and Retaliates Against Ms. Olivieri**

122.135.    On October 12, 2020, Ms. Olivieri informed Stifel that she retained legal representation to protect herself and pursue claims of sexual harassment, gender discrimination and retaliation against the Company.  Ms. Olivieri remained on administrative leave during this time and Stifel was supposedly investigating Ms. Olivieri's claims.

123.136.    On November 2, 2020, Ms. Olivieri, through her counsel, provided Stifel with correspondence containing a detailed written description of the extensive sexual harassment she had been subjected, as well as the retaliation following her complaints.  This correspondence stated that Ms. Olivieri intended to pursue litigation of her claims.

24

124.137.    Despite Ms. Olivieri's initial internal complaints to Stifel, her October 12, 2020 correspondence from counsel and her November 2, 2020 correspondence from counsel, Mr. Isler remained working at the office on a daily basis.

125.138.    Stifel did not take any intermediary measures to ensure the safety and appropriateness of the workplace – such as placing Mr. Isler on administrative leave or directing that he work from home – while Ms. Olivieri's claims were under investigation.

126.139.    On November 5, 2020, while Stifel's investigation remained ongoing, Ms. Olivieri emailed Mr. Anderson and stated that she wanted to return to work from administrative leave on Monday, November 9, 2020.  Ms. Olivieri posed several questions to Mr. Anderson about her return to work given that she had previously been thrust out of the workplace due to sexual harassment.  Among the questions she posed were:

- What is the status of the investigation into my complaints?

- Who is involved in the investigation?

- Who is aware that I raised these complaints?

- What has been done to ensure the harassment against me ends?

- What steps have been taken to ensure that I will be physically safe?

- Will Mr. Isler be in the office at the same time as me?

127.140.    On November 6, 2020, Mr. Anderson responded and said among other things that "The investigation is still ongoing and has not been closed" and "Mr. Isler is still working in the Garden City office" where Ms. Olivieri would be returning to work.

128.141.    Later that day, Ms. Olivieri replied in part as follows:

> It is absolutely unacceptable that you are permitting Neil to continue working in the office after he has sexually harassed and assaulted me.  It is even more unacceptable that you are expecting me to go back to work in the same office where he will be present.

25

> This demonstrates a complete lack of concern for my safety and for the protection of women who raise sexual harassment complaints. I expect this to be taken seriously. I cannot believe I even need to explain this to you. Please confirm that Neil will not be in the office while I am there at the very least until your investigation is completed. His presence will make me feel completely uncomfortable and unsafe.

~~129.~~142.     Mr. Anderson responded by dismissing Ms. Olivieri's concerns and stated definitively that Mr. Isler's presence did not create an unsafe environment, despite stating in a previous communication that the investigation was ongoing and had not yet been concluded.

~~130.~~143.     This response, together with the fact that Mr. Isler was *never* placed on any sort of administrative leave following Ms. Olivieri's complaints, demonstrated that Stifel had pre-determined that it would find that Mr. Isler posed no threat and did not take Ms. Olivieri's complaints seriously, particularly once Ms. Olivieri retained counsel and the prospect of litigation became likely.

~~131.~~144.     Ms. Olivieri responded:

> Neil has sexually harassed and assaulted me. You say you are investigating that. Even though you have said your investigation is not complete, you seem to have already decided that the workplace is not unsafe. How can you possibly make such a flippant decision that concerns my safety if you are not even done with your investigation? Clearly you are not legitimately investigating my complaint and are not genuinely concerned for me or my safety. It seems you are simply protecting the company given that I have hired a lawyer and raised legal claims. I may not bring in revenue like Neil does, but that should not be factored into the way you investigate and treat employees.

~~132.~~145.     Despite the fact that Stifel refused to handle the matter with any level of seriousness, Ms. Olivieri determined that she would not let Mr. Isler and Stifel dictate her life, and she committed to returning to work even though it made her feel unsafe.

~~133.~~146.     Ms. Olivieri was all set to return to work on Thursday, November 12, 2020.

134.147.    On November 10, 2020, Mr. Anderson informed Ms. Olivieri that when she arrived at work that Deborah O'Connor (an HR employee) would meet with her, and with Mr. Anderson on the phone, to "discuss the investigation."

135.148.    Ms. Olivieri responded:

> I am not comfortable speaking to the two of you directly regarding the investigation and related topics-- it gives me a lot of stress and anxiety which is already extremely high due to the harassment and assault I've been subjected to by Neil. It also makes me uncomfortable as I do not feel that you are genuinely there to help me and really are just interested in protecting the company. I'd prefer it if all our communications about these matters go through email. Please confirm. Thank you.

136.149.    Mr. Anderson responded that he would not accommodate this request. He stated, "[r]egarding our meeting about the investigation and related topics, it is a matter of standard practice at the conclusion of an investigation that we discuss these topics with the person who filed a complaint."

137.150.    Contrary to Mr. Anderson's representation, Stifel's Associate Handbook states nothing whatsoever about any policy or practice to discuss in investigation verbally with employees.

138.151.    Upon information and belief, there is no "practice" at Stifel to discuss in investigation verbally with employees.

139.152.    Upon information and belief, there is no "practice" at Stifel requiring a refusal to provide Ms. Olivieri with a written explanation of the investigation results.

140.153.    In response, Ms. Olivieri implored Mr. Anderson to accommodate her request:

> As to the proposed meeting with you and Debra, again, I am not comfortable with that. You have completely disregarded my feelings and mental health yet again by stating that I have to attend

27

in person.  Whether Stifel has "standard practices" or not, you should be able to accommodate my mental health and my request to ensure that I do not feel uncomfortable or otherwise create a more stressful environment for me.  You have provided no reason to deny my request.  If you have questions, those can be asked via email.  If you have a conclusion to report (although clearly you are going to conclude whatever is in the company's best interest whether it is true or not), those can be communicated via email . . . I've also read through the employee handbook you sent me and it says nothing about having to do an in-person meeting, let alone one that makes me feel uncomfortable.  Please confirm that my wishes will be respected, and please do not ignore my email.

**Formatted:** Font: 12 pt

141.154.      Mr. Anderson refused to accommodate Ms. Olivieri's request and said that if she wanted the results it would only be provided in an in-person meeting, which he knew made her feel uncomfortable.

142.155.      On November 12, 2020, Ms. Olivieri returned to work.

143.156.      Instead of assigning Ms. Olivieri to support different set of investment professionals, as previously indicated, Mr. Codignotto informed Ms. Olivieri that she will not be assigned to support anyone and will be spending her days preparing for her Series 9 and 10 certifications. Essentially, all of Ms. Olivieri's job responsibilities were stripped from her.  Mr. Isler remained in the workplace apparently facing absolutely no repercussions for his actions.

144.157.      To date, Stifel has refused to provide Ms. Olivieri with the results of the investigation unless she agrees for the results to be delivered verbally in-person.

145.158.      Stifel's response to Mr. Isler's conduct and Ms. Olivieri's complaints shows that the Company has no interest in legitimately investigating Mr. Isler and is not genuinely concerned for Ms. Olivieri's safety.  Rather, Stifel's conduct proves that the Company is only interested protecting will go to all lengths to protect its revenue producers and its own interests, including subjecting Ms. Olivieri to blatant retaliation and hostilities for complaining of Mr. Isler's sexual harassment of her.

28

146.    Ms. Olivieri continues to work in a hostile work environment where she feels unsafe due to Mr. Isler's presence and unprotected by a Company that does not provide legitimate avenues for complaints of misconduct and remedial measures.

159.    On January 5, 2021, Ms. Olivieri filed her Complaint in this instant action.  In her initial Complaint, Ms. Olivieri alleged that while employed at Stifel, Mr. Isler subjected her to egregious sexual harassment and retaliation after she raised complaints about his conduct.  As she then alleged, Ms. Olivieri's numerous complaints resulted in not a single substantive remedial measure.  Instead, it was Ms. Olivieri who was subjected to changes in the terms and conditions of her employment and, ultimately, punished for raising her complaints.

**VI.    Following Ms. Olivieri Filing Her Amended Complaint, Defendants Followed Through on Their Threats to Assign Ms. Olivieri to a Different Office Location**

160.    On May 20, 2021, Plaintiff filed her Amended Complaint in which she specifically named Mr. Isler individually as a Defendant and also raised additional claims of retaliation.

161.    In the immediate aftermath of Ms. Olivieri filing her Amended Complaint, Defendants – with Mr. Codignotto as the primary individual actor –engaged in completely blatant further retaliation and harassment.

162.    Within less than 10 days of Ms. Olivieri filing her Amended Complaint, Stifel and Mr. Codignotto followed through with their previous threats to transfer Ms. Olivieri to a different office location less desirable to Ms. Olivieri.

163.    On May 28, 2021, Mr. Codignotto called Ms. Olivieri into his office and informed Ms. Olivieri that he was transferring her from the Garden City office location to Melville to work for four different Advisors that would all be supervising her.  In doing so, Mr. Codignotto

29

informed Ms. Olivieri that she "will be reporting to Melville" effective the following workday, June 1, 2021.

164.    Ms. Olivieri immediately requested that Mr. Codignotto put this information into an email and send it to her.  Mr. Codignotto responded that he did not want to because he "just gave her all the details."  Ms. Olivieri once again requested that she receive the details in writing.  Mr. Codignotto finished the conversation by stating he had to check with Stifel's legal team to see if he could send her an email.

165.    Shortly thereafter, Ms. Olivieri received an email from Mr. Codignotto indicating that Ms. Olivieri would be assigned to the Melville location and be supporting Jeff Haiken, Gail Sokol, Scott Klein and Jeff Wagner starting June 1, 2021.

166.    Ms. Olivieri was immediately upset given that she had previously – on numerous occasions – protested Stifel's and Mr. Codignotto's attempts to transfer her to a new location, while allowing Mr. Isler to remain at the Garden City location.

167.    That same day, Ms. Olivieri responded to Mr. Codignotto by protesting his decision to move her office location and indicating that she believed Mr. Codignotto's actions were continued retaliation:

> I do not accept or agree with this assignment, which is clearly retaliation for me refusing to discontinue the lawsuit against Stifel and for naming Neil as a defendant.  As you probably remember, after I raised my sexual harassment claims I was placed on administrative leave.  When I returned, Stifel tried to move me to the Melville location.  I refused because it was completely improper to force me to move offices and to allow my harasser to remain in Garden City.  I was then permitted to stay in Garden City, though clearly that is not what you, Neil or the company wanted.  Now, even knowing that it is unacceptable to me, you are again attempting to move me away from the Garden City location.

30

168.     In response, also on May 28, 2021, Mr. Codignotto said it was not her choice, that relocating Ms. Olivieri was "appropriate under the circumstances" and that he expected Ms. Olivieri to report to Melville on the following business day.

169.     Ms. Olivieri responded by inquiring if she would be fired if she did not agree with Mr. Codignotto's retaliatory transfer of her work location.

170.     Mr. Codignotto confirmed that Ms. Olivieri would be terminated if she did not report to Melville moving forward, stating: "If you choose not to accept this role and report to the Melville office on June 1, we will consider this your resignation."

171.     By threatening to terminate Ms. Olivieri and designate her termination a "resignation," Defendants were attempting to prevent Ms. Olivieri from even obtaining unemployment benefits from her potential termination.

172.     On May 31, 2021, Ms. Olivieri responded to Mr. Codignotto stating:

> You are clearly retaliating against me and you have never once held Neil accountable for sexually harassing me.  As you have said I will be fired if I don't accept your transfer (and would then attempt to prevent me from getting unemployment by falsely saying I quit), I have no choice but to work from Melville.

173.     On May 31, 2021, Ms. Olivieri also emailed Stifel's Director of HR, Benjamin Ola Akande, to inform him of Mr. Codignotto's retaliatory transfer of her office location and to request remote work accommodations as a result of her pregnancy putting her at high risk for complications associated with COVID-19.  She wrote:

> I am reaching out to you because I understand you recently became the Director of Human Resources at Stifel.  You may or may not be aware that I was sexually harassed by the financial advisor I support named Neil Isler and have filed a lawsuit against the company.  Just last week, directly after I named Neil Isler personally as a defendant in the lawsuit, my branch manager Rob Codignotto retaliated against me by forcing me to transfer locations and saying I would be fired if I did not accept the

31

transfer.  I had previously told Rob I wanted to continue working in Garden City and the company said it would honor that request.  But now the company has taken a new approach and I have no say in this matter.  This is so clearly retaliatory but there is nothing I can do about it.  I wanted to make sure you are aware of this given your position at the company.

174.    On June 1, 2021, as a result of being told that she would be terminated unless she complied with Defendants' retaliatory transfer of her office location, Ms. Olivieri reported to the Melville office.

175.    Immediately upon reporting to Melville, Ms. Olivieri was confronted by an unwelcome setting clearly not intended to make her feel at all welcome.

176.    Despite being told that her workstation was to be appropriately sanitized, Ms. Olivieri was provided with a dirty workstation and an office chair that appeared to be unclean and stained and warped from the oils in the hair of the previous employee that used it.

177.    Additionally, at Ms. Olivieri's previous office, after informing Mr. Codignotto of injuries she received from an accident in 2018, Ms. Olivieri was provided with a chair that provided better support to her neck and back.

178.    At her new office, no efforts were made prior to her arrival to provide Ms. Olivieri with a chair that provided similar level of support.

**VII.    Stifel and Mr. Codignotto Denied Plaintiff a Promotion and Awarded the Position to a Lesser Qualified and Experienced Candidate**

179.    While Ms. Olivieri was waiting for her new workstation to be cleared out of the previous occupant's belongings, Ms. Olivieri learned from Christina Scelta (Operations Manager) that their colleague, Marie Baratta, was being transferred to Garden City because she had been awarded a promotion to Administrative Assistant to the Branch Manager, a position that Mr. Codignotto previously indicated Ms. Olivieri was the "perfect fit" for.

180.    In or around late January/early February 2021, Ms. Olivieri first learned of the opening for the position of Administrative Assistant to the Branch Manager when Mr. Codignotto approached Ms. Olivieri and urged her to apply for the position.

181.    Mr. Codignotto told Ms. Olivieri that she was the "perfect fit" for the position and that he "needed somebody he could trust," like Ms. Olivieri.  Mr. Codignotto then told Ms. Olivieri that she should apply for the position.

182.    Ms. Olivieri looked into the position and became interested.  Ms. Olivieri noticed that under the essential duties and responsibilities of the role both Series 9 and 10 licenses were mentioned with respect to carrying out certain functions when the Branch Manager is absent.

183.    This made Ms. Olivieri confident that she was a good candidate for the position as she obtained her Series 9 license on January 29, 2021 and was in the process of obtaining her Series 10 license.  Additionally, Ms. Olivieri already had previously obtained Series 7 and Series 63 licenses.

184.    On or about March 17, 2021, Ms. Olivieri applied for the Administrative Assistant to the Branch Manager Position.

185.    Despite being urged to apply for the position and being qualified for the position, Ms. Olivieri was never even contacted for an interview.

186.    Instead, as mentioned above, Stifel chose to award the position to Ms. Baratta.

187.    Upon information and belief, Ms. Baratta is less qualified and experienced than Ms. Olivieri and did not have a Series 7, Series 63, Series 9 or Series 10 license at the time of being selected for the position over Ms. Olivieri.

188.    Stifel and Mr. Codignotto declined to interview Ms. Olivieri and awarded the position to a less qualified employee in retaliation for Ms. Olivieri for prosecuting her claims

33

against Stifel and Mr. Isler and in response to Ms. Olivieri filing an Amended Complaint in this matter.

189.    Shortly after learning from Ms. Scelta that Ms. Baratta had been selected for the position on June 1, 2021, Ms. Olivieri received an email from the Talent Acquisition Team rejecting her candidacy for the Administrative Assistant to the Branch Manager and informing her that Stifel had "decided to pursue other candidates."

190.    Upon information and belief, as Branch Manager, Mr. Codignotto had the authority to make hiring decisions for the Administrative Assistant to the Branch Manager position and played a substantial role in Stifel declining Ms. Olivieri's application for the role without interviewing Ms. Olivieri.

**VIII.   Mr. Codignotto Attempts to Intimidate Ms. Olivieri and Create Documentation to Support His False Allegations**

191.    On June 3, 2021, Mr. Codignotto followed up his retaliatory transfer of Ms. Olivieri by sending her an intimidating email full of false accusations.

192.    In his email, despite Mr. Codignotto being the person that stripped Ms. Olivieri of her job responsibilities and told Ms. Olivieri to spend her days studying for the Series 9 and 10 licenses, Mr. Codignotto indicated that Ms. Olivieri would be provided with new assignments and claimed that she needed to "get back to work" because it "has been well over six months of us paying you for work you are not performing."

193.    Additionally, in a blatant attempt to cover up his retaliatory actions of stripping Ms. Olivieri of her job duties upon her return to work in November 2020, Mr. Codignotto claimed that Ms. Olivieri asked to be stripped of her job responsibilities as an "accommodation," which is false:

You asked us for an accommodation to delay assigning you to a team last November to study for an exam and catch up on other work.  Since then, you have now claimed that the accommodation was retaliation.

194.    Mr. Codignotto also informed Ms. Olivieri that rather than performing the responsibilities associated with her role as a Client Services Associate, Ms. Olivieri would be performing tasks that amounted to administrative busy work moving forward.  Finally, in an apparent attempt to lay the groundwork for claiming that Ms. Olivieri is having performance issues, Mr. Codignotto included several false allegations regarding Ms. Olivieri's work performance, including that she was "resistant" to working with her new team and "refused to answer phones after being instructed to do so."

195.    Mr. Codignotto's June 3, 2021 email was sent with the intent of further harassing and intimidating Ms. Olivieri and caused Ms. Olivieri to experience continued distress due to the hostile work environment at Stifel.  Moreover, Mr. Codignotto's alterations to the terms and conditions of Ms. Olivieri's employment are a continuation of the campaign of retaliation and hostilities that is being waged against Ms. Olivieri.

196.    That same day, on June 3, 2021, Ms. Olivieri received a call from Teri Wheeler, who was a Senior HR Business Partner at the time.  Ms. Wheeler informed Ms. Olivieri that another member of Stifel's HR Department, Lisa Garcia, would be reaching out to Ms. Olivieri regarding her accommodation request and to provide additional paperwork for Ms. Olivieri's medical provider to complete.  Ms. Wheeler indicated that Ms. Olivieri would be permitted to work from home during the processing of Ms. Olivieri's accommodation request.

197.    On June 4, 2021 Defendants Stifel and Codignotto proceeded to intentionally diminish Ms. Olivieri's role at Stifel by reducing Ms. Olivieri's role to a purely administrative function whereby she was assigned to perform busy work such as locating missing

35

documentation.  In doing so, Stifel once again stripped Ms. Olivieri of the functions associated with the role of Client Services Associate.

198.    Defendants' reduction of Ms. Olivieri's role to administrative functions was not necessitated by Ms. Olivieri's remote work accommodation, as Ms. Olivieri and other Client Services Associates successfully performed their roles remotely for extended periods during the COVID-19 pandemic.

199.    On June 10, 2021, Ms. Olivieri provided the completed accommodation paperwork to Ms. Wheeler and Ms. Garcia.  In her paperwork, Ms. Olivieri's medical provider stated that the remote work accommodation would not prevent her from performing any essential functions of her role.  Ms. Olivieri was certain that she could perform the essential functions of her role remotely because, as noted above, Ms. Olivieri and other Client Services Associates had done so during the COVID-19 pandemic.

**IX.    Ms. Olivieri Files a Supplemental Complaint and Defendants Continue to Retaliate Against Ms. Olivieri and Subject Ms. Olivieri to a Hostile Work Environment**

200.    As a result of Defendants subjecting Ms. Olivieri to a continuing campaign of retaliation and an ongoing hostile work environment, Ms. Olivieri filed a Supplemental Complaint in this matter on June 16, 2021.  (Dkt. No. 23).

201.    Since the filing of Ms. Olivieri's Supplemental Complaint, Defendants continue to retaliate against Ms. Olivieri and subject her to a hostile work environment to the present day.  Defendants' conduct makes it clear Stifel is attempting to make Ms. Olivieri's life at Stifel as difficult as possible to send a message to her that filing litigation against the Company will not be tolerated.  This retaliatory and ongoing hostility comes in the form of certain overt acts of retaliation together with completely disparate treatment relative to Ms. Olivieri's peers.

202.    As described in more detail below, but as a non-exhaustive list, Defendants have:

36

- Functionally demoted Ms. Olivieri by requiring her to remain in a purely administrative role, thereby negatively impacting her career trajectory at Stifel;

- Refused to provide Ms. Olivieri with a pathway to get her career and trajectory back on track to a Client Services Associate role or another more senior and more highly compensated role previously promised to her;

- Withheld compensation from Ms. Olivieri in an unjustified manner that is inconsistent with Company practices;

- Removed Ms. Olivieri from her Client Services Associate role and required Ms. Olivieri to perform an inferior role that is unrelated to her Client Services Associate role and offers less possibility for advancement both internally at Stifel and externally for her career prospects;

- Unnecessarily included one of Ms. Olivieri's harassers, Mr. Codignotto, in numerous communications with Ms. Olivieri despite Ms. Olivieri indicating that it caused her anxiety and emotional distress to work with him;

- Intentionally isolated Ms. Olivieri, failed to communicate Company announcements that impacted Ms. Olivieri's work schedule and excluded Ms. Olivieri from important Company meetings, thereby making it clear to Ms. Olivieri and others that she had a diminished role and future at Stifel;

- Rejected Ms. Olivieri's requests that Stifel take action to address the ongoing and persistent harassment by developing and implementing safety measures to prevent further harassment and retaliation by Mr. Codignotto and Mr. Isler;

- Directed hostile treatment towards Ms. Olivieri in response to Ms. Olivieri engaging in additional protected activity by raising her concerns of ongoing harassment and retaliation with Stifel's HR, including but not limited to, insulting her, completely refusing to answer her legitimate questions, refusing to provide her with support, and belittling her requests to communicate in a way (in writing) that did not trigger her anxiety; and,

- Ordered Ms. Olivieri to be docked for PTO in a manner that her colleagues are not required to; namely, despite acknowledging that Stifel routinely provided leniency to employees from its written policy that any 15-minute break from work constitute PTO (i.e., coffee breaks, short errands, short doctor's appointments). In doing so, Stifel told Ms. Olivieri that she would be treated differently than others and had to follow the written policy without exception.

203.    The aforementioned list of conduct, which has been part of the ongoing and

continuing hostile work environment which started with Mr. Isler's sexual harassment and

37

continued through the retaliatory conduct which followed her initial internal complaints of discrimination, continues to the present day.

204.    As to Ms. Olivieri's effective demotion and the derailment of her career trajectory referenced above, despite being aware that Ms. Olivieri could perform the functions of her Client Services Associates role remotely, Defendants continued to require Ms. Olivieri to work in a purely administrative role.

205.    Even in this diminished role, Defendants routinely ignored Ms. Olivieri's communications and failed to provide her with the appropriate supplies and materials to perform the administrative tasks she was assigned.

206.    By way of example, Ms. Scelta – who was actively overseeing Ms. Olivieri's work – was completely unresponsive to numerous emails and calls from Ms. Olivieri's to the point that Ms. Olivieri needed to reach out to Ms. McManus for assistance on August 26, 2021.

207.    Ms. Olivieri remained in an administrative role until going on maternity leave on October 29, 2021.  The hostile work environment continued immediately upon her return, which was scheduled for February 24, 2022.

**X.      Ms. Olivieri Returns from Maternity Leave in March 2022 and is Instantly Subjected to Additional Retaliation and Harassment**

208.    Ten days before her return to work, on February 14, 2022, Ms. Olivieri reached out to her HR Representative, Ms. Wheeler, regarding her need for a remote work accommodation.  On February, 22, 2022, more than one week later and only two days before Ms. Olivieri's scheduled return from leave, Stifel provided forms for Ms. Olivieri and her medical provider to complete.

209.    Despite a previous practice of providing employees with an interim accommodation while the paperwork was being processed, Stifel changed course for Ms.

38

Olivieri.  For Ms. Olivieri, Stifel decided that no interim accommodation would be provided and proceeded to withhold Ms. Olivieri's pay during the processing of her accommodation request and paperwork.  This was clear disparate treatment due to Ms. Olivieri's lawsuit.  Stifel's withholding of pay from Ms. Olivieri while her accommodation paperwork was processing was a retaliatory and hostile deviation from the Company's practices.

210.    Further demonstrating that Stifel's refusal to pay Ms. Olivieri during the processing of her accommodation was merely an attempt to cause harm to Ms. Olivieri and was contrary to typical practice, Stifel had previously permitted Ms. Olivieri to receive compensation and work remotely while her prior accommodation was being processed in June 2021.  Notably, this occurred before Ms. Olivieri's additional complaints of continued retaliation and hostile work environment, as well as Ms. Olivieri's filing of a Supplemental Complaint that added Mr. Codignotto as a defendant.

211.    On March 9, 2022, Ms. Olivieri provided her completed accommodation paperwork to Stifel.  Two days later, on March 11, 2022, Ms. Gaffney acknowledged that the Company had received Ms. Olivieri's documentation, and that Ms. Olivieri's accommodation request had been granted.  Ms. Gaffney informed Ms. Olivieri that, she had "spoken to the Branch and we ask for your patience while we make sure we have the appropriate set up for you to work from home in *your position*."

212.    Despite Ms. Gaffney indicating that Stifel was arranging the "appropriate set up" for Ms. Olivieri to "work from home in [her] position" – Client Services Associate – Stifel *did not restore Ms. Olivieri to her role* upon Ms. Olivieri's return from maternity leave on March 10, 2022.  Rather, Stifel, once again, intentionally diminished Ms. Olivieri's role at the Company – this time by placing her in a completely different and unrelated role, whereby she reported to a

39

new supervisor, Neal Manfredi (Central Supervision Supervisor).  In doing so, Stifel continued their ongoing pattern of interfering with Ms. Olivieri's role at the Company in a manner that has negatively impacted Ms. Olivieri's career trajectory and growth at Stifel.

213.    On March 18, 2022, Ms. Scelta scheduled a meeting with Ms. Olivieri and Mr. Codignotto to discuss Ms. Olivieri's medical accommodation.  Mr. Codignotto is not only an accused harasser and retaliator, but he is also a Defendant in this action and adverse to Ms. Olivieri.

214.    Shocked that Mr. Codignotto was being looped in on conversations and decision making regarding her employment despite already having a record of harassing her (together with an already lengthy record of numerous retaliatory acts by Stifel), Ms. Olivieri responded:

> I don't feel comfortable discussing something as private as my medical accommodation with Robert Codignotto present. As you know, I'm currently suing Mr. Codignotto for discrimination and retaliation. Requiring me to discuss my medical accommodation with him feels like a continuation of Stifel's efforts to harass and intimidate me. I request that any conversation regarding my medical accommodation occur without Mr. Codignotto present.

215.    On March 22, 2022, Ms. Olivieri had her call with Ms. Scelta regarding Ms. Olivieri's role moving forward.  Putting to doubt any remaining belief that that she could succeed at Stifel, Ms. Scelta confirmed that Stifel was assigning Ms. Olivieri to a completely different and diminished role, unrelated to Ms. Olivieri's Client Services Associate role, that offers less possibility for advancement both internally at Stifel and externally for her career prospects.  Ms. Scelta also confirmed that Mr. Manfredi would be supervising Ms. Olivieri in her new role.

216.    That same day, Ms. Scelta followed-up with Ms. Olivieri by email and memorialized that Stifel placed Ms. Olivieri in an unrelated and diminished role.  Ms. Scelta also

40

confirmed that Stifel would be providing Ms. Olivieri the necessary equipment to perform her new role soon – despite Ms. Olivieri already being back from leave for nearly two weeks.

217.    On March 23, 2022, Ms. Olivieri was once again forced to encounter Mr. Codignotto in communications related to her role.  Stifel has allowed unnecessary interactions between Ms. Olivieri and her harasser, Mr. Codignotto, to persist despite being on explicit notice that Ms. Olivieri experiences significant distress and trauma when she encounters him or Mr. Isler.

218.    On March 25, 2022, Ms. Olivieri was included on an email to Stifel's Entitlements and Access Control Team from John Thomas (Stifel Central Supervision) stating that the Company was yet to definitively determine the role that they were going to shuffle Ms. Olivieri into next.  Rather, they were "attempting to find a role" for Ms. Olivieri.  The same day, Megan Gilbert (Director, Entitlements and Access Control) confirmed that the Company had revoked Ms. Olivieri's privileges to access systems that were essential to her role as a Client Services Associate, further demonstrating that Stifel removed Ms. Olivieri from her role.

219.    As Ms. Olivieri and other Stifel employees performed the Client Services Associate role remotely in the past, any suggestions by Stifel that the changes to Ms. Olivieri's role were necessitated by Ms. Olivieri's accommodation are pretextual.  Rather, Stifel was clearly continuing its pattern of diminishing Ms. Olivieri's role at the company and interfering with her ability to progress into the previously promised career advancements.  Stifel's pattern of interfering with Ms. Olivieri's role and trajectory began at the point of her complaints concerning Mr. Isler's sexual assault and harassment of her and has persisted to this point.

220.    On or around March 31, 2022, at the recommendation of her new supervisor, Mr. Manfredi, Ms. Olivieri reached out to Stifel's Technical Support Department to request an

41

additional monitor so she could more efficiently perform her work at home.  Shortly after making her request, Ms. Scelta scolded Ms. Olivieri for not obtaining approval from Mr. Codignotto before requesting the equipment from Technical Support.  Ms. Scelta was explicitly aware that requiring Ms. Olivieri to request approval directly from Mr. Codignotto would cause Ms. Olivieri to experience unnecessary distress.  Moreover, it was unreasonable for Ms. Scelta to reprimand Ms. Olivieri for requesting equipment at the recommendation of current supervisor, Mr. Manfredi.

221.    On April 5, 2022, Stifel – via Ms. Scelta – proceeded to dock Ms. Olivieri's PTO in 15-minute increments for a brief period that she was away from her computer for a short doctor's appointment.  This was a complete and blatant deviation from Stifel's longstanding practices.  Previously, Ms. Olivieri would not be required to use PTO in such a situation.  In fact, throughout the four and a half years that Ms. Olivieri has been employed by Stifel, Ms. Olivieri obviously observed her colleagues similarly being permitted to briefly step out of the office without utilizing PTO for short doctor's appointments, coffee breaks, or running quick errands. But all of a sudden, Ms. Olivieri was being subject to a new and more restrictive set of rules and conditions.  Further demonstrating that this was a change in how Stifel's PTO policies were applied to Ms. Olivieri, had it been the norm for PTO to be utilized in such a manner, there would be no need for Ms. Scelta to inform Ms. Olivieri of this practice.  No mass communication or other communication was sent to other employees that the PTO policy was going to be applied in a different manner than before.

222.    Upon information and belief, Stifel has not made changes to its PTO practices with respect to any other employees besides Ms. Olivieri.

42

223.    Upon information and belief, Ms. Scelta was aware that her docking of Ms. Olivieri's pay was a deviation from Company practice and did so to support and advance Stifel's hostile and retaliatory campaign against Ms. Olivieri.

224.    On April 8, 2022, Ms. Olivieri raised complaints of ongoing retaliation and hostile work environment with Stifel's HR Department through an email to Ms. Gaffney:

> I have some concerns regarding the impact that my complaints of sexual harassment are having on my role and overall career trajectory at Stifel. Ever since I complained about Neil Isler's sexual harassment of me, I am being subjected to retaliation and a hostile work environment. This includes that fact that my role has been and continues to be altered. My responsibilities and supervisors have shifted now on several occasions and continues to do so. It is as if I am in an entirely different role now.

> Changes to my role have happened as recently as March 10, 2022 (upon my return from maternity leave). Once again, I find myself reporting to new supervisors and performing tasks that were never previously my responsibilities. I would like to know why my role has and continues to keep changing? I can't imagine that the constant and continuing changing of my role hasn't affected my trajectory. On a similar note, I find myself now doing compliance work for Stifel. Is my current compensation aligned to the new nature of my responsibilities and has my title changed?

> Equally concerning, the company has recently (3/18/22) included Robert Codignotto in highly private conversations related to my request for a medical accommodation. The fact that the company included Mr. Codignotto in these personal matters of mine while knowing that I am suing Mr. Codignotto for discrimination and retaliation shows that the company didn't take adequate measures to ensure that I am not exposed to additional mistreatment and distress. In response to Mr. Codignotto being included on private correspondence related to my medical accommodations, I made it clear that it felt like a "continuation of Stifel's efforts to harass and intimidate me." Since then, Mr. Codignotto has been looped in on other issues related to my role.

225.    Without conducting any investigation into Ms. Olivieri's complaints whatsoever, which was completely in contravention of Stifel's written policy and best practices, Ms. Gaffney

43

responded and confirmed that Ms. Olivieri had been placed in a different role.[1]  Ms. Gaffney falsely claimed that the change to Ms. Olivieri's role was a result of Ms. Olivieri's remote work accommodation.  Ms. Gaffney provided a blatantly pretextual excuse for Stifel engaging in a retaliatory and hostile pattern of altering Ms. Olivieri's role that has been ongoing ever since Ms. Olivieri first complained of Mr. Isler's sexual harassment.[2]  In doing so, Ms. Gaffney ignored Ms. Olivieri's protected complaints about ongoing retaliation and harassment and, instead, knowingly attempted to cover up the Company's unlawful behavior.

226.    Further confirming that Stifel no longer considered Ms. Olivieri for the career advancements that she was previously promised, Ms. Gaffney informed Ms. Olivieri that she did not need to obtain additional licensing as the licenses were not necessary for a "support role" at the Stifel.  Clearly, ever since Ms. Olivieri engaged in protected complaints and file this lawsuit, she lost any chance and being anything more an a "support role" at Stifel, which was the opposite of what she had previously been promised.

227.    On April 12, 2022, Ms. Olivieri responded to Ms. Gaffney detailing Stifel's pattern of interfering with Ms. Olivieri's role:

> With respect to my concerns about my career trajectory, my role
> has completely changed at least 4 times since I complained about
> Mr. Isler's sexual harassment. I was completely stripped of my job
> duties and told to study. Then after I complained that my role was
> removed from me, I was assigned to doing administrative busy
> work related to finding missing documents for brokers across
> locations. I did that up until going on maternity leave. Upon

---

[1]    To date, approximately 5 months after returning from maternity leave, Ms. Olivieri remains performing a diminished role, which is unrelated to Ms. Olivieri's role of Client Services Associate.

[2]    Stifel's pattern of altering Ms. Olivieri's role in the aftermath of her complaints of sexual harassment and retaliation includes, but is not limited to, the following: placing Ms. Olivieri on a paid leave in October 2020; stripping Ms. Olivieri of her job responsibilities in November 2020; transferring Ms. Olivieri to a different job location within 10 days of Ms. Olivieri filing her Amended Complaint in May 2021; assigning Ms. Olivieri to perform purely administrative functions that were not aligned with her role and experience in June 2021; and now, upon Ms. Olivieri's return from maternity leave on March 10, 2022, removing Ms. Olivieri from her Client Services Associate role and placing her in an unrelated and diminished role.

44

returning from leave on 3/10, I have been assigned a whole new set of responsibilities that are not associated with any of the functions of the Client Services Associates role. Client Services Associates don't report to Mr. Manfredi. It wasn't made clear to me that I was assigned a "temporary" role. How long will I be in this role? After this role, what are my role and responsibilities going to be and who will I report to?

Before I complained about Mr. Isler's sexual harassment, I was being told that I had a promising future. I was told I was on track to become a General Securities Sales Supervisor. Your point that I don't need the additional licensure that I'm seeking to perform the Client Services Associate role or to be "support staff" shows me that Stifel no longer considers me somebody who will progress to the next level. This has been the case ever since I complained. I have been shuffled around across teams and locations and assigned busy work or "temporary" roles. With respect to the point that this has all been done simply to "accommodate" me, I don't understand how that is the case, especially since I could have performed Client Services Associates functions remotely. Stripping me of my job responsibilities and then assigning me busy work also weren't accommodations.

228.    Ms. Olivieri also requested information regarding basic protocols to ensure her safety from further retaliation from Mr. Codignotto:

With respect to Mr. Codignotto, I feel like nobody is hearing me when I am saying that being required to work closely with somebody who is retaliating against me because he decided to support my harasser continues to be very traumatizing. I've already provided you several examples on how he's being looped into communications with me in an unnecessary way. Stifel has done very little to look out for me in this respect (was a similar situation with Mr. Isler).

229.    Through a series of correspondence, Ms. Gaffney proceeded to ignore Ms. Olivieri's protected complaints and advanced knowingly false justifications for Stifel's continued pattern of diminishing Ms. Olivieri's role and lack of safety protocols to prevent Ms. Olivieri from unnecessarily encountering her harassers.  Still, no investigation of Ms. Olivieri's

45

complaints of ongoing retaliation and harassment was ever conducted – again, in complete contravention of the policies and practices Stifel guarantees to its employees.

230.   On April 27, 2022, nearly a month and a half from Ms. Olivieri returning from maternity leave, Ms. Gaffney admitted that Stifel did not have a role for Ms. Olivieri, stating that Stifel "cannot determine the position to which [Ms. Olivieri] will be assigned."

231.   As a result of Ms. Gaffney clearly avoiding Ms. Olivieri's concerns and engaging in a blatant attempted cover-up of the Company's ongoing retaliation and harassment, Ms. Olivieri requested to be connected with somebody who would address her concerns.

232.   On April 28, 2022, Milissa Roth (Director, Employee Relations ("ER")) reached out to Ms. Olivieri via email.  Instead of addressing Ms. Olivieri's concerns about how Stifel's pattern of shuffling Ms. Olivieri around into new roles, Ms. Roth stated that Ms. Olivieri "may apply" for positions as they become available.  Thus, Stifel thrusted upon Ms. Olivieri the obligation to find an appropriate job – even though Stifel never interviewed Ms. Olivieri for the last role she applied for and awarded it to a less qualified employee.

233.   Clearly attempting to avoid addressing Ms. Olivieri's concerns in writing, Ms. Roth scheduled a call for herself and Ms. Olivieri for the following Monday.

234.   The next day, Ms. Olivieri responded to Ms. Roth and provided a detailed account of Stifel's history of altering Ms. Olivieri's role in the aftermath of her complaints of sexual harassment, retaliation and hostile work environment, in the perhaps naïve hope that doing so in a clear and direct manner might possibly generate some remedial action:

- On October 8, 2020, while a purported investigation into my sexual harassment complaints was occurring, I was placed on administrative leave while Mr. Isler was permitted to remain working at the office.

46

- Upon return from administrative leave on November 12, 2020, Stifel stripped me of all of my job responsibilities, and I was told to spend days preparing for my Series 9 and 10 certifications.

- I complained about my job duties being stripped from me and Stifel's failure to put adequate measures in place to protect me from being exposed to Mr. Isler. I also filed an Amended Complaint in my active litigation against Stifel and Mr. Isler to include detailed claims with respect to Robert Codignotto's retaliation. In response, Stifel assigned me administrative busy work (rather than giving me my role back) and transferred me to a different location.

- In October 2021, I went out on maternity leave. When I returned from maternity leave on March 10, 2022, I was assigned a completely different set of job functions that do not relate to my initial role and assigned to a new supervisor.

- When I inquired with Ms. Gaffney about the changes to my role at Stifel, I was informed that I was placed in a "temporary role" and that the company had no idea what my permanent role or who my next supervisor will be.

235.   Ms. Olivieri also reiterated that the Company's continued failure to prevent unnecessary interaction between Ms. Olivieri and her harassers was causing her to experience severe distress.

236.   Stifel rejected Ms. Olivieri's pleas for help.  Through a series of emails, Ms. Roth intentionally avoided addressing Ms. Olivieri's concerns and proceeded to pressure Ms. Olivieri into having a verbal conversation with her.

237.   Ms. Olivieri made it explicitly clear to Ms. Roth that verbal discussions of the ongoing harassment and retaliation – which stemmed from Mr. Isler's sexual assault and harassment of her – would be traumatic for her and cause her to experience further distress and that she felt a lack of trust due to the onslaught of ongoing retaliation and mistreatment.  As such,

47

Ms. Olivieri reiterated her request that the Company accommodate her mental and emotional health needs by communicating about these topics in writing.

238.    As Ms. Olivieri suffers from diagnosed anxiety, she sought the accommodation of communicating in writing to avoid having her symptoms exacerbated during a verbal conversation with an employee of Stifel regarding matters that have been severely traumatizing for her.  Moreover, Ms. Olivieri was particularly concerned about the conversation causing her anxiety to flare up because of the lack of empathy that Ms. Roth and Ms. Gaffney had expressed during their exchanges about Ms. Olivieri's concerns of continuing retaliation and harassment.

239.    Ms. Roth ignored Ms. Olivieri's plea for her concerns to be addressed in writing and continued her attempt to bully Ms. Olivieri into a verbal conversation.  That is, rather than simply responding in writing as would have been both easy and respectful, Ms. Roth cast blame and derision at Ms. Olivieri for "refusing" to speak to her.  In doing so, Ms. Roth insulted Ms. Olivieri on the basis of her need for an accommodation and baselessly said her request was "unacceptable" and "unproductive" without explaining why she could not simply email with Ms. Olivieri regarding her concerns.

240.    Ms. Roth also further confirmed Ms. Gaffney's representations regarding Stifel's lack of a role for Ms. Olivieri by indicating that she "cannot determine the position to which [Ms. Olivieri] will be assigned and with whom [Ms. Olivieri] will be working with."

241.    Finally, Ms. Roth took it upon herself to revisit Stifel's previous retaliatory transfer of Ms. Olivieri's office location by claiming the Company "accommodated" Ms. Olivieri by forcing her to transfer locations – against Ms. Olivieri's objections – after she engaged in

additional protected activity and filed her Supplemental Complaint.  In doing so, Ms. Roth advanced a knowingly false excuse for one of Stifel's previous retaliatory acts.[3]

242.    As it was clear to Ms. Olivieri that Stifel's HR and ER were ignoring Ms. Olivieri's concerns and continuing to merely protect the Company, Ms. Olivieri requested that Stifel utilize outside investigators to look into her recent complaints of ongoing retaliation and hostile work environment.  Quite literally, Ms. Olivieri was being denied the rights Stifel guaranteed to her for a fair and impartial investigation of her complaints.  No investigation whatsoever had been or was being conducted, let alone anything done fairly or impartially.

243.    Unsurprisingly, as Stifel's HR has clearly operated with the intent of insulating the Company from liability and making Ms. Olivieri's environment at Stifel as unpleasant as possible after she filed this lawsuit, Ms. Roth rejected Ms. Olivieri's request for an independent and unbiased investigator – despite the fact that hiring an outside investigator is a common practice where obvious conflicts of interest are involved with a company investigating itself at the same time it is being sued by an employee.

244.    Ms. Roth's aggressive attempts to bully Ms. Olivieri into a verbal conversation persisted for nearly a month and through the exchanging of approximately 20 emails.

245.    Stifel's above responses (blatantly ignoring Ms. Olivieri's concerns, insulting Ms. Olivieri and attempting to corner her into a distressing meeting) to Ms. Olivieri's recent complaints of ongoing retaliation and hostile work environment caused Ms. Olivieri to experience a significant amount of additional anxiety and stress that required medical treatment.

---

[3]    As a result of Ms. Olivieri's previous representations to both Ms. Roth and Ms. Gaffney, Ms. Roth was aware that Stifel's transfer of Ms. Olivieri's office location was objected to by Ms. Olivieri and was not in any way related to an accommodation request.

246.    Moreover, it rendered Ms. Olivieri without access to legitimate HR channels to express her concerns of ongoing retaliation and harassment and caused Ms. Olivieri to be less likely to raise future concerns with the Company's HR and ER Departments.

247.    Since Ms. Olivieri's return from maternity leave on March 10, 2022, Defendants have continued their pattern of ignoring and/or untimely responding to Ms. Olivieri's correspondence and isolating Ms. Olivieri.

248.    By way of example, on May 23, 2022, Stifel held a mandatory semi-annual compliance meeting and failed to take adequate measures to include Ms. Olivieri.  At the scheduled time of the meeting, Ms. Olivieri joined the telephone number that was provided to her by Ms. Parrett.  Ms. Olivieri patiently waited for the meeting to begin.  After not hearing the meeting begin, Ms. Olivieri reached out to Ms. Parrett to inquire about the meeting.  Ms. Parrett looped in Ms. Scelta to address her concerns.  Ms. Scelta called Ms. Olivieri informed Ms. Olivieri that the meeting concluded, and that Defendants proceeded to hold the meeting without her.  Adding insult to injury, Ms. Scelta attempted to shift the blame to Ms. Olivieri by suggesting that she did not properly join the call.  As a result of Defendants' failure to include Ms. Olivieri in this meeting, Ms. Olivieri missed important information related to financial compliance.

249.    Similarly, Stifel has failed to communicate announcements to Ms. Olivieri regarding early dismissals that have regularly occurred throughout Ms. Olivieri's employment at Stifel.  As such, Ms. Olivieri's colleagues have been permitted to leave work at an earlier time, while Ms. Olivieri remains working.  Ms. Olivieri raised the Company's failure to communicate these announcements with Stifel's HR and requested that she simply be informed of the announcements moving forward.  Stifel – via Ms. Gaffney – declined Ms. Olivieri's request.  As

50

a result, Ms. Olivieri remains unaware of the early dismissals and is working more hours than her similarly situated colleagues.

250.     By way of another example of the Company's isolation of Ms. Olivieri, it took Ms. Scelta and Ms. McManus until July 2022 to address Ms. Olivieri's request for supplies and shipping labels that was made on March 29, 2022.

251.     As yet another example of retaliation and ongoing hostility, on July 8, 2022, Ms. Scelta reached out to Ms. Olivieri and informed her that Stifel unilaterally deducted Ms. Olivieri's PTO for the time period that Ms. Olivieri's accommodation request was processing.

252.     As noted above, Stifel's denial of pay to Ms. Olivieri was a retaliatory deviation from their normal practices, including with respect to Ms. Olivieri during a previous request.[4] Ms. Gaffney admitted that Stifel's deducting of PTO in Ms. Olivieri's circumstances was outside of the Company's ordinary practices: "Charging the PTO is not our normal practice in this type of situation."  Ms. Gaffney's support of the Company's efforts to engage in unwarranted withholding of Ms. Olivieri's pay was committed with the intent of furthering the Company's retaliation and harassment of Ms. Olivieri.

253.     As a result of Defendants' interference with Ms. Olivieri's PTO and failure to communicate company-wide announcements to Ms. Olivieri that resulted in her working longer hours than her colleagues, Ms. Olivieri made additional protected complaints regarding Stifel's ongoing harassment and retaliation, including complaints on July 21, 2022, August 2, 2022 and August 9, 2022.

---

[4]     As noted above, Ms. Scelta also previously interfered with Ms. Olivieri's PTO by requiring her to utilize PTO in 15-minute increments for brief periods away from her desk while Ms. Olivieri's colleagues were not required to do so.

51

254.    With respect to Ms. Olivieri's complaints that the Company was retaliatorily treating her differently with respect to PTO requirements, Ms. Gaffney admitted that the Company had previously not required Ms. Olivieri to utilize her PTO in such a manner, admitting on one occasion that, "I understand that you and others may have received such leniency in the past." Shockingly, Ms. Gaffney stated that Ms. Olivieri should reach out to Mr. Codignotto if she has "questions about [her] schedule." It's undeniable that Ms. Gaffney knew that interactions with Mr. Codignotto would cause severe distress and trauma to Ms. Olivieri from their previous communications and there was no genuine need to include him.

255.    Upon information and belief, Stifel has not modified its PTO practices with respect to any other employees besides Ms. Olivieri, including changing the "leniency" with which the PTO policies are applied to employees.

256.    Upon information and belief, Stifel has not informed any other employees that the Company's PTO practices were being modified. Notably, Ms. Gaffney refused to respond to Ms. Olivieri's numerous inquiries about whether or not the Company had communicated any changes in the PTO practices to any other employees besides Ms. Olivieri and if other employees were being subjected to a similar modification of Stifel's PTO practices.

257.    Over the course of several emails, Ms. Gaffney, once again, avoided addressing Ms. Olivieri's complaints of ongoing harassment and retaliation. While doing so, Ms. Gaffney *blamed her failure to address Ms. Olivieri's concerns on Ms. Olivieri,* for her medical need to communicate in writing. Due to previous correspondence, Ms. Gaffney was well aware that Ms. Olivieri had made the accommodation request to communicate in writing due to the severe anxiety and trauma that she would experience during verbal conversations about the harassment, retaliation and sexual assault she experienced at Stifel.

52

258.    Once again, the response by Stifel's HR Department has placed Ms. Olivieri in a position where she has no meaningful recourse for her complaints to be addressed.  Rather than addressing Ms. Olivieri's concerns in a reasonable manner, Stifel's HR has clearly attempted to stifle her complaints.  As such, unlike her other colleagues, Ms. Olivieri is left without access to any assistance by Stifel's HR Department.

259.    On August 9, 2022, Stifel admitted to Ms. Olivieri that they placed Ms. Olivieri in a Compliance Analyst role rather than her Client Services Associate role upon her return from maternity leave on March 10, 2022.

260.    On August 12, 2022, after bullying Ms. Olivieri in response to her request for an accommodation to communicate in writing for several months, Ms. Gaffney emailed Ms. Olivieri acknowledging Ms. Olivieri's accommodation request and requested that Ms. Olivieri and Ms. Olivieri's medical provider complete accommodation-related paperwork.

261.    Ms. Gaffney's communication demonstrates that Stifel was aware that Ms. Olivieri was making an accommodation request to communicate in writing based on her medical needs, which they intentionally ignored and attempted to subvert.[5]

262.    Despite intentionally ignoring Ms. Olivieri's accommodation request in the past, Ms. Gaffney stated that Ms. Olivieri's failure to provide the requested paperwork by August 27, 2022, would result in the "Stifel assum[ing] that the accommodation is no longer necessary."

263.    Despite HR's ability to easily communicate with Ms. Olivieri in writing, Ms. Gaffney stated that Stifel will not communicate with Ms. Olivieri in writing until Ms. Olivieri's accommodation paperwork is received by Stifel.  Moreover, Defendants have not provided any legitimate basis for rejecting Ms. Olivieri's accommodation request in the past.

[5]    As noted above, Stifel's HR – through communications from Ms. Olivieri to Mr. Anderson – was informed of Ms. Olivieri's medical need to communicate in writing as far back as November 2020.

264.    Upon information and belief, Stifel's HR does not require other employees to submit an accommodation request before agreeing to communicate in writing.

265.    Upon information and belief, Stifel's HR regularly and frequently communicates with other employees in writing.

266.    Ms. Gaffney assisted Stifel's efforts to circumvent Ms. Olivieri's accommodation request to communicate in writing and, as a result, caused Ms. Olivieri to experience further distress and trauma.

267.    To date, Ms. Olivieri remains employed at Stifel where Defendants continue to subject her to a campaign of retaliation and harassment.  Defendants' actions have caused and continue to cause Ms. Olivieri to experience severe emotional distress.

**FIRST CAUSE OF ACTION**
**(Gender Discrimination and Hostile Work Environment in Violation of Title VII)**
***Against Defendant Stifel***

147.268.    Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

148.269.    Defendant Stifel has discriminated against Plaintiff on the basis of her gender in violation of Title VII by, *inter alia*, subjecting her to a hostile work environment, retaliatory hostile work environment, and denying her the equal terms and conditions of employment because of her gender.

149.270.    As a direct and proximate result of Defendant Stifel's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

150.271.    As  a  direct  and  proximate  result  of  Defendant  Stifel's  unlawful

54

discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress for which she is entitled to an award of compensatory damages and other relief.

151.272.     Defendant Stifel's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Title VII)**
***Against Defendant Stifel***

152.273.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

153.274.     By the actions described above, Defendant Stifel retaliated against Plaintiff based on her protected activities in violation of Title VII.

154.275.     As a direct and proximate result of Defendant Stifel's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

155.276.     As a direct and proximate result of Defendant Stifel's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress for which she is entitled to an award of compensatory damages and other relief.

156.277.     Defendant Stifel's unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so

55

reckless as to amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**(Gender Discrimination and Hostile Work Environment in Violation of the NYSHRL)**
***Against All Defendants***

~~157.~~278.      Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

~~158.~~279.      Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by, *inter alia*, subjecting her to a hostile work environment, retaliatory hostile work environment, and denying her the equal terms and conditions of employment because of her gender.

~~159.~~280.      As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

~~160.~~281.      As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress for which she is entitled to an award of damages.

~~161.~~282.      Defendants' unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYSHRL)**
***Against All Defendants***

56

162.283.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

163.284.    Defendants have retaliated against Plaintiff on the basis of her protected complaints by, *inter alia*, engaging in conduct reasonably likely to dissuade and/or deter Plaintiff and others from engaging in protected acts.

164.285.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

165.286.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress for which she is entitled to an award of damages.

166.287.    Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**(Aiding and Abetting Discrimination and Retaliation in Violation of the NYSHRL)**
*Against Defendant Neil IslerIndividual Defendants*

167.288.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

168.289.    Defendant IslerIndividual Defendants knowingly or recklessly aided and abetted the unlawful employment practices, including discrimination and retaliation, against Plaintiff in violation of the NYSHRL.

169.290.   As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

170.291.   As a direct and proximate result, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress for which she is entitled to an award of damages.

171.292.   Defendant Isler'sIndividual Defendants' unlawful discriminatory and retaliatory actions constitute malicious, willful and wanton violations of NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enters judgment in her favor and against Defendants for the following relief:

A.   A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B.   An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

C.   An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D.   An award of punitive damages in an amount to be determined at trial;

E.   Prejudgment interest on all amounts due;

F.   An award of Plaintiff's reasonable attorneys' fees and costs; and

**Formatted:** No widow/orphan control

G.   Such other and further relief as the Court may deem just and proper.

58

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  August 15, 2022
  New York, New York                            Respectfully submitted,

                              **WIGDOR LLP**

                              By:

                              David E. Gottlieb

                              Alfredo J. Pelicci

                              85 Fifth Avenue
                              New York, NY 10003
                              Telephone: (212) 257-6800
                              Facsimile: (212) 257-6845
                              dgottlieb@wigdorlaw.com
                              apelicci@wigdorlaw.com

                              *Counsel for Plaintiff*

59